Roza Crawford (SBN 222380)
Daniel A. Crawford (SBN 187807)
CRAWFORD LAW GROUP
15303 Ventura Blvd., 9th Floor
Sherman Oaks, California 91403
Tel: (818) 935-6568
dac@crawfordlawgroup.com

Attorneys for Plaintiffs,
PACIFIC GREEN, LLC; and,
BIG TREE HOLDINGS, LLC

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## Western Division

PACIFIC GREEN, LLC, a Delaware limited liability company; and BIG TREE HOLDINGS, LLC, a Delaware limited liability company,

Plaintiffs,

v.

PAUL FIORE, an individual;
JAY RIFKIN, an individual;
ALEX REYTER, an individual;
ONE ELEVEN ADVISORS, LLC, a California limited liability company;
REBEL HOLDINGS, LLC, a California limited liability company;
TUDOR CAPITAL, LLC, a Delaware limited liability company;
HILLS GROUP, LLC, a California limited liability company;
and DOES 1 through 100, inclusive,

Defendants,

and,

HILLS ONE, LLC, a Delaware limited liability company;

Nominal Defendant.

CASE NO. 2:22−cv−08949

***FOURTH AMENDED* COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF BASED ON:**

1. **FRAUD AND DECEIT;**
2. **NEGLIGENT MISREPRESENTATION;**
3. **CIVIL RICO VIOLATION (18 U.S.C. §§ 1961, *et seq.*);**
4. **FRAUDULENT INDUCEMENT TO ENTER INTO CONTRACT;**
5. **BREACH OF CONTRACT;**
6. **NEGLIGENCE (DERIVATIVE CLAIM);**
7. **CONVERSION; and,**
8. **AIDING AND ABETTING TORTS**

**JURY TRIAL DEMANDED**

1

***FOURTH AMENDED* COMPLAINT**

Plaintiffs PACIFIC GREEN, LLC ("PACIFIC GREEN"), and BIG TREE HOLDINGS, LLC ("BIG TREE HOLDINGS"), for themselves and derivatively on behalf of nominal defendant HILLS ONE, LLC, hereby allege as follows:

### GENERAL ALLEGATIONS

**Parties and Jurisdiction:**

1.      Plaintiff PACIFIC GREEN is a limited liability company organized and existing under the laws of the State of Delaware.  The manager of PACIFIC GREEN is Jacob Stein.

2.      Plaintiff BIG TREE HOLDINGS is a limited liability company organized and existing under the laws of the State of Delaware.  The manager of BIG TREE HOLDINGS is Jacob Stein.

3.      Defendant HILLS GROUP, LLC ("HILLS GROUP"), is a limited liability company organized and existing under the laws of the State of California.  HILLS GROUP remains active and qualified to conduct business in California.  At all times relevant, the managers of HILLS GROUP were Defendants PAUL FIORE, JAY RIFKIN and ALEX REYTER.

4.      Defendant HILLS ONE, LLC ("HILLS ONE"), is a limited liability company organized and existing under the laws of the State of Delaware.  HILLS ONE remains active and qualified to conduct business in California.  At all times relevant, the manager of HILLS ONE was HILLS GROUP, and the beneficial owners and designated "Management Team" of HILLS ONE comprised Defendants PAUL FIORE, JAY RIFKIN and ALEX REYTER.

5.      Defendant PAUL FIORE is an individual resident of the State of California.

6.      Defendant JAY RIFKIN is an individual resident of the State of California.

7.      Defendant ALEX REYTER is an individual resident of the State of California.

8.      Defendant ONE ELEVEN ADVISORS, LLC ("ONE ELEVEN ADVISORS"), is a California limited liability company managed and owned by Defendant PAUL FIORE.  ONE ELEVEN ADVISORS is a member and one-third owner of HILLS

GROUP.  ONE ELEVEN ADVISORS, at the direction of FIORE, may have directed the actions of HILLS GROUP as alleged herein.

9.      Plaintiffs are not aware of the internal operations of ONE ELEVEN ADVISORS, or the corporation's exact role in Defendants' fraudulent enterprise alleged herein.  However, Plaintiffs believe and allege that ONE ELEVEN ADVISORS, under the management and operation of Defendant FIORE, was a participant in and beneficiary of Defendants' enterprise.  Also, Plaintiffs are not aware of the exact relationship between the corporation and Defendant FIORE, and some conduct herein attributed to FIORE may actually have been conduct of ONE ELEVEN ADVISORS, subject to proof at trial.

10.     Defendant REBEL HOLDINGS, LLC ("REBEL HOLDINGS"), is a California limited liability company managed and owned by Defendant JAY RIFKIN.  REBEL HOLDINGS is a member and one-third owner of HILLS GROUP.  REBEL HOLDINGS, at the direction of RIFKIN, may have directed the actions of HILLS GROUP as alleged herein.

11.     Plaintiffs are not aware of the internal operations of REBEL HOLDINGS, or its exact role in Defendants' fraudulent enterprise alleged herein.  However, Plaintiffs believe and allege that REBEL HOLDINGS, under the management and operation of Defendant RIFKIN, was a participant in and beneficiary of Defendants' enterprise.  Also, Plaintiffs are not aware of the exact relationship between the corporation and Defendant RIFKIN, and some conduct herein attributed to RIFKIN may actually have been conduct of REBEL HOLDINGS, subject to proof at trial.

12.     Defendant TUDOR CAPITAL, LLC ("TUDOR CAPITAL"), is a Delaware limited liability company managed and owned by Defendant ALEX REYTER.  TUDOR CAPITAL is a member and one-third owner of HILLS GROUP.  TUDOR CAPITAL, at the direction of REYTER, may have directed the actions of HILLS GROUP as alleged herein.

*FOURTH AMENDED* COMPLAINT

13.    Plaintiffs are not aware of the internal operations of TUDOR CAPITAL, or its exact role in Defendants' fraudulent enterprise alleged herein.  However, Plaintiffs believe and allege that TUDOR CAPITAL, under the management and operation of Defendant REYTER, was a participant in and beneficiary of Defendants' enterprise.  Also, Plaintiffs are not aware of the exact relationship between the corporation and Defendant REYTER, and some conduct herein attributed to REYTER may actually have been conduct of TUDOR CAPITAL, subject to proof at trial.

14.    Plaintiffs are ignorant of the true names and capacities, whether individual, corporate, or otherwise, of the fictitiously named defendants designated as DOES 1 through 100, inclusive.  Plaintiffs are informed and believe, and thereon allege, that each fictitiously named defendant was in some way responsible for, participated in, contributed to or ratified the matters and things complained of herein, and is legally responsible for the damages complained of herein.  Plaintiffs will seek leave to amend this pleading to allege the true identities and capacities of such fictitiously named defendants when that information is learned.

15.    Plaintiffs are informed and believe, and thereon allege, that at all times herein mentioned each of the defendants, including each of the unidentified and fictitiously named defendants, was the agent, principal, employer or employee of each other defendant, and they were acting within the course and scope of such relationship in doing the things herein alleged, or they ratified, acquiesced in, consented to or approved each and all of the acts of each of the other defendants, so that each defendant is jointly and severally responsible and liable for the acts alleged herein.

16.    The contract-based claims asserted herein arise from a written contract between Plaintiffs, Defendant HILLS GROUP and Defendant HILLS ONE, entitled "Limited Liability Company Agreement, Hills One, LLC" (the "Hills One Agreement").  All pre-filing requirements are fulfilled and all parties to that agreement have waived any right to have their disputes resolved in a non-judicial forum or by a factfinder other than a jury.

**Factual Background:**

17.     In the second half of 2017, Defendants PAUL FIORE, JAY RIFKIN and ALEX REYTER (collectively the "Principals") began work on an enterprise to raise money from a range of individual and institutional sources.  The money they raised ostensibly would be used to start a business to manufacture and market products throughout the United States featuring CBD (cannabidiol), a derivative of the cannabis plant which was not prohibited under federal law.

18.     When the Principals started their enterprise, they believed there was a 'gold rush' of investment money pouring into the cannabis and CBD industries, and they wanted some of it.  They may have intended to be successful in the business.  However, they knew from the beginning that they did not have the experience, connections or other resources to succeed in the cannabis or CBD industries.  At all times, the Principals intended to generate excitement and exploit the confidence of potential investors and financial backers to raise money, using unfounded exaggeration and outright falsehoods if necessary to do so.  The Principals planned that they would learn about the CBD/cannabis industry as they raised money and built the business.  The Principals also agreed that if they raised enough money, learned about the CBD industry, and were able to create a successful business, then no investor or financial contributor would ever question the Principals' early statements, and the Principals' fraudulent enterprise scheme would never be discovered.

19.     Because none of the Principals had relevant experience, expertise or connections with either the CBD or the cannabis industries, the Principals agreed to represent themselves falsely to potential investors and financial backers as being highly experienced and well connected in the CBD/cannabis industry, well financed, and competent and capable of growing and operating a profitable business in the CBD/cannabis industry.  The Principals did that to gain and exploit the confidence of potential investors and financial backers, so they then would contribute money to the Principals' enterprise.

20.     Because the Principals wanted a vehicle for their enterprise separate from themselves, and to give potential investors further confidence in their fraudulent scheme, the Principals organized HILLS GROUP and HILLS ONE.  The Articles of Organization for HILLS GROUP were filed with the California Secretary of State on about January 11, 2018.  HILLS ONE was formed in the State of Delaware on about March 29, 2018.  Thereafter, some of the Principals' conduct (but not all) was with, through and/or on behalf of HILLS GROUP and/or HILLS ONE.

21.     Plaintiffs do not have direct knowledge or information about all the internal operations of HILLS GROUP or HILLS ONE, or the Defendants' enterprise, or about the particular facts of all of Defendants' wrongdoing.

22.     Ultimately, by about Spring of 2020, Defendants had dropped any remaining pretense with Plaintiffs that they were qualified to organize or operate the business they had represented to Plaintiffs and others.  Plaintiffs are informed and believe, and thereon allege, that as of this time the business has little or no assets left.

**Targeting Jacob Stein and his Associated Financial Sources.**

23.     Each action in furtherance of the Defendants' enterprise to raise money was undertaken with the knowledge and consent, or the ratification, of all Defendants, even when the actual conduct was undertaken by fewer than all of them.

24.     As the designated representative of all three Principals (in both their individual roles and their roles as managers of HILLS GROUP and HILLS ONE), starting in about January and early February 2018, Mr. Reyter began speaking with Jacob Stein about HILLS GROUP and the Principals' ostensible plan to develop a business in the cannabis/CBD industry.

25.     The Principals targeted Mr. Stein as one potential source of money for their enterprise based on what they knew about his access to funds and his potential to influence other financial backers.  The Principals knew that Mr. Stein was a potential financial backer for the enterprise, and that he had access to and relationships with other potential financial backers.  The Principals intended for Mr. Stein to rely on the

*FOURTH AMENDED* COMPLAINT

1   information they would provide to him, and to pass that information on to financial

2   backers, and the Principals intended for those other financial backers to rely on the

3   information they would provide to Mr. Stein to make the decision about whether or not

4   to deliver money to the Principals and their enterprise.

5   26.     The Principals also believed that Mr. Stein was a perfect target for their

6   enterprise because Mr. Reyter already had Mr. Stein's confidence.  The two were

7   personally familiar with each other from previous transactions and Mr. Reyter was a

8   former client of Mr. Stein.  The Principals believed and agreed Mr. Reyter could use

9   his influence over Mr. Stein, and the trust and confidence Mr. Stein placed in Mr.

10  Reyter, to convince him to contribute money to Defendants' enterprise.  The Principals

11  also believed Mr. Reyter could convince Mr. Stein to influence other people or entities

12  who trusted and relied on Mr. Stein to contribute money to the enterprise.

13  27.     When Mr. Reyter spoke to Mr. Stein in or about January and early February

14  2018, Mr. Reyter told Mr. Stein that HILLS GROUP was well positioned to be a

15  leader in the emerging industry of CBD products based on the connections and

16  experience of the management team, which was to consist of the Principals.  The

17  Principals were holding themselves out then, and continued to hold themselves out, as

18  highly experienced entrepreneurs with expertise in raising capital, and in organizing

19  and operating start-up businesses.  Mr. Reyter told Mr. Stein that the Principals were

20  highly experienced in the cannabis industry, that they were exploring possible growing

21  and manufacturing facilities in Oregon and other states, that they were positioned and

22  planning to market and conduct business throughout the United States, and that several

23  prominent investors were either already involved or highly interested in the venture.

24  Mr. Reyter presented those representations about the status of HILLS GROUP (not the

25  projections for future success) to Mr. Stein as current facts and not mere aspirations or

26  possibilities.  None of those facts were true, and neither Mr. Stein nor Plaintiffs knew

27  that.

28

*FOURTH AMENDED* COMPLAINT

28.    On about February 4, 2018, Mr. Reyter sent an email to Mr. Stein on behalf of the Principals.  In that email Mr. Reyter represented to Mr. Stein that HILLS GROUP was "in the process of deploying around $20M in various cannabis verticals.  Some projects are cash flowing…I also have a robust investor base."

29.    Defendants never had anywhere close to $20 million in capital or capital commitments for the venture, and HILLS GROUP had almost no capital at that time.  The Principals made those representations, knowing the statements were false, in order to increase Mr. Stein's confidence and excitement in their purported business so that he would contribute to Defendants' enterprise and persuade other potential financial backers to contribute.  None of those facts were true, and neither Mr. Stein nor Plaintiffs knew that.

30.    The Principals confirmed the statements to Mr. Stein in conversations around the same time.  Acting as the designated representative of all three Principals, Mr. Reyter met with Mr. Stein at his office in Encino, California, on about February 14, 2018, to discuss the proposed business, including the statements in the February 4 email.  Messrs. Fiore and Rifkin were not at that meeting, but they knew about it and endorsed it, and later ratified Mr. Reyter's message.

31.    The true facts were that there had been no investment in HILLS GROUP at that time, either by the Principals or by third parties.  Mr. Stein's entities, Plaintiffs, eventually would become just the second financial backers in HILLS GROUP, and they would contribute the most money by far.  Neither Mr. Stein nor Plaintiffs knew that.

32.    HILLS GROUP held interests in several related companies which it designated "Strategic Partners."  However, the total value of all of HILLS GROUP's purported "Strategic Partner" companies and ventures at that time was less than $1 million, and none of those were generating net revenue.  Neither Mr. Stein nor Plaintiffs knew that.

33.    Defendants created various publications touting HILLS GROUP and the ostensible plan to develop a business for CBD products.  Those publications were sent

to Mr. Stein and other potential financial backers via email.  As part of their scheme to lure Mr. Stein and his clients to contribute to the plan, Defendants involved Mr. Stein in the process of writing and editing some of the publications (based on substantive information that Defendants provided).  Defendants did that to coopt Mr. Stein and his good reputation, and to add greater credibility to their fundraising enterprise.  By coopting Mr. Stein as their first victim, the con was truly on.

**"Hemp and Cannabis Investment Opportunities Fund" Brochure.**

34.    On about February 26, 2018, Defendants published a document entitled "Hemp and Cannabis Investment Opportunities Fund" ("HCIOF").  The HCIOF is styled as a business plan or business summary for HILLS GROUP.  As set forth in the HCIOF, HILLS GROUP was to operate as "a highly focused hemp and cannabis venture fund with existing strategic portfolio holdings" to 'disrupt' the CBD/cannabis industry throughout the United States.  All three of the Principals contributed to writing the HCIOF and approved its content.

35.    The primary purpose of the HCIOF was to raise capital for Defendants' enterprise by inspiring confidence and excitement with unsupported, overly-optimistic projections and patently false representations about the company and the Principals. Defendants sent it to potential financial backers over the internet for that purpose.

36.    Defendants sent the HCIOF to Mr. Stein via email on about March 7, 2018.

37.    On about March 9, 2018, all three of the Principals, Messrs. Fiore, Rifkin and Reyter, met with Mr. Stein at his office to discuss their planned business.  During that meeting, among other things, they discussed the HCIOF, and the Principals confirmed the facts and representations in the HCIOF to Mr. Stein.  The Principals also repeated the representations they had made to Mr. Stein in the February 4 email and afterward about a "robust investor base" which did not actually exist (although neither Mr. Stein nor Plaintiffs knew that).

38.    Some of the information and statements in the HCIOF were false.  For example, page 2 of the HCIOF states: "Strategic Partner Companies.  HILLS GROUP has

formed partnerships with or invested capital to take ownership stakes in various related businesses that provide strategic value to portfolio companies." The businesses listed as Strategic Partner Companies included: Oregon-based New Earth Biosciences; Washington-based POSaBIT; 3C Solutions; Live Love Chill; Caseus Group; Double Beam; Digital Insight; Medpath; Ocean View Media; and CU Wallet. The true facts were that HILLS GROUP had not formed contractual relationships with, or invested capital in, any of those companies. The Principals may have had personal relationships, contracts, or investments with some of those companies, but no part of the business or ownership of any of those companies was dedicated to or actually held by HILLS GROUP, as the HCIOF states.

39.     Neither Mr. Stein nor Plaintiffs knew that the information in the HCIOF was false.

40.     Page 2 of the HCIOF also lists two entities, Skyline Brands and NatureRx as "Portfolio Companies" in which HILLS GROUP held interests, which was true. However, the value of those companies, and of HILLS GROUP's interest in them was intentionally exaggerated as a part of the Defendants' continued effort to gain and exploit the confidence of Mr. Stein and other financial backers. Page 12 of the HCIOF states that as of February 2018, the valuation of Skyline Brands was $8.75 million, and the valuation of NatureRx was $1.25 million. The HCIOF states that the value of HILLS GROUP's interests in those companies was $4,812,500 and $1,062,000, respectively. However, those valuations were grossly exaggerated based on what Defendants knew about Skyline Brands and NatureRx at that time. Neither Mr. Stein nor Plaintiffs knew that.

41.     The true facts were that as of February 2018, Skyline Brands and NatureRx were holding companies. Skyline Brands, located in Oregon, had no products, employees, sales contracts, or revenue sources. NatureRx also had no products or contracts, and no sales. Because of those facts, the actual value of those "Portfolio Companies" was limited to their existing assets at that time. Skyline Brands had slightly more than

1  $500,000 in equipment, less than $200,000 cash on hand, and no other significant
2  assets.  NatureRx had nothing apart from its inventory on hand, which had a booked
3  value of no more than $10,000.  Thus, the true value of HILLS GROUP's interest in
4  both companies at that time reasonably was less than $400,000.  Neither Mr. Stein nor
5  Plaintiffs knew that.

6  42.     Defendants knew or should have known that the valuations for Skyline Brands
7  and Nature Rx stated in the HCIOF were grossly exaggerated and false.  Neither Mr.
8  Stein nor Plaintiffs knew that.  Plaintiffs are informed and believe, and thereon allege,
9  that there were no actual valuations of those companies when Defendants made those
10 statements.  Also, Defendants knew or should have known the true valuation of
11 Skyline Brands and NatureRx if they had conducted a reasonable investigation into
12 those companies.

13 43.     Page 6 of the HCIOF states: "As a group, the General Partners have contributed
14 $3M in Initial Capital to seed the fund and make [sic] begin making portfolio
15 investments and launch new ventures… The founding General Partners [sic] Initial
16 Capital investment of $3M into Hills Group is equivalent in distribution to Limited
17 Partner contributed capital."  Page 9 of the HCIOF states: "Hills Group founders and
18 executives (General Partners) expect to contribute approximately $5M to form Hills
19 Group Fund 1…" before December 31, 2018.  Those statements were false.  Neither
20 Mr. Stein nor Plaintiffs knew that.

21 44.     The General Partners were identified in the HCIOF, pages 8-9, as Sidney Cobos,
22 Paul Fiore, Jay Rifkin and Alex Reyter.  The true facts were that none of those
23 individuals had made any capital investments into HILLS GROUP by the time the
24 HCIOF was published and presented to Mr. Stein and other potential financial backers
25 and none of those individuals made capital investments into HILLS GROUP at any
26 time.  Sidney Cobos never actually became a General Partner or member of HILLS
27 GROUP at any time.  Neither Mr. Stein nor Plaintiffs knew that.

28

45.     None of these statements or figures in the HCIOF were represented as projections or expectations, but as representations of fact about the current status and assets of HILLS GROUP.

46.     When Defendants wrote and published the HCIOF, they hoped and expected that potential financial backers who read the HCIOF, including Mr. Stein and any other backers he might bring, would accept the statements in the HCIOF as true, and rely on those statements to contribute to the enterprise.

47.     When Defendants wrote and published the HCIOF, they knew the statements were false or grossly exaggerated.  The Principals intentionally exaggerated the amount of current investments to generate more interest, to gain the confidence of Mr. Stein and other investors, and to coopt Mr. Stein to raise money on behalf of their enterprise.  All the Principals knew the true facts about HILLS GROUP relative to the statements in the HCIOF, as alleged herein.  The Principals knew they had not invested $3 million of capital personally into HILLS GROUP, and that they did not have a plan to invest $5 million later in 2018.  The Principals knew that HILLS GROUP did not have any partnerships or investments with any of the "Strategic Partner Companies."  They also knew that the valuations of the "Portfolio Companies" and of HILLS GROUP's ownership interests in them, were much lower than the amounts stated in the HCIOF.  Neither Mr. Stein nor Plaintiffs knew that.

**March 2018 Deck.**

48.     In about March 2018, the Principals created a document entitled "Hills Group March 15, 2018" (the "March 2018 Deck").  It was conceived and designed as a "pitch deck" or "investor deck" to be distributed to potential financial contributors to solicit capital contributions for the Principals' enterprise.  All three of the Principals contributed to writing the March 2018 Deck and approved its content.

49.     The primary purpose of the March 2018 Deck was to raise capital for Defendants' enterprise and they sent it to potential contributors over the internet for that purpose.

50.     Defendants sent the March 2018 Deck to Mr. Stein via email on about March 15, 2018, with the intention that he would distribute it to his clients and prospective financial backers.

51.     The Principals continued targeting Mr. Stein with the March 2018 Deck for the same reasons they had initially targeted him and sent him the HCIOF: because of his access to capital and his preexisting relationship of trust, confidence and goodwill with Mr. Reyter.  The Principals agreed that if they could trick Mr. Stein to invest in their enterprise, it would be easier to trick others.

52.     The March 2018 Deck, like the HCIOF, again included false material statements.  For example, on page 7, the deck states that the management team has "deep expertise" in the cannabis industry, among other areas.  In fact, none of the actual members of the HILLS GROUP management team had any significant expertise with the cannabis industry.  Neither Mr. Stein nor Plaintiffs knew that.

53.     On page 14, the March 2018 Deck lists Sean Stockmeyer and Matt Clute as members of HILLS GROUP's "Top Tier Executive Team."  Both of them did have some experience in the cannabis industry, but neither was ever actually part of the HILLS GROUP management.  Neither Mr. Stein nor Plaintiffs knew that.  The Principals listed Messrs. Stockmeyer and Clute as members of the management team to make HILLS GROUP more attractive to potential financial backers.  The Principals knew none of them had experience in the cannabis industry, and yet they represented that the deep industry experience of HILLS GROUP's management would give it a competitive advantage.  The Principals listed Mr. Stockmeyer and Mr. Clute on the management team, even though they were not part of the management team, to be able to convince potential financial backers, including Mr. Stein, that HILLS GROUP and its business would be a good business opportunity.

54.     The March 2018 Deck includes several disclaimers, noting that "forward looking statements" are projections involving risk, and that any statements regarding tax consequences of any investment "should not be relied upon."  However, there are

no disclaimers or qualifications about the accuracy of the statements about HILLS GROUP's management, assets, or valuation. Those statements in the March 2018 Deck are all presented as statements of fact about the current status and not as forward-looking statements.

55.     When the Principals wrote and published the March 2018 Deck, they again hoped and expected that potential financial backers who read that document, including Mr. Stein and any other backers he might bring, would accept the statements as true, and rely on those statements to join and contribute to Defendants' ostensible business.

56.     The Principals knew that statements in the March 2018 Deck were untrue. For example, they knew that neither Sean Stockmeyer nor Matt Clute was on the HILLS GROUP's management team, and they knew that no other members of the management team had any significant experience with the cannabis industry.

### April 2018 Company Valuation.

57.     In about April 2018, the Principals created a document entitled "Hills Group LLC, April 8, 2018, Company Valuation Summary" (the "April 2018 Valuation"). All three of the Principals contributed to the creation of that document and approved its contents.

58.     Defendants sent the April 2018 Valuation to Jacob Stein by email on about April 8, 2018.

59.     The purpose of the April 2018 Valuation, like the purpose of the HCIOF, the March 2018 Deck, and all the publications created by the Principals, was to solicit monetary contributions for the enterprise. Plaintiffs believe that particular document was created primarily for Mr. Stein and his clients and possible investors.

60.     The April 2018 Valuation consisted mostly of projections for HILLS GROUP and its portfolio companies, Skyline Brands and NatureRx. Those figures were labeled as projections or forecasts involving risk, not as certainties or historical data.

61.     However, the April 2018 Valuation included express statements of material fact which were false. For example, in that document the Principals represented that

Skyline Brands had cash on hand of $1.1 million, and extraction and other equipment valued at $3.4 million.  The true facts were that Skyline Brands began the month of April 2018 with only $17,490 cash on hand and ended the month with $21,576.83.  Additionally, as of the end of April 2018, Skyline Brands had equipment valued at only about $660,089, which was part of about $810,740 in total for fixed assets.  Neither Mr. Stein nor Plaintiffs knew that.

62.     In the April 2018 Valuation, the Principals also expressly represent that HILLS GROUP had "sales contracts, preorders and receivables."  In fact, at that time HILLS GROUP did not have preorders or significant receivables.  Neither Mr. Stein nor Plaintiffs knew that.

63.     The Principals believed that the April 2018 Valuation was critical to convincing Mr. Stein to bring his clients and financial backers into their enterprise.  The numbers and statements in the "Asset Valuation Summary" were specific and were used to show that HILLS GROUP was ready to operate and to be very successful.  From their discussions with Mr. Stein after he received the April 2018 Valuation, the Principals all understood that Mr. Stein believed those statements and numbers were true, and that he was relying on that information to be accurate.

64.     In fact, the Principals believed they needed at least $5 million for equipment and operational expenditures, which meant that HILLS GROUP was not able to begin any of its planned or represented operations at that time.

**Draft Investment Term Sheet.**

65.     By about mid-April 2018, the Principals had persuaded Jacob Stein to begin negotiating the terms of payments to the enterprise, in the form of investment by Plaintiffs PACIFIC GREEN and BIG TREE HOLDINGS into HILLS GROUP and its business.

66.     All three of the Principals met in person with Mr. Stein at HILLS GROUP's office in Encino on about April 16, 2018, to try to finalize the broad terms of those payments and the equity investment.  Shortly after that meeting and still on about April

*FOURTH AMENDED* **COMPLAINT**

16, 2018, the Principals emailed to Mr. Stein a document entitled "Draft Investment Term Sheet." All three of the Principals contributed to the creation of that document and approved its contents, and were aware it was sent to Mr. Stein.

67.     That document contained a summary of the deal points the Principals had discussed with Mr. Stein for the partnership, which was to be accomplished by Plaintiffs joining HILLS ONE as members.

68.     The Draft Investment Term Sheet also stated that HILLS GROUP would contribute at least $1 million to the HILLS ONE partnership. At that point, HILLS GROUP did not have access to $1 million to contribute, and the Principals knew that. In fact, that contribution was never made by the Principals. Neither Mr. Stein nor Plaintiffs knew those facts.

69.     In that same period, the Principals had other discussions or meetings with Mr. Stein about HILLS GROUP, the proposed equity investment, and various details of assets, management and operations, and projections based on their representations.

70.     Mr. Stein made it clear to the Principals, both in their April 16 meeting and subsequently, just as he had in prior meetings and conversations with any of the Principals, that his willingness to bring financial backers into the HILLS GROUP enterprise, and to commit the amount of money they were discussing, was based on the truth of what the Principals had told him and represented to him in writing about the assets and cash-on-hand to operate the business.

71.     Mr. Stein also made clear to the Principals in those meetings and conversations that the qualifications and roles of the HILLS GROUP management team (as the Principals had represented to him) were critical elements to his decision to contribute to the enterprise. For example, in an email dated April 20, 2018, Mr. Stein wrote: "We are investing primarily in the executive team. We need to make sure that each of you (Alex, Paul and Jay) work on this project full time and do not engage in other projects (cannabis or otherwise) on the side." Mr. Reyter confirmed to Mr. Stein what the

Principals had represented to him previously, writing back on April 20, 2018: "Agreed subject to carving our pre-existing obligations and engagements."

72.     The Principals had represented to Mr. Stein that their "pre-existing obligations and engagements" were minimal and that they would each commit their full-time attention and resources to the venture.  The true facts were that as of April 2018, Mr. Fiore was actively involved in at least two additional separate start-up companies which required significant time and attention from him, which he never disclosed to Mr. Stein.  For one of those, called e-Pallet, Mr. Fiore was the lead investor and an active board member, and later became the President, while according to the Principals' representations he was supposed to be working full time to start HILLS GROUP's business.  Similarly, Mr. Rifkin was actively involved in multiple start-up and established ventures as of April 2018.  He was also active in the entertainment industry and in real estate.  Collectively, those commitments required essentially his full-time attention.  Mr. Stein did not know how much work time Messrs. Fiore and Rifkin were spending, and would continue to spend, on their other business ventures, and he relied on their representations that those time commitments were minimal.

73.     The Principals also made some specific representations to Jacob Stein in that period about other current or imminent investors in HILLS GROUP.  They specifically represented that Charles Walgreen, a scion of the founding family of the Walgreen's drugstore chain, was bidding against Mr. Stein to invest.  They also specifically represented that Marty Rifkin, Mr. Rifkin's brother, was highly interested to become an investor with valuable industry connections.  The Principals also specifically represented that Sidney Cobos, who is another qualified investor, had committed to provide funds although he had not.  The Principals also specifically confirmed that they had already invested over a million dollars into the enterprise and were poised to invest several million dollars more.  The Principals assured Mr. Stein that HILLS GROUP or its strategic partners controlled sufficient equipment and product to commence operations, although they did not. The Principals made the representations

about other investors and their own forthcoming investment to gain credibility for their enterprise and to maintain Mr. Stein's interest, while knowing that no other investments or payments were forthcoming either from outside sources or from the Principals.  Neither Mr. Stein nor Plaintiffs knew those representations were untrue.

74.    By May 2018, the three Principals had decided that manufacturing cannabis-derivative products containing CBD would be the center of the business and they would attempt to build it up from there.  They had established a 'ballpark' figure of $5 million to commence operations, including the costs to acquire equipment, to lease and build out a facility, and a financial buffer for contingencies, which they communicated to Mr. Stein.

75.    Also, in May 2018, an entity called Freedom House, LLC ("Freedom House" fka "Provision Limited"), contributed $1 million to the enterprise, in the form of a payment to Skyline.

76.    Based on their 'ballpark' estimate of $5 million, the Principals knew the $1 million contribution by Freedom House was not sufficient to commence operations. Because the Principals had not been able to find any other funding sources for their enterprise, the eventual contributions from Plaintiffs were critical to allow them to launch operations.

77.    By email dated June 10, 2018, Mr. Stein informed Mr. Reyter that he had a prospective investor, and that he was "trying to push him over the edge."  Mr. Stein wrote: "Can you please put together a one-page on the proposed merger with the Adalante producer, how that will benefit Hills, what their financials look like and how it will change the overall project to make it super-lucrative.  I may be able to use it on this investor and also some other prospects."

78.    Mr. Stein sent another email dated June 11, 2018, with inquiries he received from another potential investor, asking about some specific representations made in the HILLS GROUP publications.

79.     The June 10 and 11, 2018, emails and other communications from Mr. Stein verified to the Principals that Mr. Stein was relying on their representations in reaching his decision about making financial contributions for himself and for his associated investors.

80.     On about June 18, 2018, Mr. Stein traveled to Oregon for a day to see the processing facility that the Principals had represented HILLS GROUP to be controlling or operating, and to view the industrial space that the Principals represented they would be leasing for the HILLS GROUP operations.  Mr. Reyter met with Mr. Stein that day on behalf of the Principals.

81.     Both before and after that trip by Mr. Stein, the Principals represented to him that HILLS GROUP had a controlling ownership stake in the facility when it actually did not, and never acquired such an interest, and HILLS GROUP never leased the industrial space that Mr. Stein toured.  The tour of the third-party processing facility and the industrial space was intended to portray HILLS GROUP as a viable and credible investment, and was part of the Principals' confidence game.  Neither Mr. Stein nor Plaintiffs knew those facts.

**July 2018 Investor Deck.**

82.     On about July 3, 2018, the Principals published a document entitled "Hills Group July 2018" (the "July 2018 Deck").  All the Principals contributed to the creation of that document and approved its contents.

83.     The Principals sent the July 2018 Deck to Mr. Stein by email on about July 3, 2018.

84.     Like the March 2018 Deck and other HILLS GROUP publications before it, the July 2018 Deck was conceived and designed as another "investor deck" to be distributed to Mr. Stein and other potential victims to solicit capital through the Principals' enterprise.  By the time the July 2018 Deck was published, the Principals believed they were very close to securing a payment from Mr. Stein through his

1  entities, and they were using the new deck as part of their effort to get that final

2  commitment and a payment from him.

3  85.    The July 2018 Deck repeated many of the misrepresentations, distortions, and

4  falsehoods of the previous HILLS GROUP publications.  The new deck also included

5  some new false information.  All those statements were again presented as facts which

6  the Principals expected prospective investors to rely upon.

7  86.    The July 2018 Deck again falsely stated that HILLS GROUP's management had

8  cannabis industry expertise (page 6) when, in fact, none of the actual managers had

9  such experience.

10  87.    The July 2018 Deck also misrepresented that HILLS GROUP's managers

11  worked "hands-on" and "full-time" managing the company (pages 6-7), and that they

12  had invested their own capital into HILLS GROUP (page 7).   Those statements were

13  still untrue in July 2018, as they had been in April 2018.  In fact, Mr. Fiore had

14  significant other commitments on his time then, and Mr. Rifkin was required to

15  dedicate almost all his work time to his other businesses.

16  88.    The July 2018 Deck repeated the false representations that HILLS GROUP and

17  its affiliates had already received significant investments, over $2 million in total, from

18  other sources (page 10).

19  89.    The July 2018 Deck misrepresented that the company had multiple product lines

20  in distribution (page 13) when the only actual product produced by any HILLS

21  GROUP company was a tincture manufactured on a small scale by Skyline Brands

22  under the brand name NatureRx, but not yet in distribution at that time.

23  90.    Also, the July 2018 Deck misrepresented that "Company Owned Brands" held

24  "over 40 product skus."  (Page 15.)  Holding such product SKU numbers would have

25  facilitated distributing and selling products throughout the United States.  In fact, all

26  HILLS GROUP affiliated entities actually owned only one SKU, for Skyline's tincture

27  product.

28

91.    The Principals had made most of those misrepresentations to Mr. Stein previously, but some of them had not been included in previous HILLS GROUP publications.

92.    Neither Mr. Stein nor Plaintiffs knew that the false statements on the July 2018 Dec, were, in fact, false.

93.    For each of the publications and decks published by Defendants, drafts were circulated between the Principals, and all the Principals approved the final versions, before they were published.

**<u>Hills One LLC Agreement / Initial Payment from Plaintiffs.</u>**

94.    By mid-July 2018, the Principals had spent months building up Mr. Stein's confidence in themselves and excitement in their purported business.  As a result of their constant stream of false claims, written and verbal, about themselves, about their purported business, about non-existent assets, non-existent prospects, non-existent facilities and non-existent additional investors, Mr. Stein had fallen for Defendants' fraudulent scheme.

95.    On about July 16, 2018, the Principals secured a firm commitment from Jacob Stein to invest in Defendants' enterprise.  They accomplished that when HILLS GROUP, on one hand, and PACIFIC GREEN and BIG TREE HOLDINGS, on the other hand, entered into a written agreement entitled "Limited Liability Company Agreement – Hills One, LLC" (the "Hills One Agreement").  A true and correct copy of that agreement is attached hereto as Exhibit "A."

96.    Plaintiffs are not aware of the exact relationship between HILLS GROUP, HILLS ONE and the Principals, or the exact role each entity played in Defendants' fraudulent enterprise, particularly HILLS ONE.  Plaintiffs are aware that HILLS ONE was created by the Principals shortly after HILLS GROUP.  Plaintiffs believe and allege that from the time of its incorporation until July 2018, HILLS ONE was wholly owned, managed and operated by the Principals and/or HILLS GROUP.

*FOURTH AMENDED* **COMPLAINT**

97.    On about July 19, 2018, the Principals received the first payments for their enterprise from Mr. Stein's entities, PACIFIC GREEN and BIG TREE HOLDINGS, in the aggregate amount of $1 million.

98.    When Mr. Stein added PACIFIC GREEN and BIG TREE HOLDINGS to the Hills One Agreement, and subsequently delivered the first $1 million on July 19, 2018, he was relying on the oral and written statements and representations that had been made to him by the Principals about HILLS GROUP, about HILLS ONE, and about the Principals' business plan to manufacture and market CBD products.  Mr. Stein was particularly relying on the purported factual statements in the various detailed publications that the Principals had created and transmitted to him via email.  He was relying on the Principals dedicating their undivided efforts and fidelity to HILLS ONE, on the amount of money already invested, and on the proffered fact that other financial contributors were about to come into the project.  Mr. Stein was relying on the veracity and accuracy of those purportedly factual statements, and those statements were essential to his decision to have PACIFIC GREEN and BIG TREE HOLDINGS enter into the Hills One Agreement and deliver the first $1 million payment to Defendants.

99.    When Mr. Stein added PACIFIC GREEN and BIG TREE HOLDINGS to the Hills One Agreement, and subsequently delivered the first $1 million payment on July 19, 2018, the Principals all understood and believed that Mr. Stein had accepted and relied upon the written and oral statements and representations they had all made to him about HILLS GROUP and its affiliates for over six months.

100.   But for Defendants' multiple and repeated misrepresentations and falsehoods made to Mr. Stein as alleged herein, Plaintiffs would not have agreed to go into business with the Principals, would not have entered into any contract with any Defendant, would not have paid any money to any Defendant, and would not have lost money or been damaged as alleged herein.  Plaintiffs only did those things because of Defendants' false and misleading misstatements as alleged herein, and Plaintiffs' justifiable reliance on Defendants' statements.

101.   The payment by PACIFIC GREEN and BIG TREE HOLDINGS on July 19, 2018, was the first significant infusion of money into HILLS ONE from any source. HILLS ONE was a direct or indirect beneficiary of Defendants' fraudulent scheme in that its operation was funded by Plaintiffs' money.

102.   Section 8.01 of the Hills One Agreement states, in part, that the manager of HILLS ONE is HILLS GROUP.  In that section the Principals also represent that they are the beneficial owners of HILLS GROUP.  On that basis, Plaintiffs allege that some of the actions of the Principals were undertaken as actions of HILLS GROUP or HILLS ONE.  However, Plaintiffs are not aware now precisely which actions by the Principals were undertaken as actions of HILLS GROUP or HILLS ONE.

103.   Section 8.06 of the Hills One Agreement states, in part, that the Principals "shall devote the amount of time and attention to the Company's business and affairs that are reasonably necessary for the Company's day-to-day operation and management."

104.   Section 15.11 of the Hills One Agreement states, in part: "All issues and questions concerning the application, construction, validity, interpretation and enforcement of the Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware…"  However, section 15.12 of the Hills One Agreement states, in part, that any "dispute, claim or controversy, arising out of or relating to [Hills One] Agreement and/or a Member's investment in the Company or in an investment opportunity or to the rights, duties and obligations of the parties arising out of or relating to this [Hills One] Agreement" (subd. b) "shall be determined in accordance with the substantive laws of the State of California and the procedural laws of the State of California…"  (Subd. d.)

105.   Schedule A of the Hills One Agreement states that HILLS GROUP would provide $1 million as its capital contribution for its membership in HILLS ONE and restates the fabricated and false value of Skyline Brands and NatureRX as $9 million.

/ / /

/ / /

*FOURTH AMENDED* COMPLAINT

**Additional Representations to Stein and Payments to the Enterprise.**

106. The misrepresentations to Mr. Stein by the Principals were not limited to emails, writings, and meetings. Throughout the time they were trying to persuade Mr. Stein to contribute to their enterprise and while Plaintiffs were making their payments (through January 2019) there were also numerous telephone conversations between the Principals and Mr. Stein about the business. In many of those conversations, the Principals repeated and confirmed the misstatements and misrepresentations in their written documents and that they had made to Mr. Stein in meetings as part of their ongoing effort to maintain Mr. Stein's confidence in them and their fraudulent enterprise.

107. Plaintiffs do not have detailed specific records of the non-written communications, and Mr. Stein does not have detailed specific recollection of all those communications. However, the same topics were repeated in most or all of the conversations, and the effect of those representations by the Principals to Mr. Stein was to deceive Plaintiffs, to persuade them to keep their faith in Defendants' prior false representations, and to persuade Plaintiffs to continue to believe that Defendants' statements had been truthful and the business would succeed. Also, Plaintiffs allege again that Defendants thought if the business succeeded, their deception would never be discovered. Plaintiffs allege that the Principals, on behalf of all Defendants, intended those effects.

108. Following the initial payment of $1 million from Plaintiffs, the Principals expected those entities to make several additional payments of equal or greater amounts. Defendants still needed approximately $3 to $4 million more to go forward with the planned manufacturing business, which they needed in order to hide their fraudulent money-raising scheme. The Principals knew Plaintiffs could provide that money if they could maintain their fraudulent ruse and keep Mr. Stein's confidence until he was persuaded, so they kept pressuring Mr. Stein to get more money from his investors.

109.   To ensure that those payments were actually made, the Principals discussed and agreed it was essential that Jacob Stein not discover the truth about HILLS GROUP. Specifically, they discussed and agreed that Mr. Stein could not learn the truth about their lack of industry experience or the lack of other investors.  The Principals discussed and agreed that if Mr. Stein learned about the misrepresentations in the HILLS GROUP publications, and in the statements the Principals had made to him directly, then Mr. Stein would cancel the scheduled payments from PACIFIC GREEN and BIG TREE HOLDINGS and seek the return of the initial $1 million payment.

110.   To ensure that the enterprise received additional payments from Plaintiffs, the Principals continued to make misrepresentations to Mr. Stein and in HILLS GROUP publications after the Hills One Agreement was executed.  For example, the Principals repeatedly told Mr. Stein they were near to securing additional investors, although they were not.  Neither Mr. Stein nor the Plaintiffs knew those facts.

111.   Additionally, the Principals hid the fact that at least Messrs. Fiore and Rifkin were not devoting their full-time attention or energy to the business.

112.   When Mr. Stein had PACIFIC GREEN and BIG TREE HOLDINGS deliver additional payments to Defendants after July 19, 2018, Mr. Stein was continuing to rely, and Plaintiffs were continuing to rely, on the statements and representations that the Principals had made to Mr. Stein orally and in their publications which had been transmitted to him via email.  Mr. Stein was particularly relying on statements and representations made to him after July 19, 2018, when he decided to have payments delivered after that date.  Mr. Stein was continuing to rely on the veracity and accuracy of those purportedly factual statements, and those statements were essential to his decision to have PACIFIC GREEN and BIG TREE HOLDINGS make those payments to Defendants subsequent to July 19, 2018.

113.   On August 27, 2018, Mr. Reyter sent an email to Mr. Stein purportedly about the status of the business, and the operation of HILLS ONE and HILL GROUP.  That email had been approved by all the Principals.  Some of the statements in that email

were false.  For example, Mr. Reyter wrote that "A number of orders were placed and delivered to various destinations (e.g. CA, NY, Chicago, N.Carolina, etc.)" but that was not true.  Mr. Stein replied positively, stating that we was relying on the report to secure additional funding for the business.

114.   Even after the Plaintiffs' payment to Defendants in January 2019, the Principals continued to make fraudulent misrepresentations to Mr. Stein and Plaintiffs about the same topics—false statements about imminent investors; false statements about the Principals' experience in the CBD industry and their effort in the business; false statements about the value of other assets of the business; false statements about personnel associated with the business; false statements about the progress and growth of the business; and false statements about other topics alleged herein—in conversations and written communications until at least December 2019.

115.   In making those continued misrepresentations and misstatements, and in otherwise continuing their fraudulent enterprise, the Principals were continuing to act on their own behalves and also on behalf of HILLS GROUP, HILLS ONE and/or all other Defendants.

116.   In the communications between the Principals (or sometimes, fewer than all of them acting on behalf of all) and Mr. Stein, particularly after July 19, 2018, they never limited their capacities as the managers of HILLS GROUP and HILLS ONE, or suggested they were not communicating on behalf of all Defendants.  Instead, the Principals communicated with Mr. Stein about the business of all the Defendants, and apparently on behalf of all the Defendants, in each communication.

117.   On May 11, 2019, Mr. Reyter and Mr. Stein spoke by telephone, on behalf of all the Principals, HILLS GROUP and HILLS ONE.  During that conversation, among other topics, Mr. Reyter told Mr. Stein that the business would be generating revenue within months.  However, Mr. Reyter had no reasonable basis to make those statements, which turned out to be untrue.  Mr. Stein and Plaintiffs relied on those

*FOURTH AMENDED* COMPLAINT

statements to continue trusting Defendants, and their discovery of the true facts was delayed.

118.   On November 5, 2019, Mr. Reyter sent an email to Mr. Stein on behalf of the Principals, HILLS GROUP and HILLS ONE, stating that a harvest had been completed and that cash flow was imminent.  That was untrue, but neither Mr. Stein nor Plaintiffs knew that.

119.   After July 19, 2018, Mr. Stein, on behalf of Plaintiffs, met with one or more of the Principals on at least the following dates.  On the afternoon of November 27, 2018, Mr. Stein met with the Principals at their office in Encino, California.  During that meeting, they repeated the false statements that there were other very interested investors who were going to provide money imminently.  They stated that the business was growing and developing positively, and that further investments were needed from Plaintiffs to secure additional investments and to ensure continued success of the business.

120.   On the afternoon of March 17, 2019, Mr. Stein met with all three Principals at a Coffee Bean store in Encino, California.

121.   On April 15, 2019, at about noon, Mr. Stein met with all three Principals at his office in Encino, California.

122.   On the morning of December 19, 2019, Mr. Stein met with Mr. Reyter (and possibly one or both of the other Principals) in Encino, California.

123.   Mr. Stein also communicated with the Principals by telephone multiple times throughout that period.

124.   In each of those meetings, and in each substantive telephone conversation between the Principals and Mr. Stein in that period, the Principals continued to make the same type of false representations to Mr. Stein that they had made from the beginning, for the purpose of maintaining Mr. Stein's confidence in the business, possibly getting additional investments, and hiding the true facts about their enterprise (alleged herein) from him.

*FOURTH AMENDED* COMPLAINT

125.   On June 10, 2020, Mr. Stein met with all three Principals at his office in Encino, California.  Prior to that meeting, Mr. Stein had raised suspicions on behalf of Plaintiffs that Defendants had misrepresented critical facts about the business, as alleged herein.  In that meeting, the Principals, on behalf of themselves, HILLS GROUP and HILLS ONE, attempted to refute Mr. Stein's suspicions and keep him from discovering the true facts about their representations about other investors, their connections and experience, the financial and personnel assets of the business, and the possibility for growth, as alleged herein.

### **Summary of Payments to the Enterprise.**

126.   The Principals' enterprise eventually received a series of payments totaling $4.7 million from Mr. Stein and the entities he managed, PACIFIC GREEN and BIG TREE HOLDINGS.

127.   On about July 19, 2018, the Principals' enterprise received a payment of $500,000 from PACIFIC GREEN and $500,000 from BIG TREE HOLDINGS.

128.   On about September 28, 2018, the Principals' enterprise received a payment of $1.7 million from PACIFIC GREEN.

129.   On about December 10, 2018, the Principals' enterprise received another payment of $1 million from PACIFIC GREEN.

130.   On about January 23, 2019, the Principals' enterprise received a final payment of $1 million from PACIFIC GREEN.

131.   The Principals understood that Mr. Stein and his associated investors were relying on representations and information that the Principals provided to them about HILLS GROUP, including the inaccurate representations and information, to make their investment decisions each time.  That included representations and information in the analyses and decks, in their emails and other correspondence to Mr. Stein, and also oral representations that the Principals made to Mr. Stein about HILLS GROUP at various times.

132.   As of the time this lawsuit was initiated, HILLS GROUP had never made its $1 million capital contribution to HILLS ONE for its member share.

133.   Because Plaintiffs' payments were only made based on Defendants' material fraudulent and false statements, Plaintiffs did not receive anything of value, or the consideration they received was of substantially less value than Defendants represented, in return for those payments.

## **Mismanagement and Malfeasance**

134.   The Principals and HILLS GROUP failed to manage HILLS ONE for the exclusive benefit of the members or in a reasonably competent manner.  Despite the payments of millions of dollars from Plaintiffs ostensibly as investments into HILLS ONE and the Principals' business plan, Defendants generated almost no revenue.  The only revenue of any significance came from the sale of the NatureRx tincture, but that revenue was far lower than the costs of advertising and resulted in a significant net loss.

135.   Contrary to the Principals' representations to Mr. Stein, and the requirements set forth in the Hills One Agreement, the Principals failed and refused to tend to the day-to-day operations of HILLS ONE.  They failed to devote sufficient time or effort to their management duties, infrequently traveled to Oregon, to the HILLS GROUP base of operations, and instead spent their time and energy on other ventures for their personal benefit, to the detriment of HILLS ONE and Plaintiffs.  In 2019, Messrs. Fiore and Rifkin reduced their work for the business considerably, to the point where they were more like passive investors than active managers.  However, Defendants hid that fact from Mr. Stein because they understood that it was essential to Plaintiffs that all the Principals dedicate their attention and energy to the business on a full-time basis.

136.   Additionally, the Principals failed to demonstrate any established relationship, strategic alliance, prior experience, or capability to perform their duties as managers of HILLS ONE.

*FOURTH AMENDED* **COMPLAINT**

137.   In fact, the Principals used the money provided by Plaintiffs to attempt to educate themselves about the CBD and cannabis industries, and to "learn the ropes" of the very business they were supposed to form, manage, and operate profitably and competently.

138.   The Principals imprudently spent, wasted, dissipated, or converted the money contributed by Plaintiffs, failing to act in a reasonably prudent manner or to exercise reasonable business judgment.  In less than two years the Principals wasted the entire $5.7 million they extracted from Plaintiffs and Freedom House.

139.   Plaintiffs are informed and believe, and thereon allege, that Defendants took various actions on behalf of HILLS ONE without consultation, approval or ratification by Mr. Stein or Plaintiffs, in violation of the Hills One Agreement.  Plaintiffs are not aware of the specific facts now as the information is in the exclusive possession of Defendants.

**Conversion of Funds.**

140.   In addition to committing waste and failing to manage HILLS ONE for the exclusive benefit of the members or in a reasonably competent manner, the Principals and HILLS GROUP engaged in prohibited acts of self-dealing, comingling, and/or conversion of funds of HILLS ONE and/or Plaintiffs.

141.   Each of the Defendants took payments from the money paid by Plaintiffs into the enterprise and retained that money, knowing it was paid as the result of fraud.

142.   By the summer of 2019, Defendants became aware that Defendant RIFKIN was opportunistically trading various hemp products for his personal benefit, taking opportunities which should have gone to benefit the business and Plaintiffs.

143.   In the fall of 2019, Defendants became aware of several unexplained transactions on the books of several HILLS ONE entities, including Key Xtracts LLC and Skyline Brands LLC, which may have been used by one or more of the Principals to usurp corporate opportunities and/or misappropriate corporate funds.

***FOURTH AMENDED* COMPLAINT**

144.   On about November 27, 2019, Defendant RIFKIN withdrew funds from the account of Skyline Brands to pay property tax for a property not owned by Skyline Brands or HILLS ONE.  However, the payment was not made to the County Assessor, but instead to J Rifkin LLC.  Defendant RIFKIN had no authority for that withdrawal, and the transaction was not ratified by HILLS ONE or Plaintiffs.

145.   Also, on November 27, 2019, Defendant RIFKIN withdrew funds to reimburse himself for purported expenses without substantiation.  Defendant RIFKIN made another withdrawal of funds two months later, again purportedly to reimburse expenses, and again without substantiation.  Defendant RIFKIN had no authority for either of those withdrawals, and the transactions were not ratified by HILLS ONE or Plaintiffs.

146.   Defendant RIFKIN made other unauthorized and unsubstantiated transactions and payments for the undue enrichment and benefit of himself and at the expense of HILLS ONE and Plaintiffs.  Some of those transactions involved KeyXtracts, LLC.  Defendant RIFKIN had no authority for those transactions, and the transactions were not ratified by HILLS ONE or Plaintiffs.  Plaintiffs are not aware of the specific facts now as the information is in the exclusive possession of Defendants.

147.   Defendant RIFKIN utilized HILLS ONE assets for his personal enrichment, including using the hemp licenses of portfolio companies to undertake hemp trading and brokerage deals, to the detriment and at the expense of HILLS ONE and Plaintiffs.  Defendant RIFKIN had no authority for those transactions, and the transactions were not ratified by HILLS ONE or Plaintiffs.  Defendant RIFKIN breached his fiduciary duty to Plaintiffs and HILLS ONE and usurped corporate opportunities of HILLS ONE.  Plaintiffs are not aware of the specific facts now as the information is in the exclusive possession of Defendants.

148.   Defendant RIFKIN wasted assets of HILLS ONE, and/or converted funds of Plaintiffs, by attempting to recharacterize his personal equity investments into HILLS ONE as loans eligible for repayment, and by attempting to forego collection or to

release certain payable obligations due to HILLS ONE and or Plaintiffs.  Defendant RIFKIN had no authority for those transactions, and the transactions were not ratified by HILLS ONE or Plaintiffs.  Plaintiffs are not aware of the specific facts now as the information is in the exclusive possession of Defendants.

<b>FIRST CAUSE OF ACTION:<br>FRAUD AND DECEIT<br>(Against All Defendants)</b>

149.   Plaintiffs repeat and incorporate the allegations set forth in paragraphs 1-148, above, and all other factual allegations in this pleading, as though fully set forth here.

150.   As alleged herein, Defendants intentionally made a series of material false and misleading representations and statements to Plaintiffs, orally and in writing, about HILLS GROUP, HILLS ONE, Defendants' experience and capabilities, the time and effort the Principals would devote to the business, the availability of funds, business valuations, cash and property on hand, companies and products owned, and Defendants' plan for a business to manufacture and market CBD products.

151.   Defendants knew that such representations and statements were false and misleading when they made them to Plaintiffs.

152.   As more fully alleged herein, Defendants engaged in that conduct intentionally, with the purpose and expectation of convincing Plaintiffs to deliver money to Defendants for a purported investment opportunity.

153.   Plaintiffs reasonably relied on Defendants' false and misleading information, reasonably believing it to be true.

154.   Plaintiffs' reliance on Defendants' false and misleading information was the primary, material, and essential factor in convincing Plaintiffs to deliver money to Defendants.

155.   As a direct result of Defendants' fraudulent scheme, Plaintiffs delivered at least $4.7 million to Defendants.

156.   As a direct and proximate result of Defendants' conduct as alleged herein, Plaintiffs sustained damages in an amount subject to proof.

<i><b>FOURTH AMENDED</b> COMPLAINT</i>

157.   In doing the things alleged herein, Defendants acted with intent to damage and injure Plaintiffs, or in conscious disregard of Plaintiffs' rights, so that Plaintiffs are entitled to an award of exemplary or punitive damages.

### SECOND CAUSE OF ACTION:
### NEGLIGENT MISREPRESENTATION
### (Against All Defendants)

158.   Plaintiffs repeat and incorporate the allegations set forth in paragraphs 1-148, above, and all other factual allegations in this pleading, as though fully set forth here.

159.   As alleged herein, Defendants made a series of material but false and misleading representations and statements to Plaintiffs, orally and in writing, about HILLS GROUP, HILLS ONE, Defendants' experience and capabilities, and Defendants' plan for a business to manufacture and market CBD products.

160.   Defendants had no reasonable basis to believe that such representations and statements were true when they made them to Plaintiffs.

161.   Defendants had no reason to believe Plaintiffs would know that Defendants' representations and statements were false or misleading.

162.   As more fully alleged herein, Defendants engaged in that conduct with the purpose of convincing Plaintiffs to deliver money to Defendants for a purported investment opportunity.

163.   Defendants reasonably should have expected that Plaintiffs would believe and rely on the information Defendants provided when Plaintiffs determined whether to deliver money to Defendants for their purported investment opportunity.

164.   Plaintiffs reasonably relied on Defendants' false and misleading information, reasonably believing it to be true.

165.   Plaintiffs' reliance on Defendants' false and misleading information was the primary, material, and essential factor in convincing Plaintiffs to deliver money to Defendants.

166.   As a direct result of Defendants' fraudulent scheme, Plaintiffs delivered at least $4.7 million to Defendants.

*FOURTH AMENDED* **COMPLAINT**

167.   As a direct and proximate result of Defendants' conduct as alleged herein, Plaintiffs sustained damages in an amount subject to proof.

**THIRD CAUSE OF ACTION:**
**CIVIL RICO VIOLATION (18 U.S.C. §§ 1961, *et seq.*)**
**(Against All Defendants)**

168.   Plaintiffs repeat and incorporate the allegations set forth in paragraphs 1-148, above, and all other factual allegations in this pleading, as though fully set forth here.

169.   As alleged herein, Defendants transmitted a series of publications and communications to potential investors including Plaintiffs' manager, Jacob Stein, via email as part of Defendants' fraudulent enterprise to collect money for their enterprise from Plaintiffs and other investors.

170.   Defendants were aware that such publications and communications contained material false and misleading representations and statements.

171.   When Defendants transmitted such publications and communications to Plaintiffs and the other potential investors, Defendants intended for the recipients of those messages, including Plaintiffs' manager, to rely on the false and misleading representations and statements, to believe those representations and statements were true, and to act on that false and misleading information.

172.   Plaintiffs did believe the false and misleading representations and statements in Defendants' publications, including those transmitted by emails, and Plaintiffs relied on those representations and statements when they sent payments to Defendants totaling $4.7 million.

173.   As alleged herein, all Defendants received income from their fraudulent enterprise, in the form of the payments from Plaintiffs and from Freedom House, and used at least some of that money to establish and operate the enterprise.

174.   As alleged herein, the fraudulent enterprise was controlled entirely by Defendants.  Plaintiffs are not aware now of the exact relationship between Defendants with regard to the enterprise, including the interest and role each particular Defendant had in the control of the enterprise.

*FOURTH AMENDED* COMPLAINT

175.   As alleged herein, each Defendant participated in operating the fraudulent enterprise and conducting its affairs by making and confirming false and fraudulent misrepresentations to Plaintiffs, by establishing sham credentials, partnerships, projects and products to add credibility to the enterprise, and by receiving and distributing the fraudulently-induced payments from Plaintiffs and Freedom House, among other things.

176.   All Defendants conspired to create and operate the fraudulent enterprise.  First, the Principals hatched their plan for the enterprise.  Then, when HILLS GROUP and HILLS ONE were created, those entities (including through the direction of the Principals) worked to further the fraud on Plaintiffs.

177.   Defendants' fraudulent enterprise was illegal in many respects.  Among other things, Defendants' creation and operation of their enterprise constituted a violation of 18 U.S.C. §1343.

178.   As alleged herein, Defendants' enterprise affected interstate commerce.  It involved transmission of false and fraudulent statements via the internet, some party citizens of different states, contracts and partnerships between citizens of different states, interstate transfers of money, and a purported nationwide business venture.

179.   Defendants' actions alleged herein involve a continued threat of repetition and a distinct threat of long-term racketeering activity of the type they perpetrated against Plaintiffs.

180.   As alleged herein, Defendants formed HILLS GROUP and HILLS ONE as part of their fraudulent enterprise and for the purpose of putting that enterprise into effect.  Those corporations remain in existence and good corporate standing, and are eligible to conduct business in California.  Additionally, at least Mr. Rifkin and Mr. Fiore are still the managers of those corporations (Plaintiffs do not know the relationship of Mr. Reyter to those companies now).

181.   By keeping HILLS GROUP and HILLS ONE active, and remaining as the managers, the Principals have taken steps to be able to resume their fraudulent efforts at fundraising for any purported business at any time.

182.   Plaintiffs are informed and believe, and thereon allege, that Defendants may be continuing their efforts to raise money from gullible investors for some type of purported business.

183.   Plaintiffs are informed and believe, and thereon allege, that the Principals are each currently engaged in efforts to raise money for ventures which are at least highly speculative, and for which they are likely exaggerating or misrepresenting their expertise and assets.  Specifically, Plaintiffs are informed that Mr. Fiore is attempting to promote a cryptocurrency business, that Mr. Rifkin is promoting himself as a new-media expert, and that Mr. Reyter advertises himself as a specialist in 'start up developments with sustainable advantages in the marketplace.'

184.   There is a distinct threat that the Principals, in collaboration with their respective limited liability companies, with each other, and with HILLS GROUP and HILLS ONE, will resume their enterprise to raise money from individuals and institutional sources for purported business ventures using misrepresentations and fabrications.

185.   As a direct and proximate result of Defendants' conduct alleged herein, Plaintiffs were damaged in an amount subject to proof.

186.   Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover treble damages from Defendants.

**FOURTH CAUSE OF ACTION:**
**FRAUDULENT INDUCEMENT TO ENTER INTO CONTRACT**
**(Against All Defendants *Except* HILLS ONE, LLC)**

187.   Plaintiffs repeat and incorporate the allegations set forth in paragraphs 1-148, above, and all other factual allegations in this pleading, as though fully set forth here.

188.   As alleged herein, Defendants engaged in a deliberate scheme of providing material but false and misleading information to Plaintiffs, with the intent of inducing Plaintiffs to enter into agreements and contracts with Defendants.

*FOURTH AMENDED* COMPLAINT

189.   As alleged herein, Plaintiffs were unaware that Defendants' representations and statements were false or misleading.  Instead, Plaintiffs reasonably relied on Defendants' representations and statements, and were induced by those representations and statements to enter into agreements and contracts with Defendants, including the Hills One Agreement.

190.   Because Plaintiffs' consent to enter the Hills One Agreement, and to perform the duties required of them under that contract, was obtained by Defendants fraudulently, Plaintiffs are entitled to rescission of that agreement.

191.   Plaintiffs will tender any and all consideration received from Defendants under the Hills One Agreement upon rescission of that agreement.

### FIFTH CAUSE OF ACTION:
### BREACH OF CONTRACT
### (Against Defendant HILLS GROUP and DOES 1-100)

192.   Plaintiffs repeat and incorporate the allegations set forth in paragraphs 1-148, above, and all other factual allegations in this pleading, as though fully set forth here.

193.   As alleged herein, Plaintiffs and Defendant HILLS GROUP, by and through the Principals as its managers, entered into the Hills One Agreement on about July 16, 2018.

194.   As more fully alleged herein, Defendant HILLS GROUP, by and through the Principals as its managers, committed various breaches of the Hills One Agreement including, but not limited to, failing to have its managers devote sufficient time and energy to the management and operation of HILLS ONE, engaging in acts of self-dealing and mismanagement prohibited under the contract, failing to make the capital contribution to HILLS ONE as required under the contract, and by other conduct to be proven.

195.   Plaintiffs fulfilled all duties and provided all consideration required of them under the agreement.

196.   As a direct and proximate result of Defendant HILLS GROUP's conduct as alleged herein, Plaintiffs sustained damages in an amount subject to proof.

197.   Pursuant to the terms of the Hills One Agreement, Plaintiffs are entitled to an award of their attorney's fees reasonably incurred in prosecuting their claims.

### SIXTH CAUSE OF ACTION:
### NEGLIGENCE (DERIVATIVE CLAIM)
### (Against Defendant HILLS GROUP and DOES 1-100)

198.   Plaintiffs repeat and incorporate the allegations set forth in paragraphs 1-148, above, and all other factual allegations in this pleading, as though fully set forth here.

199.   At all times relevant herein, including at all times the alleged conduct of Defendants occurred which is the basis of the claims pleaded herein, Plaintiffs were members of Nominal Defendant HILLS ONE.

200.   On about May 28, 2020, on behalf of Plaintiffs, Jacob Stein transmitted a letter to Defendants and each of them in their roles as managers of HILLS ONE, via email and first-class mail.  That letter set forth the claims made herein by Plaintiffs on behalf of HILLS ONE, including the alleged conduct of Defendants on which those claims were based.  That letter demanded responsive action from Defendants, including but not limited to an immediate cessation of the offending and illegal conduct, preservation of evidence and restitution.

201.   Defendants failed to respond to Plaintiffs' letter of May 28, 2020, or to take any of the actions demanded therein.

202.   HILLS GROUP was the manager of HILLS ONE at all relevant times.  The Principals were the management team of HILLS ONE, and the managers of HILLS GROUP, at all relevant times.

203.   As the managers of HILLS ONE, Defendant HILLS GROUP, through the Principals as its managers, owed duties to HILLS ONE to manage and operate HILLS ONE in a reasonably prudent manner and in the best interests of the company.

204.   As alleged herein, Defendant HILLS GROUP, through the Principals as its managers, breached its duties toward HILLS ONE by, among other things, failing to operate HILLS ONE in a reasonably prudent manner, engaging in unauthorized self-

dealing, commingling, or converting assets, and committing other actions which are contrary to the best interests of HILLS ONE.

205.   As a direct and proximate result of Defendant HILLS GROUP' conduct as alleged herein, through the Principals as its managers, HILLS ONE sustained damages in an amount subject to proof.

**SEVENTH CAUSE OF ACTION:**
**CONVERSION**
**(Against Defendants FIORE, RIFKIN, REYTER**
**and HILLS GROUP and DOES 1-100)**

206.   Plaintiffs repeat and incorporate the allegations set forth in paragraphs 1-148, above, and all other factual allegations in this pleading, as though fully set forth here.

207.   As alleged herein, Defendants intentionally and wrongfully converted Plaintiffs' property by, among other conduct, withdrawing funds or taking assets of HILLS ONE, in which Plaintiffs had ownership interests.

208.   As a direct and proximate result of Defendants' conduct as alleged herein, Plaintiffs and HILLS ONE sustained damages in an amount subject to proof.

209.   In doing the things alleged herein, Defendants acted with intent to damage Plaintiffs, or in conscious disregard of Plaintiffs' rights, so that Plaintiffs are entitled to exemplary or punitive damages.

**EIGHTH CAUSE OF ACTION:**
**AIDING AND ABETTING TORTIOUS CONDUCT**
**(Against All Defendants)**

210.   Plaintiffs repeat and incorporate the allegations set forth in paragraphs 1-148, above, and all other factual allegations in this pleading, as though fully set forth here.

211.   As alleged herein, one or more Defendants lied to Plaintiffs and violated their trust, deceived and defrauded Plaintiffs, and stole or converted Plaintiffs' property.

212.   All Defendants knew and understood that conduct was occurring, and knew the harm it was causing to Plaintiffs.

213.   Despite knowing that, all Defendants assisted and encouraged the responsible Defendants to engage in that conduct and to continue it for as long as possible.

214.   As a direct and proximate result of Defendants' conduct as alleged herein, Plaintiffs sustained damages in an amount subject to proof.

215.   In doing the things alleged herein, Defendants acted with intent to damage Plaintiffs, or in conscious disregard of Plaintiffs' rights, so that Plaintiffs are entitled to exemplary or punitive damages.

## **PRAYER FOR RELIEF**

Based on the foregoing allegations and claims, Plaintiffs PACIFIC GREEN, LLC, and BIG TREE HOLDINGS, LLC, pray for relief as follows:

1.   For judgment in favor of Plaintiffs and against all Defendants;

2.   For an award of compensatory damages according to proof;

3.   For an award of exemplary damages according to proof;

4.   For an award of treble damages pursuant to 18 U.S.C. § 1964(c);

5.   For an order rescinding the "Limited Liability Company Agreement – Hills One, LLC" and directing restoration of all consideration given thereunder;

6.   For an order directing restitution by Defendants of all money paid by Plaintiffs, as alleged herein;

/ / /

/ / /

/ / /

*FOURTH AMENDED* **COMPLAINT**

7.     For an award of attorney's fees;

8.     For an award of costs of suit herein; and,

9.     For such other and further relief as is just and proper.

Dated: April 24, 2023

By _____

Roza Crawford
Daniel A. Crawford
CRAWFORD LAW GROUP
15303 Ventura Blvd., 9th Floor
Sherman Oaks, CA 91403
dac@crawfordlawgroup.com | 818-935-6568
Attorneys for Plaintiffs,
PACIFIC GREEN, LLC, and
BIG TREE HOLDINGS, LLC

*FOURTH AMENDED* **COMPLAINT**

**<u>DEMAND FOR JURY TRIAL</u>**

Plaintiffs PACIFIC GREEN, LLC, and BIG TREE HOLDINGS, LLC, hereby demand a trial by jury in the above-entitled action on all issues and questions which may be submitted to a jury.

Dated: April 24, 2023

By _____

Roza Crawford
Daniel A. Crawford
CRAWFORD LAW GROUP
15303 Ventura Blvd., 9th Floor
Sherman Oaks, CA 91403
dac@crawfordlawgroup.com | 818-935-6568
Attorneys for Plaintiffs,
PACIFIC GREEN, LLC, and
BIG TREE HOLDINGS, LLC

*FOURTH AMENDED* **COMPLAINT**

# EXHIBIT A

## LIMITED LIABILITY COMPANY AGREEMENT

### HILLS ONE, LLC

This Limited Liability Company Agreement of Hills One, LLC, a Delaware limited liability company (the "**Company**"), is entered into as of July 16, 2018 (the "**Effective Date**") by and among the Company, the Initial Members executing this Agreement as of the date hereof and each other Person who after the date hereof becomes a Member of the Company and becomes a party to this Agreement by executing a Joinder Agreement.

### RECITALS

WHEREAS, the Company was formed under the Delaware Act by the filing of a Certificate of Formation with the Secretary of State of the State of Delaware on March 29, 2018 (the "**Certificate of Formation**");

WHEREAS, the parties hereto now desire to enter into this Agreement to provide for the governance of the Company and the conduct of its business and to specify their relative rights and obligations.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

### ARTICLE I

### DEFINITIONS

**Section 1.01 Definitions.** Capitalized terms used herein and not otherwise defined shall have the meanings set forth in this **Section 1.01**:

"**Acceptance Notice**" has the meaning set forth in **Section 9.01(c)**.

"**Additional Investment Deadline**" has the meaning set forth in **Section 5.09(a)**.

"**Additional Maximum Investment**" has the meaning set forth in **Section 5.09(a)**.

"**Additional Minimum Investment**" has the meaning set forth in **Section 5.09(a)**.

"**Adjusted Capital Account Deficit**" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

      (a)    crediting to such Capital Account any amount which such Member is obligated to restore or is deemed to be obligated to restore pursuant to Treasury Regulations Sections 1.704-1(b)(2)(ii)(c), 1.704-2(g)(1) and 1.704-2(i); and

      (b)    debiting to such Capital Account the items described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

"**Adjusted Taxable Income**" of a Member for a Fiscal Year (or portion thereof) with respect to Units held by such Member means the federal taxable income allocated by the Company to the Member with respect to such Units (as adjusted by any final determination in connection with any tax audit or other proceeding) for such Fiscal Year (or portion thereof); *provided*, that such taxable income shall be computed (i) minus any excess taxable loss or excess taxable credits of the Company for any

Page **1** of **54**

prior period allocable to such Member with respect to such Units that were not previously taken into account for purposes of determining such Member's Adjusted Taxable Income in a prior Fiscal Year to the extent such loss or credit would be available under the Code to offset income of the Member (or, as appropriate, the direct or indirect members of the Member) determined as if the income, loss, and credits from the Company were the only income, loss, and credits of the Member (or, as appropriate, the direct or indirect members of the Member) in such Fiscal Year and all prior Fiscal Years, and (ii) taking into account any special basis adjustment with respect to such Member resulting from an election by the Company under Code Section 754.

"**Affiliate**" means, with respect to any Person, any other Person who, directly or indirectly (including through one or more intermediaries), controls, is controlled by, or is under common control with, such Person. For purposes of this definition, "control," when used with respect to any specified Person, shall mean the power, direct or indirect, to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities or partnership or other ownership interests, by contract or otherwise; and the terms "controlling" and "controlled" shall have correlative meanings.

"**Agreement**" means this Limited Liability Company Agreement, as executed and as it may be amended, modified, supplemented or restated from time to time, as provided herein.

"**Applicable Law**" means all applicable provisions of (a) constitutions, treaties, statutes, laws (including the common law), rules, regulations, decrees, ordinances, codes, proclamations, declarations or orders of any Governmental Authority; (b) any consents or approvals of any Governmental Authority; and (c) any orders, decisions, advisory or interpretative opinions, injunctions, judgments, awards, decrees of, or agreements with, any Governmental Authority.

"**Applicable Offered Class A Units**" has the meaning set forth in **Section 10.03(a)(ii)**.

"**Applicable Offered Class B Units**" has the meaning set forth in **Section 10.03(a)(ii)**.

"**Applicable Offered Units**" has the meaning set forth in **Section 10.03(a)(ii)**.

"**Applicable Pro Rata Portion**" means:

(a)      for purposes of **Section 9.01**, a Member's Class A Pro Rata Portion of any New Securities proposed to be issued or sold by the Company; and

(b)      for purposes of **Section 10.03**, a Member's Preferred Pro Rata Portion of any Offered Class A Units proposed to be Transferred by an Offering Member and a Member's Common Pro Rata Portion of any Offered Class B Units proposed to be Transferred by an Offering Member.

"**Applicable ROFR Rightholders**" has the meaning set forth in **Section 10.03(a)(ii)**.

"**Bankruptcy**" means, with respect to a Member, the occurrence of any of the following: (a) the filing of an application by such Member for, or a consent to, the appointment of a trustee of such Member's assets; (b) the filing by such Member of a voluntary petition in bankruptcy or the filing of a pleading in any court of record admitting in writing such Member's inability to pay its debts as they come due; (c) the making by such Member of a general assignment for the benefit of such Member's creditors; (d) the filing by such Member of an answer admitting the material allegations of, or such Member's consenting to, or defaulting in answering a bankruptcy petition filed against such Member in any bankruptcy proceeding; or (e) the expiration of sixty (60) days following the entry of an order, judgment or decree by any court of competent jurisdiction adjudicating such Member a bankrupt or appointing a trustee of such Member's assets.

"**BBA**" has the meaning set forth in **Section 7.04(b)**.

"**BBA Procedures**" has the meaning set forth in **Section 12.03**.

"**Book Depreciation**" means, with respect to any Company asset for each Fiscal Year, the Company's depreciation, amortization, or other cost recovery deductions determined for federal income tax purposes, except that if the Book Value of an asset differs from its adjusted tax basis at the beginning of such Fiscal Year, Book Depreciation shall be an amount which bears the same ratio to such beginning Book Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; *provided*, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero and the Book Value of the asset is positive, Book Depreciation shall be determined with reference to such beginning Book Value using any permitted method selected by the Manager in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(g)(3).

"**Book Value**" means, with respect to any Company asset, the adjusted basis of such asset for federal income tax purposes, except as follows:

(a)     the initial Book Value of any Company asset contributed by a Member to the Company shall be the gross Fair Market Value of such Company asset as of the date of such contribution;

(b)     immediately prior to the Distribution by the Company of any Company asset to a Member, the Book Value of such asset shall be adjusted to its gross Fair Market Value as of the date of such Distribution;

(c)     the Book Value of all Company assets shall be adjusted to equal their respective gross Fair Market Values, as determined by the Manager, as of the following times:

(i)     the acquisition of an additional Membership Interest in the Company by a new or existing Member in consideration of a Capital Contribution of more than a *de minimis* amount;

(ii)     the Distribution by the Company to a Member of more than a *de minimis* amount of property (other than cash) as consideration for all or a part of such Member's Membership Interest in the Company; and

(iii)     the liquidation of the Company within the meaning of Treasury Regulation Section 1.704-1(b)(2)(ii)(g);

*provided*, that adjustments pursuant to clauses (i), (ii) and (iii) above need not be made if the Manager reasonably determines that such adjustment is not necessary or appropriate to reflect the relative economic interests of the Members and that the absence of such adjustment does not adversely and disproportionately affect any Member;

(d)     the Book Value of each Company asset shall be increased or decreased, as the case may be, to reflect any adjustments to the adjusted tax basis of such Company asset pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Account balances pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m); *provided*, that Book Values shall not be adjusted pursuant to this paragraph (d) to the extent that an adjustment pursuant to paragraph (c) above is made in conjunction with a transaction that would otherwise result in an adjustment pursuant to this paragraph (d); and

(e)     if the Book Value of a Company asset has been determined pursuant to paragraph (a) or adjusted pursuant to paragraphs (c) or (d) above, such Book Value shall thereafter be adjusted to reflect the Book Depreciation taken into account with respect to such Company asset for

Page **3** of **54**

purposes of computing Net Income and Net Losses.

"**Business Day**" means a day other than a Saturday, Sunday or other day on which commercial banks in the City of Los Angeles are authorized or required to close.

"**Capital Account**" has the meaning set forth in **Section 5.03**.

"**Capital Contribution**" means, for any Member, the total amount of cash and cash equivalents and the Book Value of any property contributed to the Company by such Member.

"**Certificate of Formation**" has the meaning set forth in the Recitals.

"**CCP**" has the meaning set forth in **Section 15.12(d)**.

"**Change of Control**" means: (a) the sale of all or substantially all of the assets of the Company to a Third Party Purchaser; (b) a sale resulting in no less than a majority of the Units on a Fully Diluted Basis being held by a Third Party Purchaser; or (c) a merger, consolidation, recapitalization or reorganization of the Company with or into a Third Party Purchaser that results in the inability of the Members to designate or elect a majority of the managers (or the board of directors (or its equivalent)) of the resulting entity or its parent company).

"**Class A Pro Rata Portion**" means:

    (a)    for purposes of **Section 9.01**, with respect to any Pre-emptive Member holding Class A Units, on any issuance date for New Preferred Securities, a fraction determined by dividing (i) the number of Preferred Units on a Fully Diluted Basis owned by such Pre-emptive Member immediately prior to such issuance by (ii) the total number of Preferred Units on a Fully Diluted Basis held by the Members on such date immediately prior to such issuance; and

    (b)    for purposes of **Section 10.03**, with respect to an Applicable ROFR Rightholder holding Preferred Units, on any date of a proposed Transfer by an Offering Member, a fraction determined by dividing (i) the number of Preferred Units on a Fully Diluted Basis owned by such Applicable ROFR Rightholder immediately prior to such Transfer by (ii) the total number of Preferred Units on a Fully Diluted Basis held by the Members on such date immediately prior to such Transfer.

"**Class A Units**" means the Units having the privileges, preference, duties, liabilities, obligations and rights specified with respect to "Class A Units" in this Agreement.

"**Class B Pro Rata Portion**" means:

    (a)    for purposes of **Section 9.01**, with respect to any Pre-emptive Member holding Class B Units, on any issuance date for New Class B Securities, a fraction determined by dividing (i) the number of Class B Units on a Fully Diluted Basis owned by such Pre-emptive Member immediately prior to such issuance by (ii) the total number of Class B Units on a Fully Diluted Basis held by the Members on such date immediately prior to such issuance; and

    (b)    for purposes of **Section 10.03**, with respect to an Applicable ROFR Rightholder holding Class B Units, on any date of a proposed Transfer by an Offering Member, a fraction determined by dividing (i) the number of Class B Units on a Fully Diluted Basis owned by such Applicable ROFR Rightholder immediately prior to such Transfer by (ii) the total number of Class B Units on a Fully Diluted Basis held by the Members on such date immediately prior to such Transfer.

"**Class B Units**" means the Units having the privileges, preference, duties, liabilities, obligations and rights specified with respect to "Class B Units" in this Agreement.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Company**" has the meaning set forth in the Preamble.

"**Company Business**" means the investment in and the development, operation and management of various businesses.

"**Company Expenses**" has the meaning set forth in **Section 8.04(c)**.

"**Company Interest Rate**" has the meaning set forth in **Section 7.04(c)**.

"**Company Minimum Gain**" means "partnership minimum gain" as defined in Section 1.704-2(b)(2) of the Treasury Regulations, substituting the term "Company" for the term "partnership" as the context requires.

"**Company Opportunity**" has the meaning set forth in **Section 11.02**.

"**Company Option Period**" has the meaning set forth in **Section 10.03(d)(iii)**.

"**Company ROFR Exercise Notice**" has the meaning set forth in **Section 10.03(d)(iii)**.

"**Confidential Information**" has the meaning set forth in **Section 11.01(a)**.

"**Counsel**" has the meaning set forth in **Section 15.18**.

"**Covered Person**" has the meaning set forth in **Section 14.01(a)**.

"**Delaware Act**" means the Delaware Limited Liability Company Act, Title 6, Chapter 18, §§ 18-101, et seq., and any successor statute, as it may be amended from time to time.

"**Disability**" means a Person's incapacity due to physical or mental illness that: (a) shall have prevented such Person from performing his duties for the Company on a full-time basis for more than one hundred eighty (180) or more consecutive days or an aggregate of two hundred seventy (270) days in any three hundred sixty-five (365) day period.

"**Dispute**" has the meaning set forth in **Section 15.12(b)**.

"**Dispute Notice**" has the meaning set forth in **Section 15.12(b)**.

"**Distribution**" means a distribution made by the Company to a Member, whether in cash, property or securities of the Company and whether by liquidating distribution or otherwise; *provided*, that none of the following shall be a Distribution: (a) any redemption or repurchase by the Company or any Member of any Units; (b) any recapitalization or exchange of securities of the Company; or (c) any subdivision (by a split of Units or otherwise) or any combination (by a reverse split of Units or otherwise) of any outstanding Units. "**Distribute**" when used as a verb shall have a correlative meaning.

"**Drag-along Member**" has the meaning set forth in **Section 10.04(a)**.

"**Drag-along Notice**" has the meaning set forth in **Section 10.04(c)**.

"**Drag-along Sale**" has the meaning set forth in **Section 10.04(a)**.

"**Dragging Member**" has the meaning set forth in **Section 10.04(a)**.

"**Egregious Act**" means a Person's (i) breach of any fiduciary duties owed to the Company or any of the Members (including the duty of loyalty, the duty of care and the duty of good faith and fair dealing), (ii) breach of any other material duty or obligation imposed upon the Person by this Agreement, the Delaware Act or other Applicable Law; (iii) fraud, deceit, gross negligence, willful misconduct, bad faith, waste, misappropriation or wrongful taking in relation to the Company or any of the Members, (iv) violation of the Delaware Act or any other Applicable Law, (v) commission of a crime that involves Moral Turpitude or that involves the willful, material violation of any Applicable Law, or (vi) any other act or omission that causes any material harm to the Company or any of the Members, any or all of the following as determined by such Person's admission, by such Person's plea of *nolo contendere* or by a final, non-appealable judgment or conviction by an arbitrator, court or tribunal of competent jurisdiction.

"**Electronic Transmission**" means any form of communication not directly involving the physical transmission of paper that creates a record that may be retained, retrieved and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

"**Estimated Tax Amount**" of a Member for a Fiscal Year means the Member's Tax Amount for such Fiscal Year as estimated in good faith from time to time by the Manager. In making such estimate, the Manager shall take into account amounts shown on Internal Revenue Service Form 1065 filed by the Company and similar state or local forms filed by the Company for the preceding taxable year and such other adjustments as in the reasonable business judgment of the Manager are necessary or appropriate to reflect the estimated operations of the Company for the Fiscal Year.

"**Excess Amount**" has the meaning set forth in **Section 7.03(c)**.

"**Exercise Period**" has the meaning set forth in **Section 9.01(c)**.

"**Exercising Member**" has the meaning set forth in **Section 9.01(d)**.

"**Fair Market Salary**" in the case of any compensation, including a salary, as of any date means the payment that a willing payor having all relevant knowledge would pay a willing payee for such compensation in an arm's length transaction, as determined in good faith by the Manager based on such factors as the Manager, in the exercise of its reasonable business judgment, considers relevant.

"**Fair Market Value**" in the case of any asset, including an investment in a Portfolio Company, as of any date means the purchase price that a willing buyer having all relevant knowledge would pay a willing seller for such asset in an arm's length transaction, as determined in good faith by the Manager based on such factors as the Manager, in the exercise of its reasonable business judgment, considers relevant.

"**Family Members**" has the meaning set forth in **Section 10.02(b)**.

"**Financing Document**" means any credit agreement, guarantee, financing or security agreement or other agreements or instruments governing indebtedness of the Company.

"**Fiscal Year**" means the calendar year, unless the Company is required to have a taxable year other than the calendar year, in which case Fiscal Year shall be the period that conforms to its taxable year.

"**Forfeiture Allocations**" has the meaning set forth in **Section 6.02(e)**.

"**Fully Diluted Basis**" means, as of any date of determination, (a) with respect to all the Units, all issued and outstanding Units of the Company, or (b) with respect to any specified type, class or

series of Units, all issued and outstanding Units designated as such type, class or series.

"**Fully Participating Tag-along Member**" has the meaning set forth in **Section 10.05(e)(i)**.

"**GAAP**" means United States generally accepted accounting principles in effect from time to time.

"**Governmental Authority**" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of law), or any arbitrator, court or tribunal of competent jurisdiction.

"**Gross Revenue**" means all revenue received by the Company from or otherwise in connection with the Company Business and any other sources on a consolidated Company-wide basis prior to any deductions.

"**Hills Group**" means Hills Group, LLC, a California limited liability company.

"**Initial Cost**" means, with respect to any Unit, the purchase price paid to the Company with respect to such Unit by the Member to whom such Unit was originally issued.

"**Initial Member**" means each Person identified as a Member as of the date hereof. "**Initial Member**" has the meaning set forth in the term "**Member**".

"**Insolvency Proceeding**" means any proceeding commenced by or against, the Company under any provision of the United States Bankruptcy Code and all other debtor relief laws of the United States, including assignments for the benefit of creditors,  formal or informal moratoria, compositions, extensions generally with creditors, or proceedings seeking reorganization, compromise, arrangement, administration, receivership, administrative receivership, winding up, dissolution, liquidation or other similar relief or proceeding or arrangement, or the appointment or threatened appointment of a liquidator, trustee in bankruptcy, receiver, administrative receiver, administrator or similar officer in respect of the Company's assets, or any other analogous step or procedure, which proceeding is not terminated within ninety (90) days after its commencement.

"**Investment Opportunity**" has the meaning set forth in **Section 4.16**.

"**Investment Value**" means the consideration paid by a Member for its Units on a per Unit basis.

"**Issuance Notice**" has the meaning set forth in **Section 9.01(b)**.

"**Joinder Agreement**" means a joinder agreement in form and substance satisfactory to the Manager.

"**Liquidator**" has the meaning set forth in **Section 13.03(a)**.

"**Losses**" has the meaning set forth in **Section 14.03(a)**.

"**Management Team**" has the meaning set forth **Section 8.01**.

"**Manager**" has the meaning set forth in **Section 8.01**.

"**Manager Termination Event**" means any of the following:

    (a)    the Manager's repeated failure to perform substantially its duties as the

Manager (other than any such failure resulting from its death, Disability or dissolution (or other cessation of business)) which failure, whether committed willfully or negligently, has continued unremedied for more than thirty (30) days after the Manager's receipt of written notice thereof from the Company;

        (b)    the Manager's commission of an Egregious Act;

        (c)    the material violation by the Manager of any covenant undertaken in **Article XI** herein;

        (d)    the Manager's death (if an individual) or dissolution or other cessation of business (if a Person other than an individual);

        (e)    the Manager's Disability (if an individual); or

        (f)    the Manager's resignation.

"**Member**" means (a) each Person identified on the Members Schedule as of the date hereof as a Member and who has executed this Agreement or a counterpart thereof (each, an "**Initial Member**"); and (b) and each Person who is hereafter admitted as a Member in accordance with the terms of this Agreement and the Delaware Act, in each case so long as such Person is shown on the Company's books and records as the owner of one or more Units. The Members shall constitute the "members" (as that term is defined in the Delaware Act) of the Company.

"**Member Nonrecourse Debt**" means "partner nonrecourse debt" as defined in Treasury Regulation Section 1.704-2(b)(4), substituting the term "Company" for the term "partnership" and the term "Member" for the term "partner" as the context requires.

"**Member Nonrecourse Debt Minimum Gain**" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if the Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Treasury Regulation Section 1.704-2(i)(3).

"**Member Nonrecourse Deduction**" means "partner nonrecourse deduction" as defined in Treasury Regulation Section 1.704-2(i), substituting the term "Member" for the term "partner" as the context requires.

"**Member ROFR Exercise Notice**" has the meaning set forth in **Section 10.03(d)(iv)**.

"**Members Schedule**" has the meaning set forth in **Section 3.01**.

"**Membership Interest**" means an interest in the Company owned by a Member, including such Member's right (based on the type and class of Unit or Units held by such Member), as applicable, (a) to a Distributive share of Net Income, Net Losses and other items of income, gain, loss and deduction of the Company; (b) to a Distributive share of the assets of the Company; (c) to vote on, consent to or otherwise participate in any decision of the Members as provided in this Agreement; and (d) to any and all other benefits to which such Member may be entitled as provided in this Agreement or the Delaware Act.

"**Misallocated Item**" has the meaning set forth in **Section 6.05**.

"**Moral Turpitude**" means any other crime defined as a crime of moral turpitude under Applicable Law, including murder, manslaughter, rape, abuse, assault, mayhem, kidnapping, robbery, burglary, theft, fraud, terrorism, arson, blackmail, forgery, embezzlement, larceny, extortion and bribery, as well as any attempt or conspiracy in connection with any of the foregoing.

1611778.1 – 32280.0001

"**Net Income**" and "**Net Loss**" mean, for each Fiscal Year or other period specified in this Agreement, an amount equal to the Company's taxable income or taxable loss, or particular items thereof, determined in accordance with Code Section 703(a) [where, for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or taxable loss], but with the following adjustments:

(a)       any income realized by the Company that is exempt from federal income taxation, as described in Code Section 705(a)(1)(B), shall be added to such taxable income or taxable loss, notwithstanding that such income is not includable in gross income;

(b)       any expenditures of the Company described in Code Section 705(a)(2)(B), including any items treated under Treasury Regulation Section 1.704-1(b)(2)(iv)(i) as items described in Code Section 705(a)(2)(B), shall be subtracted from such taxable income or taxable loss, notwithstanding that such expenditures are not deductible for federal income tax purposes;

(c)       any gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of the property so disposed, notwithstanding that the adjusted tax basis of such property differs from its Book Value;

(d)       any items of depreciation, amortization and other cost recovery deductions with respect to Company property having a Book Value that differs from its adjusted tax basis shall be computed by reference to the property's Book Value (as adjusted for Book Depreciation) in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(g);

(e)       if the Book Value of any Company property is adjusted as provided in the definition of Book Value, then the amount of such adjustment shall be treated as an item of gain or loss and included in the computation of such taxable income or taxable loss; and

(f)       to the extent an adjustment to the adjusted tax basis of any Company property pursuant to Code Sections 732(d), 734(b) or 743(b) is required, pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis).

"**New Units**" has the meaning set forth in **Section 9.01(a)**.

"**Non-Exercising Member**" has the meaning set forth in **Section 9.01(d)**.

"**Nonrecourse Liability**" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

"**Offered Class B Units**" has the meaning set forth in **Section 10.03(a)(i)**.

"**Offered Class A Units**" has the meaning set forth in **Section 10.03(a)(i)**.

"**Offered Units**" has the meaning set forth in **Section 10.03(a)(i)**.

"**Offering Member**" has the meaning set forth in **Section 10.03(a)(i)**.

"**Offering Member Notice**" has the meaning set forth in **Section 10.03(c)(i)**.

"**Organizer**" the authorized Person named in the Certificate of Formation.

1611778.1 – 32280.0001

"**Other Business**" has the meaning set forth in **Section 11.02**.

"**Over-allotment Exercise Period**" has the meaning set forth in **Section 9.01(d)**.

"**Over-allotment Notice**" has the meaning set forth in **Section 9.01(d)**.

"**Pacific Green**" means Pacific Green, LLC, a Delaware limited liability company and Big Tree Holdings, LLC, a Delaware limited liability company. Whenever this Agreement grants rights or preferential treatment to Pacific Green, or imposes requirements, obligations or restrictions on Pacific Green, all are intended to apply to each of Pacific Green, LLC and Big Tree Holdings, LLC.

"**Pacific Green Management**" means Pacific Green Management, LLC, a Delaware limited liability company.

"**Pacific Green Management Fee**" has the meaning set forth in **Section 8.04(b)(i)**.

"**Participating Investment**" has the meaning set forth in **Section 4.15**.

"**Partnership Representative**" has the meaning set forth in **Section 12.03**.

"**Percentage Interest**" means the percentage determined by dividing a Member's Units by the total number of all Members' Units.

"**Permitted Transfer**" means a Transfer of Class A Units or Class B Units carried out pursuant to **Section 10.02**.

"**Permitted Transferee**" means a recipient of a Permitted Transfer.

"**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"**Portfolio Company**" any Person in which the Company owns an equity interest, through ownership of voting securities or partnership or other ownership interests, by contract or otherwise.

"**Pre-emptive Member**" has the meaning set forth in **Section 9.01(a)**.

"**Preferred Return**" has the meaning set forth in **Section 7.02(a)**.

"**Preliminary Conference**" has the meaning set forth in **Section 15.12(b)**.

"**Proposed Transferee**" has the meaning set forth in **Section 10.05(a)**.

"**Prospective Purchaser**" has the meaning set forth in **Section 9.01(b)**.

"**Purchasing Rightholders**" has the meaning set forth in **Section 10.03(e)(ii)**.

"**Quarterly Estimated Tax Amount**" of a Member for any calendar quarter of a Fiscal Year means the excess, if any of (a) the product of (i) a quarter (¼) in the case of the first calendar quarter of the Fiscal Year, half (½) in the case of the second calendar quarter of the Fiscal Year, three-quarters (¾) in the case of the third calendar quarter of the Fiscal Year, and one (1) in the case of the fourth calendar quarter of the Fiscal Year and (ii) the Member's Estimated Tax Amount for such Fiscal Year over (b) all Distributions previously made during such Fiscal Year to such Member.

"**Regulatory Allocations**" has the meaning set forth in **Section 6.02(d)**.

"**Remaining Portion**" has the meaning set forth in **Section 10.05(e)(i)**.

"**Remaining Portion Notice**" has the meaning set forth in **Section 10.05(e)(i)**.

"**Remaining Tag-along Notice**" has the meaning set forth in **Section 10.05(e)(ii)**.

"**Representative**" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"**Restricted Period**" has the meaning set forth in **Section 11.02(a)**.

"**ROFR Rightholder Option Period**" has the meaning set forth in **Section 10.03(d)(iv)**.

"**Rules**" has the meaning set forth in **Section 15.18**.

"**Sale Notice**" has the meaning set forth in **Section 10.05(c)**.

"**Securities Act**" means the Securities Act of 1933, as amended, or any successor federal statute, and the rules and regulations thereunder, which shall be in effect at the time.

"**Selling Member**" has the meaning set forth in **Section 10.05(a)**.

"**Shortfall Amount**" has the meaning set forth in **Section 7.03(b)**.

"**Tag-along Member**" has the meaning set forth in **Section 10.05(a)**.

"**Tag-along Notice**" has the meaning set forth in **Section 10.05(d)(ii)**.

"**Tag-along Period**" has the meaning set forth in **Section 10.05(d)(ii)**.

"**Tag-along Portion**" has the meaning set forth in **Section 10.05(d)(i)**.

"**Tag-along Sale**" has the meaning set forth in **Section 10.05(a)**.

"**Tax Advance**" has the meaning set forth in **Section 7.03(a)**.

"**Tax Amount**" of a Member for a Fiscal Year means the product of (a) the Tax Rate for such Fiscal Year and (b) the Adjusted Taxable Income of the Member for such Fiscal Year with respect to its Units.

"**Tax Rate**" of a Member, for any period, means the highest marginal blended federal, state and local tax rate applicable to ordinary income, qualified dividend income or capital gains, as appropriate, for such period for an individual residing in Los Angeles, California, taking into account for federal income tax purposes the deduction under IRC Section 199A.

"**Taxing Authority**" has the meaning set forth in **Section 7.04(b)**.

"**Third Party Purchaser**" means any Person who, immediately prior to the contemplated transaction, (a) does not directly or indirectly own or have the right to acquire any outstanding Class A Units or Class B Units or (b) is not a Permitted Transferee of any Person who directly or indirectly owns or has the right to acquire any Class A Units or Class B Units.

"**Transfer**" means to, directly or indirectly, sell, transfer, assign, pledge, encumber, hypothecate or similarly dispose of, either voluntarily or involuntarily, by operation of law or otherwise, or to enter into any contract, option or other arrangement or understanding with respect to

the sale, transfer, assignment, pledge, encumbrance, hypothecation or similar disposition of, any Units owned by a Person or any interest (including a beneficial interest) in any Units owned by a Person. "**Transfer**" when used as a noun shall have a correlative meaning. "**Transferor**" and "**Transferee**" mean a Person who makes or receives a Transfer, respectively. When a Member is a Person other than an individual, "**Transfer**" shall also include any change in the power, directly or indirectly, to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities or partnership or other ownership interests, by contract or otherwise.

"**Treasury Regulations**" means the final or temporary regulations issued by the United States Department of Treasury pursuant to its authority under the Code, and any successor regulations.

"**Unallocated Item**" has the meaning set forth in **Section 6.05**.

"**Unit**" means a unit representing a fractional part of the Membership Interests of the Members and shall include all types and classes of Units, including the Class A Units and the Class B Units; *provided*, that any type or class of Unit shall have the privileges, preference, duties, liabilities, obligations and rights set forth in this Agreement and the Membership Interests represented by such type or class or series of Unit shall be determined in accordance with such privileges, preference, duties, liabilities, obligations and rights.

"**Withholding Advances**" has the meaning set forth in **Section 7.04(b)**.

**Section 1.02 Interpretation.** For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive and shall be interpreted to include "and/or"; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. The definitions given for any defined terms in this Agreement shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. Unless the context otherwise requires, references herein: (x) to Articles, Sections, and Exhibits mean the Articles and Sections of, and Exhibits attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

## ARTICLE II

## ORGANIZATION

**Section 2.01 Formation.**

(a)     The Company was formed on April 3, 2018, pursuant to the provisions of the Delaware Act, upon the filing of the Certificate of Formation with the Secretary of State of the State of Delaware.

(b)     This Agreement shall constitute the "limited liability company agreement" (as that term is used in the Delaware Act) of the Company. The rights, powers, duties, obligations and liabilities of the Members shall be determined pursuant to the Delaware Act and this Agreement. To the extent that the rights, powers, duties, obligations and liabilities of any Member are different by reason of any provision of this Agreement than they would be under the Delaware Act in the absence of such provision, this Agreement shall, to the extent permitted by the Delaware Act, control.

Page **12** of **54**

**Section 2.02 Name.** The name of the Company is "HILLS ONE, LLC" or such other name or names as the Manager may from time to time designate; *provided*, that the name shall always contain the words "Limited Liability Company" or the abbreviation "L.L.C." or the designation "LLC." The Manager shall give prompt notice to each of the Members of any change to the name of the Company.

**Section 2.03 Principal Office.** The principal office of the Company shall be at such place as may from time to time be determined by the Manager.

**Section 2.04 Registered Office; Registered Agent.**

(a)     The registered office of the Company shall be the office of the initial registered agent named in the Certificate of Formation or such other office (which need not be a place of business of the Company) as the Manager may designate from time to time in the manner provided by the Delaware Act and Applicable Law.

(b)     The registered agent for service of process on the Company in the State of Delaware shall be the initial registered agent named in the Certificate of Formation or such other Person or Persons as the Manager may designate from time to time in the manner provided by the Delaware Act and Applicable Law.

**Section 2.05 Purpose; Powers.**

(a)     The purpose of the Company is to engage in any lawful act or activity for which limited liability companies may be formed under the Delaware Act and to engage in any and all activities necessary or incidental thereto.

(b)     The Company shall have all the powers necessary or convenient to carry out the purposes for which it is formed, including the powers granted by the Delaware Act.

**Section 2.06 Term.** The term of the Company commenced on the date the Certificate of Formation was filed with the Secretary of State of the State of Delaware and shall continue in existence perpetually until the Company is dissolved in accordance with the provisions of this Agreement.

**Section 2.07 No State-Law Partnership.** The Members intend that the Company shall be treated as a partnership for federal and, if applicable, state and local income tax purposes, and, to the extent permissible, the Company shall elect to be treated as a partnership for such purposes. The Company and each Member shall file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment and no Member shall take any action inconsistent with such treatment. The Members intend that the Company shall not be a partnership (including a limited partnership) or joint venture, and that no Member, Manager or Officer of the Company shall be a partner or joint venturer of any other Member, Manager or Officer of the Company, for any purposes other than as set forth in the first sentence of this **Section 2.07**.

**Section 2.08 Organizer.** The Members by this Agreement ratify, confirm and consent to the actions of the Organizer and by this Agreement agree to release the Organizer from and indemnify the Organizer from and against any and all liability which may result from or in connection with the organization of the Company and all actions taken incident thereto.

**ARTICLE III**

**UNITS**

**Section 3.01 Units Generally.** The Membership Interests of the Members shall be represented by issued and outstanding Units, which may be divided into one of more types, classes or series. Each

Page **13** of **54**

type, class or series of Units shall have the privileges, preference, duties, liabilities, obligations and rights, including voting rights, if any, set forth in this Agreement. The Manager shall maintain a schedule of all Members, their respective mailing addresses and the amount and series of Units held by them (the "**Members Schedule**") and shall update the Members Schedule upon the issuance or Transfer of any Units to any new or existing Member. A copy of the Members Schedule as of the execution of this Agreement is attached hereto as **Schedule A** and incorporated herein by this reference.

**Section 3.02 Authorization and Issuance of Class A Units.** Subject to compliance with **Section 4.06(b)**, **Section 9.01** and **Section 10.01(b)**, the Company has authorized to issue One Hundred Thousand (100,000) Units designated as Class A Units. As of the Effective Date, Eleven Thousand (11,000) Class A Units are issued and outstanding to the Members as set forth on the Members Schedule. For the avoidance of doubt, each Class A Unit has the value of nine hundred and nine dollars ($909).

**Section 3.03 Authorization and Issuance of Class B Units.** Subject to compliance with **Section 9.01** and **Section 10.01(b)**, the Company is hereby authorized to issue One Hundred Thousand (100,000) Units designated as Class B Units. As of Effective Date, One Thousand One Hundred (1,100) Class B Units are issued and outstanding to the Members as set forth on the Members Schedule. For the avoidance of doubt, each Class B Unit has the value of nine hundred and nine dollars ($909).

**Section 3.04 Distinction between Class A Units and Class B Units.** Class A Units and Class B Units shall have the same privileges, preferences, duties, liabilities, obligations, value and unit price on sale and rights set forth in this Agreement, except that (a) the Class A Units shall possess different voting rights than the Class B Units, as more specifically set forth herein, in connection with those matters which require a vote of the Members hereunder, except as otherwise required by the Delaware Act or Applicable Law, and (b) the holders of the Class A Units shall have a preference on Distributions as provided in **Section 7.02**.

**Section 3.05 Certification of Units.**

(a)     The Manager in its sole discretion may, but shall not be required to, issue certificates to the Members representing the Units held by such Member.

(b)     In the event that the Manager shall issue certificates representing Units in accordance with **Section 3.05(a)**, then in addition to any other legend required by Applicable Law, all certificates representing issued and outstanding Units shall bear a legend substantially in the following form:

> THE UNITS REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A LIMITED LIABILITY COMPANY AGREEMENT AMONG THE COMPANY AND ITS MEMBERS, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL EXECUTIVE OFFICE OF THE COMPANY. NO TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF THE UNITS REPRESENTED BY THIS CERTIFICATE MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SUCH LIMITED LIABILITY COMPANY AGREEMENT.

> THE UNITS REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS AND MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED EXCEPT (A) PURSUANT TO A REGISTRATION STATEMENT EFFECTIVE UNDER SUCH ACT AND LAWS, OR (B) PURSUANT TO AN EXEMPTION FROM REGISTRATION THEREUNDER.

## ARTICLE IV

## MEMBERS

### Section 4.01 Admission of New Members.

(a)     Except as otherwise provided by this Agreement and subject to Section 5.09, new Members may be admitted from time to time (i) in connection with an issuance of Units by the Company, subject to compliance with the provisions of **Section 4.06(b)** and **Section 9.01**, and (ii) in connection with a Transfer of Units, subject to compliance with the provisions of **Article X**, and in either case, following compliance with the provisions of **Section 4.01(b)**.

(b)     In order for any Person not already a Member of the Company to be admitted as a Member, whether pursuant to an issuance or Transfer of Units, such Person shall have executed and delivered to the Company a written undertaking in the form of the Joinder Agreement. Upon the amendment of the Members Schedule by the Manager and the satisfaction of any other applicable conditions, including, if a condition, the receipt by the Company of payment for the issuance of the applicable Units, such Person shall be admitted as a Member and deemed listed as such on the books and records of the Company and thereupon shall be issued his, her or its Units. The Manager shall also adjust the Capital Accounts of the Members as necessary in accordance with **Section 5.03**.

**Section 4.02 Representations and Warranties of Members.** By execution and delivery of this Agreement or a Joinder Agreement, as applicable, each of the Members, whether admitted as of the date hereof or pursuant to **Section 4.01**, represents and warrants to the Company and acknowledges that:

(a)     The Units have not been registered under the Securities Act or the securities laws of any other jurisdiction, are issued in reliance upon federal and state exemptions for transactions not involving a public offering and cannot be disposed of unless (i) they are subsequently registered or exempted from registration under the Securities Act and (ii) the provisions of this Agreement have been complied with;

(b)     Such Member is an "accredited investor" within the meaning of Rule 501 promulgated under the Securities Act, as amended by Section 413(a) of the Dodd-Frank Wall Street Reform and Consumer Protection Act, and agrees that it will not take any action that could have an adverse effect on the availability of the exemption from registration provided by Rule 501 promulgated under the Securities Act with respect to the offer and sale of the Units;

(c)     Such Member's Units are being acquired for its own account solely for investment and not with a view to resale or distribution thereof;

(d)     Such Member has conducted its own independent review and analysis of the business, operations, assets, liabilities, results of operations, financial condition and prospects of the Company and such Member acknowledges that it has been provided adequate access to the personnel, properties, premises and records of the Company for such purpose;

(e)     The determination of such Member to acquire Units has been made by such Member independent of any other Member and independent of any statements or opinions as to the advisability of such purchase or as to the business, operations, assets, liabilities, results of operations, financial condition and prospects of the Company that may have been made or given by any other Member or by any agent or employee of any other Member;

(f)     Such Member has such knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of an investment in the Company and making an

Page **15** of **54**

informed decision with respect thereto;

(g)     Such Member is able to bear the economic and financial risk of an investment in the Company for an indefinite period of time;

(h)     The execution, delivery and performance of this Agreement have been duly authorized by such Member and do not require such Member to obtain any consent or approval that has not been obtained and do not contravene or result in a default in any material respect under any provision of any law or regulation applicable to such Member or other governing documents or any agreement or instrument to which such Member is a party or by which such Member is bound; and

(i)     This Agreement is valid, binding and enforceable against such Member in accordance with its terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium, and other similar laws of general applicability relating to or affecting creditors' rights or general equity principles (regardless of whether considered at law or in equity).

(j)     The Members hereby acknowledge and recognize that Pacific Green Management has disclosed its economic interest(s) in Hills Group, as reflected herein, to Pacific Green's investors.

**Section 4.03   No Personal Liability.** Except as otherwise provided in the Delaware Act, by Applicable Law or expressly in this Agreement, no Member will be obligated personally for any debt, obligation or liability of the Company or other Members, whether arising in contract, tort or otherwise, solely by reason of being a Member.

**Section 4.04   No Withdrawal.** A Member shall not cease to be a Member as a result of the Bankruptcy of such Member or as a result of any other events specified in § 18-304 of the Delaware Act. Subject to Section 4.13, so long as a Member continues to hold any Units, such Member shall not have the ability to withdraw or resign as a Member prior to the dissolution and winding up of the Company and any such withdrawal or resignation or attempted withdrawal or resignation by a Member prior to the dissolution or winding up of the Company shall be null and void. As soon as any Person who is a Member ceases to hold any Units, such Person shall no longer be a Member.

**Section 4.05   Death; Dissolution.** A Member's death (if such Member is an individual) or dissolution or other cessation of business (if such Member is a Person other than an individual) shall not cause the dissolution of the Company. In such event the Company and its business shall be continued by the remaining Member or Members and the Units owned by the deceased or dissolved Member shall automatically be Transferred to such Member's successors and assigns; *provided*, that within a reasonable time after such Transfer, the applicable successors and assigns shall sign a written undertaking substantially in the form of the Joinder Agreement. Notwithstanding the foregoing, in the event of any Transfer to the deceased or dissolved successors and assigns, the transferee shall not become a Member without the unanimous consent of all Members. Absent such consent, the transferee shall be entitled to the transferring Member's share of the Net Income and Net Losses of, and the right to receive Distributions from, the Company, but does not include any other rights of a Member under this Agreement or the Delaware Act, including the right to vote, participate in the management of the Company or the right to information concerning the business and affairs of the Company.

**Section 4.06   Voting.** Except as otherwise provided by this Agreement (including **Section 4.06(b)** and **Section 15.09**) or as otherwise required by the Delaware Act or Applicable Law:

(a)     each holder of a Class A Unit shall be entitled to one vote per Class A Unit on all matters upon which the holders of the Class A Units have the right to vote under this Agreement; and

(b)     each holder of a Class B Unit shall be entitled to one vote per Class B Unit on all

Page **16** of **54**

matters upon which the holders of the Class B Units have the right to vote under this Agreement.

## Section 4.07  Meetings.

(a)     No regular meetings of the Members shall be required to be held.  A meeting of the Members may be called by (i) the Manager or (ii) by a Member holding the majority of the Units in a series or class entitled to vote on the matter which is the subject of the meeting.

(b)     Written notice stating the place, date and time of the meeting and, in the case of a meeting of the Members not regularly scheduled, describing the purposes for which the meeting is called, shall be delivered not fewer than ten (10) Business Days and not more than thirty (30) days before the date of the meeting to each Member, by or at the direction of the Manager or the Member(s) calling the meeting, as the case may be.  The Members may hold meetings at the Company's principal office or at such other place as the Manager or the Member(s) calling the meeting may designate in the notice for such meeting.

(c)     Any Member may participate in a meeting of the Members by means of conference telephone or other communications equipment by means of which all Persons participating in the meeting can hear each other, and participation in a meeting by such means shall constitute presence in person at such meeting.

(d)     On any matter that is to be voted on by a Member who has the right to vote pursuant to this Agreement, such Member may vote in person or by proxy, and such proxy may be granted in writing, by means of Electronic Transmission or as otherwise permitted by Applicable Law.  Every proxy shall be revocable in the discretion of the Member executing it unless otherwise provided in such proxy; *provided*, that such right to revocation shall not invalidate or otherwise affect actions taken under such proxy prior to such revocation.

(e)     The business to be conducted at a meeting of the Members need not be limited to the purpose described in the notice of such meeting and can include other business; *provided*, that the Members shall have been notified of the meeting in accordance with **Section 4.07(b)**.

**Section 4.08  Quorum.**  A quorum of any meeting of the Members shall require the presence of the Members holding a majority of each class of Units held by all of the Members who have the right to vote pursuant to this Agreement.  Subject to **Section 4.09**, no action at any meeting may be taken by the Members unless the appropriate quorum is present.  Subject to **Section 4.09**, no action may be taken by the Members at any meeting at which a quorum is not present.

**Section 4.09  Action Without Meeting.**  Notwithstanding the provisions of **Section 4.08**, any matter that is to be voted on, consented to or approved by the Members who have the right to vote pursuant to this Agreement may be taken without a meeting, without prior notice and without a vote if consented to, in writing or by Electronic Transmission, by a Member or Members holding not less than a majority of the appropriate Units held by all the Members who have the right to vote pursuant to this Agreement.  A record shall be maintained by the Manager of each such action taken by written consent of a Member or Members.

**Section 4.10  Power of Members.**  The Members shall have the power to exercise any and all rights or powers granted to Members pursuant to the express terms of this Agreement and the Delaware Act.  Whenever this Agreement limits the rights or powers of Members that would otherwise be available under the Delaware Act, and to the extent that Delaware Act allows such a limitation, then the Members shall have only the rights and powers extended pursuant to this Agreement, and not pursuant to the Delaware Act.  Except as otherwise specifically provided by this Agreement or required by the Delaware Act, no Member, in its capacity as a Member, shall have the power to act for or on behalf of, or to bind, the Company.

**Section 4.11 No Interest in Company Property.** No real or personal property of the Company shall be deemed to be owned by any Member individually, but shall be owned by, and title shall be vested solely in, the Company. Without limiting the foregoing, each Member hereby irrevocably waives during the term of the Company any right that such Member may have to maintain any action for partition with respect to the property of the Company.

**Section 4.12 Mandatory Redemption.** The Manager may require, in its sole and absolute discretion, the redemption, in whole or in part, of any Class B Units if the Manager believes, in good faith, that the continued participation of the holder of such Class B Units in the Company (a) might cause the Company, the Manager or any Member to violate any law or breach any agreement, or (b) might otherwise be adverse to the interests of the Company, the Manager or any Member. The Manager shall give written notice to the holder of the Class B Units subject to such required redemption at least five (5) Business Days prior to the effective date of such redemption, which effective date shall be determined by the Manager in its sole and absolute discretion. The redemption price of such Class B Units shall equal the amount that would have been Distributed to the holder of those Class B Units pursuant to **Section 7.02** had all of the assets of the Company been sold for Fair Market Value and the Company liquidated on the effective date of the redemption.

**Section 4.13 Mandatory Repurchase.** Subject to **Section 5.09**, for a period of five (5) years following the Effective Date, and for so long as Hills Group is the Manager and Pacific Green is a Member, Pacific Green shall have the right to require Hills Group to purchase all of the Units held by Pacific Green in the event one (1) or more of the members of the Management Team fails to satisfy his or their obligations under **Section 8.06**. Pacific Green shall give written notice to Hills Group of its election to exercise such right by no later than thirty (30) days after Pacific Green discovers that one (1) or more of the members of the Management Team fails to satisfy his or their obligations under **Section 8.06**. The purchase price for Pacific Green's Units shall equal the amount that would have been Distributed to the holder of those Units pursuant to **Section 7.02** had all of the assets of the Company been sold for Fair Market Value and the Company liquidated on the effective date of the redemption **plus** Twenty Five Percent (25%).

**Section 4.14 Management Team Meetings.** Subject to **Section 5.09**, for so long as Hills Group is the Manager and Pacific Green is a Member, and unless otherwise agreed upon by Hills Group and Pacific Green, one (1) or more members of the Management Team shall meet and confer in good faith with a representative of Pacific Green for the purpose of reviewing and discussing the business and operations of the Company. Such meetings may be held by means of conference telephone or other communications equipment by means of which all Persons participating in the meeting can hear or communicate with each other by other means such as text messaging, and participation in a meeting by such means shall constitute presence in person at such meeting. Such monthly meetings shall not be deemed to be the meetings which are the subject of **Section 4.07**.

**Section 4.15 Participating Investments.** Subject to **Section 5.09**, For so long as Pacific Green is a Member, Pacific Green shall have the right to participate equally with the Company (or in whatever other percentages upon which they may agree) in any transaction pursuant to the Company purchasing an equity interest in, purchases the assets of or makes a loan to any Person in connection with the Company Business (each, a **"Participating Investment"**). The Company shall provide Pacific Green with written notice of any such prospective Participating Investment, which notice shall include a detailed summary of such prospective Participating Investment. Pacific Green shall be required to provide the Company with written notice of its election to participate in such prospective Participating Investment within five (5) Business Days of its receipt of the Company's notice. Pacific Green shall be deemed to have declined to participate in such prospective Participating Investment if the Company does not receive Pacific Green's written notice within such five (5) Business Day period. If Pacific Green declines to participate in such prospective Participating Investment, the Company shall have the right to proceed with and consummate such prospective Participating Investment without Pacific Green's participation and Pacific Green shall have no interest therein other than by virtue of it being a Member.

**Section 4.16 Investment Opportunities**. Subject to **Section 5.09**, for so long as Hills Group is the Manager and Pacific Green is a Member, Hills Group shall not purchase an equity interest in, purchase the assets of or make a loan to any Person involved in a cannabis or cannabis-related business (other than a cannabis or cannabis-related business whose sole or primary asset is real property) (each, a "**Investment Opportunity**") without first offering such Investment Opportunity to the Company. Hills Group shall provide the Company with written notice of any such prospective Investment Opportunity, which notice shall include a detailed summary of such prospective Investment Opportunity. The Company shall be required to provide Hills Group with written notice of its election to pursue such prospective Investment Opportunity within five (5) Business Days of its receipt of Hills Group's notice. The Company's election to pursue such prospective Investment Opportunity shall be subject to approval pursuant to **Section 8.10(j)**. The Company shall be deemed to have declined to pursue such prospective Investment Opportunity if Hills Group does not receive the Company's written notice within such five (5) Business Day period. If the Company declines to pursue such prospective Investment Opportunity, Hills Group shall have the right to pursue and consummate such prospective Investment Opportunity without the Company's involvement and the Company shall have no interest therein.

## ARTICLE V

### CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

**Section 5.01 Initial Capital Contributions.** Contemporaneously with the execution of this Agreement, each Initial Member owning Class A Units or Class B Units has made the Capital Contribution giving rise to such Initial Member's initial Capital Account and is deemed to own the number and class of Units, in each case, in the amounts set forth opposite such Initial Member's name on the Members Schedule as in effect on the date hereof.

### Section 5.02 Additional Capital Contributions.

(a)     No Member shall be required to make any additional Capital Contributions to the Company. Subject to **Section 5.09**, any future Capital Contributions made by any Member shall only be made with the consent of the Manager and in connection with an issuance of Units made in compliance with **Section 9.01**.

(b)     No Member shall be required to lend any funds to the Company and no Member shall have any personal liability for the payment or repayment of any Capital Contribution by or to any other Member.

**Section 5.03 Maintenance of Capital Accounts.** The Company shall establish and maintain for each Member a separate capital account (a "**Capital Account**") on its books and records in accordance with this **Section 5.03**. Each Capital Account shall be established and maintained in accordance with the following provisions:

(a)     Each Member's Capital Account shall be increased by the amount of:

(i)     such Member's Capital Contributions, including such Member's initial Capital Contribution;

(ii)     any Net Income or other item of income or gain allocated to such Member pursuant to **Article VI**; and

(iii)     any liabilities of the Company that are assumed by such Member or secured by any property Distributed to such Member.

Page **19** of **54**

(b)     Each Member's Capital Account shall be decreased by:

(i)     the cash amount or Book Value of any property Distributed to such Member pursuant to **Article VII** and **Section 13.03(c)**;

(ii)     the amount of any Net Loss or other item of loss or deduction allocated to such Member pursuant to **Article VI**; and

(iii)     the amount of any liabilities of such Member assumed by the Company or which are secured by any property contributed by such Member to the Company.

**Section 5.04  Succession Upon Transfer.** In the event that any Units are Transferred in accordance with the terms of this Agreement, the Transferee shall succeed to the Capital Account of the Transferor to the extent it relates to the Transferred Units and, subject to **Section 6.04**, shall receive allocations and Distributions pursuant to **Article VI**, **Article VII** and **Article XIII** in respect of such Units.

**Section 5.05  Negative Capital Accounts.** In the event that any Member shall have a deficit balance in his, her or its Capital Account, such Member shall have no obligation, during the term of the Company or upon dissolution or liquidation thereof, to restore such negative balance or make any Capital Contributions to the Company by reason thereof, except as may be required by Applicable Law or in respect of any negative balance resulting from a withdrawal of capital or dissolution in contravention of this Agreement.

**Section 5.06  No Withdrawal.** No Member shall be entitled to withdraw any part of his, her or its Capital Account, to receive any Distribution from the Company or to redeem any of his, her or its Units, except as may be provided in this Agreement. No Member shall receive any interest, salary or drawing with respect to its Capital Contributions or its Capital Account, except as otherwise provided in this Agreement. The Capital Accounts are maintained for the sole purpose of allocating items of income, gain, loss and deduction among the Members and shall have no effect on the amount of any Distributions to any Members, in liquidation or otherwise.

**Section 5.07  Treatment of Loans From Members.** Loans by any Member to the Company shall not be considered Capital Contributions and shall not affect the maintenance of such Member's Capital Account, other than to the extent provided in **Section 5.03(a)(iii)**, if applicable.

**Section 5.08  Modifications.** The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Section 1.704-1(b) of the Treasury Regulations and shall be interpreted and applied in a manner consistent with such Treasury Regulations. If the Manager determines that it is prudent to modify the manner in which the Capital Accounts, or any increases or decreases to the Capital Accounts, are computed in order to comply with such Treasury Regulations, the Manager may authorize such modifications.

**Section 5.09  Additional Investment.**

(a)     On or before September 15, 2018 (the "**Additional Investment Deadline**"), Pacific Green shall have the right to purchase from the Company no less than two thousand two hundred (2,200) additional Class B Units (the "Additional Minimum Investment") and no more than four thousand four hundred (4,400) additional Class B Units (the "Additional Maximum Investment"). The unit price for each additional Class B Unit shall be nine hundred and nine dollars ($909), the respective full amounts of which shall be paid by Pacific Green to the Company in cash within three (3) Business Days' of the Company's receipt of written notice of Pacific Green's purchase election as detailed in Subsections (b), (c) and (d) immediately below.

(b)     In the event the Company does not receive on or before the Additional Investment

Page **20** of **54**

Deadline notice from Pacific Green of its election to immediately make at least the Additional Minimum Investment, Pacific Green shall be deemed to have elected to decline making the Additional Minimum Investment, the Additional Maximum Investment or any investment in between the two and **Sections 4.15, 4.16, 8.01(b), 8.04(b), 8.10 (j), and 9.01(e)** shall immediately and irrevocably have no further force or effect.

(c)     In the event the Company does receive on or before the Additional Investment Deadline notice from Pacific Green of its election to immediately make an investment which is greater than the Additional Minimum Investment but less than the Additional Maximum Investment, Pacific Green shall be deemed to have elected to decline making the Additional Maximum Investment and **Section 9.01(e)**, shall immediately and irrevocably have no further force or effect.   For the sake of clarity, in the event that the Additional Minimum Investment has been reached by the Additional Investment Deadline but Additional Maximum Investment has not been reached, the management fees and equity participation in Hills Group as reflected in **Section 8.04(b)** and in **Section 8.04(c)** respectively shall be adjusted pro-rata, proportional to the investment made.   For example, in the event Pacific Green fulfills its Maximum Investment by the Additional Investment Deadline, the Pacific Green Management Fee, as defined in **Section 8.04(b)(i)**, shall be Twenty-Five Thousand Dollars ($25,000.00).

(d)     In the event the Company does receive on or before the Additional Investment Deadline notice from Pacific Green of its election to immediately make the Additional Maximum Investment, the subsections (b) and (c) immediately above shall remain in full force and effect.

(e)     Upon Pacific Green's purchase of such additional Class B Units, as reflected above, the Percentage Interests of the other Members shall be adjusted accordingly and the Manager shall have the authority to amend the Members Schedule accordingly.

(f)     For the avoidance of doubt and notwithstanding any other Sections in this Agreement, until the Additional Investment Deadline, the Manager can accept investment(s) from any other Person. At Manager's sole and absolute discretion, prior to the Additional Investment Deadline, Pacific Green shall be allowed to purchase Class B Units at the same valuation as any other Person.

# ARTICLE VI

## ALLOCATIONS

**Section 6.01 Allocation of Net Income and Net Loss.** For each Fiscal Year (or portion thereof), except as otherwise provided in this Agreement, Net Income and Net Loss (and, to the extent necessary, individual items of income, gain, loss or deduction) of the Company shall be allocated among the Members in a manner such that, after giving effect to the special allocations set forth in **Section 6.02**, the Capital Account balance of each Member, immediately after making such allocations, is, as nearly as possible, equal to (i) the Distributions that would be made to such Member pursuant to **Section 13.03(c)** if the Company were dissolved, its affairs wound up and its assets sold for cash equal to their Book Value, all Company liabilities were satisfied (limited with respect to each Nonrecourse Liability to the Book Value of the assets securing such liability), and the net assets of the Company were Distributed, in accordance with **Section 13.03(c)**, to the Members immediately after making such allocations, minus (ii) such Member's share of Company Minimum Gain and Member Nonrecourse Debt Minimum Gain, computed immediately prior to the hypothetical sale of assets.

**Section 6.02  Regulatory and Special Allocations.** Notwithstanding the provisions of **Section 6.01**:

(a)     If there is a net decrease in Company Minimum Gain (determined according to Treasury Regulations Section 1.704-2(d)(1)) during any Fiscal Year, each Member shall be specially allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such

Page **21** of **54**

Member's share of the net decrease in Company Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g). The items to be so allocated shall be determined in accordance with Treasury Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2). This **Section 6.02(a)** is intended to comply with the "minimum gain chargeback" requirement in Treasury Regulation Section 1.704-2(f) and shall be interpreted consistently therewith.

(b)     Member Nonrecourse Deductions shall be allocated in the manner required by Treasury Regulations Section 1.704-2(i). Except as otherwise provided in Treasury Regulations Section 1.704-2(i)(4), if there is a net decrease in Member Nonrecourse Debt Minimum Gain during any Fiscal Year, each Member that has a share of such Member Minimum Gain shall be specially allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to that Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain. Items to be allocated pursuant to this paragraph shall be determined in accordance with Treasury Regulations Sections 1.704-2(i)(4) and 1.704-2(j)(2). This **Section 6.02(b)** is intended to comply with the "minimum gain chargeback" requirements in Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c)     In the event any Member unexpectedly receives any adjustments, allocations or Distributions described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), Net Income shall be specially allocated to such Member in an amount and manner sufficient to eliminate the Adjusted Capital Account Deficit created by such adjustments, allocations or Distributions as quickly as possible. This **Section 6.02(c)** is intended to comply with the qualified income offset requirement in Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(d)     The allocations set forth in paragraphs (a), (b) and (c) above (the **"Regulatory Allocations"**) are intended to comply with certain requirements of the Treasury Regulations under Code Section 704. Notwithstanding any other provisions of this **Article VI** (other than the Regulatory Allocations), the Regulatory Allocations shall be taken into account in allocating Net Income and Net Losses among Members so that, to the extent possible, the net amount of such allocations of Net Income and Net Losses and other items and the Regulatory Allocations to each Member shall be equal to the net amount that would have been allocated to such Member if the Regulatory Allocations had not occurred.

(e)     The Company and the Members acknowledge that allocations like those described in Proposed Treasury Regulation Section 1.704-1(b)(4)(xii)(c) (**"Forfeiture Allocations"**) result from the allocations of Net Income and Net Loss provided for in this Agreement. For the avoidance of doubt, the Company is entitled to make Forfeiture Allocations and, once required by applicable final or temporary guidance, allocations of Net Income and Net Loss will be made in accordance with Proposed Treasury Regulation Section 1.704-1(b)(4)(xii)(c) or any successor provision or guidance.

(d)     To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Sections 734(b) or 743(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(2) or 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as the result of a Distribution to a Member in complete liquidation of such Member's interest in the Company, the amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in accordance with their interests in the Company in the event Treasury Regulations Section 1.704-(b)(2)(iv)(m)(2) applies, or to the Member to whom such distribution was made in the event Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4) applies. If a Code Section 754 election is made at a Member's request, then such Member shall pay and be responsible for all accounting fees and costs of adjusting basis of all assets, including Portfolio Companies, if the election has a cascading effect.

**Section 6.03  Tax Allocations.**

(a)    Subject to **Section 6.03(b)** through **Section 6.03(e)**, all income, gains, losses and deductions of the Company shall be allocated, for federal, state and local income tax purposes, among the Members in accordance with the allocation of such income, gains, losses and deductions among the Members for computing their Capital Accounts, except that if any such allocation for tax purposes is not permitted by the Code or other Applicable Law, the Company's subsequent income, gains, losses and deductions shall be allocated among the Members for tax purposes, to the extent permitted by the Code and other Applicable Law, so as to reflect as nearly as possible the allocation set forth herein in computing their Capital Accounts.

(b)    Items of Company taxable income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall be allocated among the Members in accordance with Code Section 704(c) and the traditional method of Treasury Regulations Section 1.704-3(b), so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its Book Value.

(c)    If the Book Value of any Company asset is adjusted pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(f) as provided in clause (c) of the definition of Book Value, subsequent allocations of items of taxable income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Book Value in the same manner as under Code Section 704(c).

(d)    Allocations of tax credit, tax credit recapture and any items related thereto shall be allocated to the Members according to their interests in such items as determined by the Manager taking into account the principles of Treasury Regulations Section 1.704-1(b)(4)(ii).

(e)    The Company shall make allocations pursuant to this **Section 6.03** in accordance with the traditional method in accordance with Treasury Regulations Section 1.704-3(d).

(f)    Allocations pursuant to this **Section 6.03** are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Net Income, Net Losses, Distributions or other items pursuant to any provisions of this Agreement.

**Section 6.04  Allocations in Respect of Transferred Units.**  In the event of a Transfer of Units during any Fiscal Year made in compliance with the provisions of **Article X**, Net Income, Net Losses and other items of income, gain, loss and deduction of the Company attributable to such Units for such Fiscal Year shall be determined using the interim closing of the books method.

**Section 6.05  Curative Allocations.**  In the event that the Partnership Representative determines, after consultation with counsel experienced in income tax matters, that the allocation of any item of Company income, gain, loss or deduction is not specified in this **Article VI** (an **"Unallocated Item"**), or that the allocation of any item of Company income, gain, loss or deduction hereunder is clearly inconsistent with the Members' economic interests in the Company (determined by reference to the general principles of Treasury Regulations Section 1.704-1(b) and the factors set forth in Treasury Regulations Section 1.704-1(b)(3)(ii)) (a **"Misallocated Item"**), then the Manager may allocate such Unallocated Items, or reallocate such Misallocated Items, to reflect such economic interests; *provided,* that no such allocation will be made without the prior consent of each Member that would be adversely and disproportionately affected thereby; and *provided, further,* that no such allocation shall have any material effect on the amounts distributable to any Member, including the amounts to be distributed upon the complete liquidation of the Company.

### ARTICLE VII

### DISTRIBUTIONS

Page **23** of **54**

**Section 7.01  General.**

(a)     Subject to **Section 7.01(b)**, **Section 7.02** and **Section 7.03**, the Manager shall have sole discretion regarding the amounts and timing of Distributions to Members, including to decide to forego payment of Distributions in order to provide for the retention and establishment of reserves, capital investments, or payment to third parties, of such funds as it deems necessary with respect to the reasonable business needs of the Company (which needs may include the payment or the making of provision for the payment when due of the Company's obligations, including present and anticipated debts and obligations, capital needs and expenses, the payment of any management or administrative fees and expenses, and reasonable reserves for contingencies).

(b)     Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any Distribution to Members if such Distribution would violate Section 18-607 of the Delaware Act or other Applicable Law.

**Section 7.02  Priority of Distributions.**  After making all Distributions required for a given Fiscal Year under **Section 7.03** and subject to the priority of Distributions pursuant to **Section 13.03(c)**, if applicable, all Distributions determined to be made by the Manager pursuant to **Section 7.01** shall be made to the Members as follows:

(a)     First, to all of the Members, who made cash Capital Contributions, *parri-passu*, in proportion to their respective cash Capital Contributions, until Distributions to a Member under this **Section 7.02(a)** equals the sum of (i) such Member's aggregate cash Capital Contributions, and (ii) Eight Percent (8%) per year simple interest on the amount in clause (i) from the Effective Date until the date of the distribution (the "**Preferred Return**"); and

(b)     Thereafter, to all of the Members, *parri-passu*, in proportion to their respective Percentage Interests.

Further, notwithstanding anything to the contrary set forth in this Agreement, the Manager shall have the right to establish cash reserves for the Company as are required pursuant to any agreements to which the Company is a party or as the Manager otherwise determines are necessary or desirable in its sole and absolute discretion.

**Section 7.03  Tax Advances.**

(a)     Subject to any restrictions in any of the Company's then applicable debt-financing arrangements, and subject to the Manager's sole discretion to retain any amounts necessary to satisfy the Company's obligations, at least five (5) Business Days before each date prescribed by the Code for a calendar-year taxpayer to pay quarterly installments of estimated tax, the Company shall use commercially reasonable efforts to Distribute cash to each Member in proportion to and to the extent of such Member's Quarterly Estimated Tax Amount for the applicable calendar quarter (each such Distribution, a "**Tax Advance**").

(b)     If, at any time after the final Quarterly Estimated Tax Amount has been Distributed pursuant to **Section 7.03(a)** with respect to any Fiscal Year, the aggregate Tax Advances to any Member with respect to such Fiscal Year are less than such Member's Tax Amount for such Fiscal Year (a "**Shortfall Amount**"), the Company shall use commercially reasonable efforts to Distribute cash in proportion to and to the extent of each Member's Shortfall Amount. The Company shall use commercially reasonable efforts to Distribute Shortfall Amounts with respect to a Fiscal Year before the seventy-fifth (75th) day of the next succeeding Fiscal Year; *provided*, that if the Company has made Distributions other than pursuant to this **Section 7.03**, the Manager may apply such Distributions to reduce any Shortfall Amount.

(c)     If the aggregate Tax Advances made to any Member pursuant to this **Section 7.03** for

Page **24** of **54**

any Fiscal Year exceed such Member's Tax Amount (an "**Excess Amount**"), such Excess Amount shall reduce subsequent Tax Advances that would be made to such Member pursuant to this **Section 7.03**, except to the extent taken into account as an advance pursuant to **Section 7.03(d)**.

(d)     Any Distributions made pursuant to this **Section 7.03** shall be treated for purposes of this Agreement as advances on Distributions pursuant to **Section 7.02** and shall reduce, dollar-for-dollar, the amount otherwise Distributable to such Member pursuant to **Section 7.02**.

## Section 7.04 Tax Withholding; Withholding Advances.

(a)     If requested by the Manager, each Member shall, if able to do so, deliver to the Manager:

(i)     an affidavit in form satisfactory to the Manager that the applicable Member is not subject to withholding under the provisions of any federal, state, local, foreign or other Applicable Law;

(ii)     any certificate that the Manager may reasonably request with respect to any such laws; or

(iii)     any other form or instrument reasonably requested by the Manager relating to any Member's status under such law.

If a Member fails or is unable to deliver to the Manager the affidavit described in **Section 7.04(a)(i)**, the Manager may withhold amounts from such Member in accordance with **Section 7.04(b)**.

(b)     The Company is hereby authorized at all times to make payments ("**Withholding Advances**") with respect to each Member in amounts required to discharge any obligation of the Company (as determined by the Partnership Representative based on the advice of legal or tax counsel to the Company) to withhold or make payments to any federal, state, local or foreign taxing authority (a "**Taxing Authority**") with respect to any Distribution or allocation by the Company of income or gain to such Member (including payments made pursuant to Code Section 6225 as amended by the Bipartisan Budget Act of 2015 ("**BBA**") and allocable to a Member as determined by the Tax Matters Member or Partnership Representative in its sole discretion) and to withhold the same from Distributions to such Member. Any funds withheld from a Distribution by reason of this **Section 7.04(b)** shall nonetheless be deemed Distributed to the Member in question for all purposes under this Agreement and, at the option of the Manager, shall be charged against the Member's Capital Account.

(c)     Any Withholding Advance made by the Company to a Taxing Authority on behalf of a Member and not simultaneously withheld from a Distribution to that Member shall, with interest thereon accruing from the date of payment at a rate equal to the prime rate published in the *Wall Street Journal* on the date of payment plus two percent (2.0%) per annum (the "**Company Interest Rate**"):

(i)     be promptly repaid to the Company by the Member on whose behalf the Withholding Advance was made (which repayment by the Member shall not constitute a Capital Contribution, but shall credit the Member's Capital Account if the Manager shall have initially charged the amount of the Withholding Advance to the Capital Account); or

(ii)     with the consent of the Manager, be repaid by reducing the amount of the next succeeding Distribution or Distributions to be made to such Member (which reduction amount shall be deemed to have been Distributed to the Member, but which shall not further reduce the Member's Capital Account if the Manager shall have initially charged the amount of the Withholding Advance to the Capital Account).

Interest shall cease to accrue from the time the Member on whose behalf the Withholding Advance was

Page **25** of **54**

made repays such Withholding Advance (and all accrued interest) by either method of repayment described above.

(d)     Each Member hereby agrees to indemnify and hold harmless the Company and the other Members from and against any liability with respect to taxes, interest or penalties which may be asserted by reason of the Company's failure to deduct and withhold tax on amounts Distributable or allocable to such Member. The provisions of this **Section 7.04(d)** and the obligations of a Member pursuant to **Section 7.04(c)** shall survive the termination, dissolution, liquidation and winding up of the Company and the withdrawal of such Member from the Company or Transfer of its Units. The Company may pursue and enforce all rights and remedies it may have against each Member under this **Section 7.04**, including bringing a lawsuit to collect repayment with interest of any Withholding Advances.

(e)     Neither the Company nor the Manager shall be liable for any excess taxes withheld in respect of any Distribution or allocation of income or gain to a Member. In the event of any over withholding, a Member's sole recourse shall be to apply for a refund from the appropriate Taxing Authority.

### Section 7.05  Distributions in Kind.

(a)     The Manager is hereby authorized, in its sole discretion, to make Distributions to the Members in the form of securities or other property held by the Company; *provided*, that Tax Advances shall only be made in cash. In any non-cash Distribution, the securities or property so Distributed will be Distributed among the Members in the same proportion and priority as cash equal to the Fair Market Value of such securities or property would be Distributed among the Members pursuant to **Section 7.02**.

(b)     Any Distribution of securities shall be subject to such conditions and restrictions as the Manager determines are required or advisable to ensure compliance with Applicable Law. In furtherance of the foregoing, the Manager may require that the Members execute and deliver such documents as the Manager may deem necessary or appropriate to ensure compliance with all federal and state securities laws that apply to such Distribution and any further Transfer of the Distributed securities, and may appropriately legend the certificates that represent such securities to reflect any restriction on Transfer with respect to such laws.

## ARTICLE VIII

## MANAGEMENT

### Section 8.01  The Manager.

(a)     The business and affairs of the Company shall be managed, operated and controlled by or under the direction of a single manager (the "**Manager**"). The Manager shall have, and is hereby granted, the full and complete power, authority and discretion for, on behalf of and in the name of the Company, to take such actions as it may in its sole discretion deem necessary or advisable to carry out any and all of the objectives and purposes of the Company, subject only to the terms of this Agreement. Except as set forth in **Section 8.10**, such power, authority and discretion shall include the right to (a) make all decisions in connection with the Company Business, (b) make all decisions with respect to investments in Portfolio Companies, including the ability to invest all Company funds into one (1) Portfolio Company, to diversify or to hold Company funds in cash or short-term notes, (c) authorize and issue New Units, (d) make tax elections, including the Code Section 754 election, (e) amend this Agreement without the consent of the Company or the Members (provided that such amendment does not have a material adverse effect on all of the Members), (f) enter into, make and perform contracts on such terms as it deems appropriate, (g) establish, maintain and close accounts with financial institutions is such amounts as it deems necessary or desirable and to draw checks and

other orders against such accounts, (h) engage at the expense of the Company such accountants, attorneys, consultants and other Persons as it deems necessary or desirable for purposes of carrying out the Company's business and affairs, (i) pay, extend, renew, modify, adjust, prosecute, defend or settle any obligation, suit, liability, cause of action or claim, including tax audits, either in favor of or against the Company, and (j) invest funds on a temporary or short term basis pending utilization in the Company's business or Distribution to the Members in such manner as it deems prudent and in the best interests of the Company. The initial Manager of the Company shall be Hills Group. As of the Effective Date, the beneficial owners of Hills Group are Alex Reyter, Jay Rifkin and Paul Fiore (the "**Management Team**").

(b)     In the event of any deadlock amongst the members of the Management Team in connection with any of the matters properly decided by the Manager pursuant to this **Section 8.01** or elsewhere in the Agreement, the deadlock shall be resolved by the vote of Jacob Stein, for so long as Pacific Green is a Member, Pacific Green is managed by Pacific Green Management and for so long as Jacob Stein is the manager of Pacific Green Management. At such time, if any, as Pacific Green is no longer a Member, Pacific Green Management is no longer the manager of Pacific Green or Jacob Stein is no longer the manager of Pacific Green Management, then the deadlock shall be resolved by the vote of any other Person so designated by the mutual agreement of the Management Team.

**Section 8.02 Vacancy.**  The Manager shall serve as the Manager of the Company until the occurrence of a Manager Termination Event. Upon the occurrence of a Manager Termination Event, the Person serving as the Manager shall automatically, and without any action by the Members, cease to be a Manager. Upon the occurrence of a Manager Termination Event, and notwithstanding anything to the contrary set forth in this Agreement, a replacement Manager shall be elected by the unanimous vote of the Class A Units. If the Manager is also a Member, the occurrence of a Manager Termination Event shall not affect the Manager's rights as a Member.

**Section 8.03 Resignation.**  The Manager may resign at any time by delivering his written resignation to the Company. Any such resignation shall be effective upon receipt thereof unless it is specified to be effective at some other time or upon the occurrence of some other event. The Company's acceptance of a resignation shall not be necessary to make it effective. If the Manager is also a Member, the resignation of the Manager shall not affect the Manager's rights as a Member.

**Section 8.04 Compensation.**

(a)     In consideration of identifying, organizing and managing the Company Business, including the Company's investments and assets, and for performance by Manager of its duties enumerated in this Agreement, the Company shall pay to the Manager a management fee as follows:

(i)     Until such time as the Company's Gross Revenue exceeds Five Hundred Thousand Dollars ($500,000.00) per month for three (3) consecutive calendar months, the Company shall pay to the Manager the sum of Thirty Thousand Dollars ($30,000.00) per month in advance on the first day of each calendar month; and

(ii)     Thereafter, the Company shall pay to the Manager a sum which is the greater of (A) Seventy-Five Thousand Dollars ($75,000.00) per month, and (B) the Fair Market Salary per month as determined in good faith from time to time by the Manager, either of which shall be paid in advance on the first day of each calendar month.

(iii)     For the purposes of this **Section 8.04**, Fair Market Salary shall not exceed Two Hundred Fifty Thousand Dollars ($250,000.00) per month).

In its sole and absolute discretion, the Manager may retain the services of an independent, third-party valuation service, at the Company's expense, to assist in determination of the Fair Market Salary. The Manager may, in its sole and absolute discretion, defer the payment of its compensation; *provided,*

that no interest shall be paid by the Company on such deferral.

(b)     Subject to **Section 5.09**, in consideration of participating as an advisor in connection with the operation and management of the Company Business, and for so long as Pacific Green is a Member, the Company shall pay to Pacific Green Management (or the then current manager of Pacific Green) a supervisory fee as follows:

(i)     The Company shall pay to Pacific Green Management (or the then current manager of Pacific Green) the sum of Twenty-Five Thousand Dollars ($25,000.00) per calendar year in advance on the first day of the calendar year (the "**Pacific Green Management Fee**"); and

(ii)     In any calendar year in which the Company's Gross Revenue exceeds Ten Million Dollars ($10,000,000.00) or any additional increment of Ten Million Dollars ($10,000,000.00), the Company shall pay to Pacific Green Management (or the then current manager of Pacific Green) in arrears an additional sum of Fifty Thousand Dollars ($50,000.00) per each Ten Million Dollar ($10,000,000.00) increment in arrears by no later than the sixtieth (60th) day of the following calendar year.  Thus, an additional sum of Fifty Thousand Dollars ($50,000.00) shall be due and payable when the Company's Gross Revenue in a calendar year exceeds Ten Million Dollars ($10,000,000.00), when the Company's Gross Revenue in that same calendar year exceeds Twenty Million Dollars ($20,000,000.00), when the Company's Gross Revenue in that same calendar year exceeds Thirty Million Dollars ($30,000,000.00) and so forth.

(iii)     Hills Group shall grant Pacific Green Management a three percent (3%) equity under its direct control and ownership.

(c)     The Company shall bear, and reimburse the Manager for, all expenses (the "**Company Expenses**") incurred in connection with the Company, including the following: (i) expenses incurred in connection with (A) forming the Company and offering the Units, including the legal and accounting fees incurred in connection with preparing this Agreement, (B) operating the day-to-day business of the Company, including allocable expenses of administration, rent, office expenses salaries paid to employees and the cost of maintaining books and records, (C) communicating with the Members, (D) all accounting fees and expenses incurred in connection with the preparation of the annual financial statements, the audit of such statements, and any tax returns required to be filed by the Company, (E) all appraisal and valuation fees of both the Company's assets and of Portfolio Company investments, and (F) costs of private investigators and background checks; (ii) all taxes payable in respect of the holding of, or dealing with, the investments of the Company; (iii) all costs and expenses incurred as a result of termination of the Company and the realization of Company assets; (iv) all taxes or governmental charges, brokerage fees, commissions and other duties, charges or fees arising in connection with the purchase and sale of real estate for the Company; (v) any costs and expenses of any litigation involving the Company and the amount of any judgment or settlement paid in connection therewith, excluding, however, the costs and expenses of any litigation, judgment or settlement in which the conduct of the Manager is found to have violated the standard of conduct set forth in this Agreement; (vi) all costs and expenses incurred in connection with the redemption of any Units and the holder(s) of such Units withdrawal from the Company which are not borne by such holder(s); and (vii) all other ordinary and extraordinary expenses which may be incurred by the Company.

(d) The Manager shall bear no Company Expenses and shall be reimbursed for all Company Expenses incurred by the Manager on behalf of the Company

(e)     Nothing contained in this **Section 8.04** shall be construed to preclude any Manager from serving the Company in any other capacity and receiving reasonable compensation for such services.

**Section 8.05 Sole Representative.** Subject to the restrictions set forth in this Agreement, the Delaware Act and other Applicable Law, the Manager shall be the sole agent and authorized representative of the Company. No Member shall have the authority, in such Member's capacity as the Member, to act on behalf of or to bind the Company. Accordingly, each of the Members shall indemnify, defend and hold harmless the Company from and against any and all demands, claims, complaints, actions, causes of action, damages, debts, liabilities, losses, fines, judgments, settlements, obligations, duties, liens, costs and expenses (including attorneys' fees) of every nature, character and description arising from or out of any action by such Member in contravention of the restrictions imposed by this Section.

**Section 8.06 Devotion of Time.** Subject to **Section 5.09**, the Manager and the Management Team (or as many of the Management Team as are not then deceased, Disabled or otherwise unable to participate in the operation and management of the Manager due to circumstances beyond his reasonable control) shall devote the amount of time and attention to the Company's business and affairs that are reasonably necessary for the Company's day-to-day operation and management. Without limiting the generality of the provisions of Section 8.06, it is hereby acknowledged and recognized that the Management Team has business interests and activities in addition to those relating to the Company, which do not require full time operational oversight and management. Neither the Company nor any Member shall have any right pursuant to this Agreement to share or participate in such other business interests or activities or to the income or proceeds derived therefrom. The Management Team shall not incur any liability to the Company or any Member as a result of engaging in any other business interests or activities and shall owe no duties to the Members as a result of such other business interests and activities. At such time, if any, as Pacific Green has received the full amount of its Preferred Return, the obligations set forth in this **Section 8.06** shall no longer apply to the Manager and the Management Team.

**Section 8.07 No Personal Liability.** Except as otherwise provided in the Delaware Act, by Applicable Law or expressly in this Agreement, the Manager shall not be obligated personally for any debt, obligation or liability of the Company, whether arising in contract, tort or otherwise, solely by reason of being a Manager.

**Section 8.08 Reliance.** In performing its duties, the Manager shall be entitled to rely on information, opinions, reports or statements, including financial statements and other financial data, of other Persons, unless the Manager has knowledge concerning the matter in question that would cause such reliance to be unwarranted and provided that the Manager acts in good faith and after reasonable inquiry when the need therefor is indicated by the circumstances.

**Section 8.09 Acts Furthering Manager's Interest.** The Manager does not violate a duty or obligation under the Delaware Act or Applicable Law based on the fact that the Manager's conduct furthers the Manager's or its Affiliates own interests. By way of example, and not limitation, the Manager may vote or make an election, or decide whether to approve or disapprove, an act or transaction of the Company based upon the effect that such act or transaction would have upon the interests of the Manager or its Affiliates outside of the Company.

**Section 8.10 Acts Requiring Members' Approval.** Subject to **Section 5.09** and notwithstanding anything to the contrary set forth in this Agreement, the following acts may **not** be taken by the Manager without the approval of the Seventy Five Percent (75%) of the Units and, if at the time Pacific Green is a Member and is not a part of the Units which comprise the Seventy Five Percent (75%) of the Units approving the Manager's act, without Pacific Green's prior written approval of such act:

    (a)    Amending the Certificate of Formation, this Agreement or any of the Company's other organizational documents;

    (b)    Changing the nature of the Company Business;

(c)     Filing an Insolvency Proceeding by or on behalf of the Company or consenting to the institution of an Insolvency Proceeding against the Company;

(d)     Performing any act that would make it impossible to carry on the Company Business;

(e)     Liquidating, dissolving, reorganizing or recapitalizing the Company or a Portfolio Company in which the Company or merging the Company or a Portfolio Company with another Person which is not an individual;

(f)     Authorizing, issuing or selling any New Units below Pacific Green's Investment Value;

(g)     Selling all or substantially all of the Company's assets or the assets of a Portfolio Company, other than the sale of all or substantially all of the Company's inventory of products in the ordinary course of business;

(h)     Unless approved in writing by Members beforehand, as part of the budgetary process or similar, spending any amount in excess of Two Hundred Fifty Thousand Dollars ($250,000.00) in any one calendar year on any one-line item of the Company's operating expenses (e.g., rent, insurance, etc.), excluding sums payable under **Section 8.04**;

(i)     Purchasing an equity interest in, purchasing the assets of or making a loan to any Person in connection with the Company Business for an amount in excess of Five Hundred Thousand Dollars ($500,000.00);

(j)     Electing to pursue an Investment Opportunity; or

(k)     Taking, or causing to be taken, any action which would be in contravention of any of the non-waivable or non-modifiable provisions of the Delaware Act, but only to the extent that the Delaware Act does not permit such provisions to be waived or modified by the Certificate of Formation or this Agreement and those provisions have been so waived or modified thereby or by this Agreement.

## ARTICLE IX

## NEW UNITS

### Section 9.01 Pre-emptive Right.

(a)     The Company hereby grants to each Unit holder (each, a **"Pre-emptive Member"**) the right to purchase its Applicable Pro Rata Portion of any New Units that the Company may from time to time propose to issue or sell. The term **"New Units"** shall mean any new Class B Units authorized by the Manager after the date of this Agreement.

(b)     The Company shall give written notice (an **"Issuance Notice"**) of any proposed issuance or sale described in **Section 9.01(a)** to the Pre-emptive Members within twenty (20) Business Days following the date upon which the Manager authorizes the issuance of New Units. The Issuance Notice shall, if applicable, be accompanied by a written offer from any prospective purchaser seeking to purchase New Units (a **"Prospective Purchaser"**) and shall set forth the material terms and conditions of the proposed issuance or sale, including:

(i)     the number and description of the New Units proposed to be issued and the percentage of the Company's Units then outstanding on a Fully Diluted Basis (both in the aggregate and with respect to each class or series of Units proposed to be issued) that such issuance would represent;

(ii)     the proposed issuance date, which shall be at least thirty-five (35) Business

Page **30** of **54**

Days from the date of the Issuance Notice;

        (iii)    the proposed purchase price per unit of the New Units; and

        (iv)    if the consideration to be paid by the Prospective Purchaser includes non-cash consideration, the Manager's good-faith determination of the Fair Market Value thereof.

The Issuance Notice shall also be accompanied by a current copy of the Members Schedule indicating the Pre-emptive Members' holdings of Class A Units and Class B Units in a manner that enables each Pre-emptive Member to calculate its Pro Rata Portion of any New Units.

        (c)    Each Pre-emptive Member shall for a period of five (5) Business Days following the receipt of an Issuance Notice (the "**Exercise Period**") have the right to elect irrevocably to purchase all or any portion of its Pro Rata Portion of any New Units at the respective purchase price set forth in the Issuance Notice by delivering a written notice to the Company (an "**Acceptance Notice**") specifying the number of New Units it desires to purchase. The delivery of an Acceptance Notice by a Pre-emptive Member shall be a binding and irrevocable offer by such Member to purchase the New Units described therein. The failure of a Pre-emptive Member to deliver an Acceptance Notice by the end of the Exercise Period shall constitute a waiver of its rights under this **Section 9.01** with respect to the purchase of such New Units but shall not affect its rights with respect to any future issuances or sales of New Units.

        (d)    No later than five (5) Business Days following the expiration of the Exercise Period, the Company shall notify each Pre-emptive Member in writing of the number of New Units that each Pre-emptive Member has agreed to purchase (including, for the avoidance of doubt, where such number is zero) (the "**Over-allotment Notice**"). Each Pre-emptive Member exercising its rights to purchase its Applicable Pro Rata Portion of the New Units in full (an "**Exercising Member**") shall have a right of over-allotment such that if any other Pre-emptive Member has failed to exercise its right under this **Section 9.01** to purchase its full Applicable Pro Rata Portion of the New Units (each, a "**Non-Exercising Member**"), such Exercising Member may purchase its Applicable Pro Rata Portion of such Non-Exercising Member's allotment by giving written notice to the Company within five (5) Business Days of receipt of the Over-allotment Notice (the "**Over-allotment Exercise Period**").

        (e)    Subject to **Section 5.09**, and notwithstanding the foregoing, if Pacific Green is an Exercising Member, Pacific Green's purchase price for its Applicable Pro Rata Portion shall be ten percent (10%) less than the purchase price that would otherwise be applicable.

        (f)    Following the expiration of the Exercise Period and, if applicable, the Over-allotment Exercise Period, the Company shall be free to complete the proposed issuance or sale of New Units described in the Issuance Notice with respect to which Pre-emptive Members declined to exercise the pre-emptive right set forth in this **Section 9.01** on terms no less favorable to the Company than those set forth in the Issuance Notice (except that the amount of New Units to be issued or sold by the Company may be reduced); *provided*, that the price at which the New Units are sold to the Prospective Purchaser is at least equal to or higher than the purchase price described in the Issuance Notice. In the event the Company has not sold such New Units within such time period, the Company shall not thereafter issue or sell any New Units without first again offering such securities to the Members in accordance with the procedures set forth in this **Section 9.01**.

        (g)    The closing of any purchase by any Pre-emptive Member shall be consummated concurrently with the consummation of the issuance or sale described in the Issuance Notice. Upon the issuance or sale of any New Units in accordance with this **Section 9.01**, the Company shall deliver the New Units free and clear of any liens (other than those arising hereunder and those attributable to the actions of the purchasers thereof), and the Company shall so represent and warrant to the purchasers thereof, and further represent and warrant to such purchasers that such New Units shall be, upon issuance thereof to the Exercising Members and after payment therefor, duly authorized,

validly issued, fully paid and non-assessable. The Company, in the discretion of the Manager pursuant to **Section 3.05(a)**, may deliver to each Exercising Member certificates evidencing the New Units. Each Exercising Member shall deliver to the Company the purchase price for the New Units purchased by it by certified or bank check or wire transfer of immediately available funds. Each party to the purchase and sale of New Units shall take all such other actions as may be reasonably necessary to consummate the purchase and sale including entering into such additional agreements as may be necessary or appropriate.

**Section 9.02 Non-Dilution.** Subject to **Section 5.09** and notwithstanding anything to the contrary set forth in this Agreement, for so long as Pacific Green is a Member, the Company shall not without Pacific Green's prior approval issue or sell any New Units to any Person if the effect of such sale or issuance would be to dilute the then-current value of Pacific Green's total Units to less than its Investment Value.

## ARTICLE X

## TRANSFER

**Section 10.01 General Restrictions on Transfer.**

(a)    Each Class B Member acknowledges and agrees that such Class B Member (or any Permitted Transferee of such Class B Member) shall not Transfer any Units except with the express written permission of the Manager and except as permitted pursuant to **Section 10.02** or in accordance with the procedures described in **Section 10.03** through **Section 10.04**, as applicable. No Transfer of Units to a Person not already a Member of the Company shall be deemed completed until the prospective Transferee is admitted as a Member of the Company in accordance with **Section 4.01(b)** hereof.

(b)    Notwithstanding any other provision of this Agreement (including **Section 10.02**), each Member agrees that it will not, directly or indirectly, Transfer any of its Units, and the Company agrees that it shall not issue any Units:

(i)    except as permitted under the Securities Act and other applicable federal or state securities or blue-sky laws, and then, with respect to a Transfer of Units, if requested by the Company, only upon delivery to the Company of an opinion of counsel in form and substance satisfactory to the Company to the effect that such Transfer may be effected without registration under the Securities Act;

(ii)    if such Transfer or issuance would cause the Company to be considered a "publicly traded partnership" under Section 7704(b) of the Code within the meaning of Treasury Regulation Section 1.7704-1(h)(1)(ii), including the look-through rule in Treasury Regulation Section 1.7704-1(h)(3);

(iii)    if such Transfer or issuance would affect the Company's existence or qualification as a limited liability company under the Delaware Act;

(iv)    if such Transfer or issuance would cause the Company to lose its status as a partnership for federal income tax purposes;

(v)    if such Transfer or issuance would cause the Company to be required to register as an investment company under the Investment Company Act of 1940, as amended; or

(vi)    if such Transfer or issuance would cause the assets of the Company to be deemed "Plan Assets" as defined under the Employee Retirement Income Security Act of 1974 or its accompanying regulations or result in any "prohibited transaction" thereunder involving the Company.

Page **32** of **54**

1611778.1 — 32280.0001

In any event, the Manager may refuse the Transfer to any Person if such Transfer would have a material adverse effect on the Company as a result of any regulatory or other restrictions imposed by any Governmental Authority.

(c)      Any Transfer or attempted Transfer of any Units in violation of this Agreement shall be null and void, no such Transfer shall be recorded on the Company's books and the purported Transferee in any such Transfer shall not be treated (and the purported Transferor shall continue be treated) as the owner of such Units for all purposes of this Agreement.

(d)      For the avoidance of doubt, any Transfer of Units permitted by **Section 10.02** or made in accordance with the procedures described in **Section 10.03** through **Section 10.04**, as applicable, and purporting to be a sale, transfer, assignment or other disposal of the entire Membership Interest represented by such Units, inclusive of all the rights and benefits applicable to such Membership Interest as described in the definition of the term **"Membership Interest"**, shall be deemed a sale, transfer, assignment or other disposal of such Membership Interest in its entirety as intended by the parties to such Transfer, and shall not be deemed a sale, transfer, assignment or other disposal of any less than all of the rights and benefits described in the definition of the term **"Membership Interest"**, unless otherwise explicitly agreed to by the parties to such Transfer.

**Section 10.02 Permitted Transfers.** The provisions of **Section 10.01(a)**, **Section 10.03** and **Section 10.04** (with respect to the Dragging Member only) shall not apply to any of the following Transfers:

(a)      Any Transfer by the Class A Member;

(b)      With respect to any Member, to (i) such Member's spouse, parent, siblings, descendants (including adoptive relationships and stepchildren) and the spouses of each such natural persons (collectively, **"Family Members"**), (ii) a trust under which the distribution of Units may be made only to such Member or any Family Member of such Member, (iii) a charitable remainder trust, the income from which will be paid to such Member during his life, (iv) a corporation, partnership or limited liability company, the stockholders, partners or members of which are only such Member or Family Members of such Member, or (v) by will or by the laws of intestate succession, to such Member's executors, administrators, testamentary trustees, legatees or beneficiaries; *provided*, that any Member who Transfers Units shall remain bound by the provisions of **Section 11.01**.

**Section 10.03 Right of First Refusal.**

(a)      (i)      Subject to the terms and conditions specified in **Section 5.09, Section 10.01, Section 10.02** and this **Section 10.03**, the Company, first, and each Member holding Class A Units or Class B Units (as applicable), second, shall have a right of first refusal if any other Member (the **"Offering Member"**) receives a bona fide offer that the Offering Member desires to accept to Transfer all or any portion of the Class A Units (the **"Offered Class A Units"**) or Class B Units (the **"Offered Class B Units"**) it owns (the Offered Class A Units and the Offered Class B Units, collectively, the **"Offered Units"**).

(ii)      As used herein, the term **"Applicable Offered Units"** shall mean (A) the Offered Class A Units with respect to those Members holding Class A Units (the **"Applicable Offered Class A Units"**) and (B) the Offered Class B Units with respect to those Members holding Class B Units (the **"Applicable Offered Class B Units"**). As used herein, the term **"Applicable ROFR Rightholders"** shall mean, in the case of a proposed Transfer of Class A Units, all Members other than the Offering Member holding Class A Units, and in the case of a proposed Transfer of Class B Units, all Members other than the Offering Member holding Class B Units.

(b)      Each time the Offering Member receives an offer for a Transfer of any of its Class A

Page **33** of **54**

Units or Class B Units (other than Transfers that (i) are permitted by **Section 10.02**, or (ii) are proposed to be made by a Dragging Member or required to be made by a Drag-along Member pursuant to **Section 10.04**), the Offering Member shall first make an offering of the Offered Units to the Company, *first*, and the Applicable ROFR Rightholders, *second*, all in accordance with the following provisions of this **Section 10.03**, prior to Transferring such Offered Units to the proposed purchaser.

(c)    (i)    The Offering Member shall, within five (5) Business Days of receipt of the Transfer offer, give written notice (the "**Offering Member Notice**") to the Company and the Applicable ROFR Rightholders stating that it has received a bona fide offer for a Transfer of its Class A Units or Class B Units and specifying:

(A)    the number of Offered Class A Units or Offered Class B Units to be Transferred by the Offering Member;

(B)    the proposed date, time and location of the closing of the Transfer, which shall not be less than sixty (60) days from the date of the Offering Member Notice;

(C)    the purchase price per Applicable Offered Unit (which shall be payable solely in cash) and the other material terms and conditions of the Transfer; and

(D)    the name of the Person who has offered to purchase such Offered Units.

(ii)    The Offering Member Notice shall constitute the Offering Member's offer to Transfer the Offered Units to the Company and the Applicable ROFR Rightholders, which offer shall be irrevocable until the end of the ROFR Rightholder Option Period described in **Section 10.03(d)(iv)**.

(iii)    By delivering the Offering Member Notice, the Offering Member represents and warrants to the Company and each Applicable ROFR Rightholder that:

(A)    the Offering Member has full right, title and interest in and to the Offered Units;

(B)    the Offering Member has all the necessary power and authority and has taken all necessary action to Transfer such Offered Units as contemplated by this **Section 10.03**; and

(C)    the Offered Units are free and clear of any and all liens other than those arising as a result of or under the terms of this Agreement.

(d)    (i)    Upon receipt of the Offering Member Notice, the Company and each Applicable ROFR Rightholder shall have the right to purchase the Applicable Offered Units in the following order of priority: *first*, the Company shall have the right to purchase all or any portion of the Offered Units in accordance with the procedures set forth in **Section 10.03(d)(iii)**, and *thereafter*, the Applicable ROFR Rightholders shall have the right to purchase the Applicable Offered Units, in accordance with the procedures set forth in **Section 10.03(d)(iv)**, to the extent the Company does not exercise its right in full. Notwithstanding the foregoing, the Company and the Applicable ROFR Rightholders may only exercise their right to purchase the Offered Units if, after giving effect to all elections made under this **Section 10.03(d)**, no less than all of the Offered Units will be purchased by the Company or the Applicable ROFR Rightholders.

(ii)    For the avoidance of doubt, in the event of a proposed Transfer of both Class A Units and Class B Units, the Offering Member may deliver a single Offering Member Notice to the Company and all Members holding any Class A Units or Class B Units. Upon their receipt of the Offering Member Notice: *first*, the Company shall have the right to elect to purchase all or any portion of the Offered Class A Units, the Offered Class B Units, or both; and *thereafter*, any Member holding only Class A Units shall have the right to purchase the Offered Class A Units; any Member holding

Page **34** of **54**

only Class B Units shall have the right to purchase the Offered Class B Units, and any Member holding both Class A Units and Class B Units shall have the right to elect to purchase both or either the Offered Class A Units or the Offered Class B Units without purchasing any Units of the other class or series; *provided*, in all cases, that the Company's and Applicable ROFR Rightholders' rights to purchase any Offered Class A Units or any Offered Class B Units will only be exercisable if, after giving effect to all elections made under this **Section 10.03(d)**, the Company or the Applicable ROFR Rightholders shall have elected to purchase no less than all the Offered Class A Units and all the Offered Class B Units.

(iii) The initial right of the Company to purchase any Offered Units shall be exercisable with the delivery of a written notice (the "**Company ROFR Exercise Notice**") by the Company to the Offering Member and the Applicable ROFR Rightholders within ten (10) Business Days of receipt of the Offering Member Notice (the "**Company Option Period**"), stating the number (including where such number is zero) and type of Offered Units the Company elects irrevocably to purchase on the terms and respective purchase prices set forth in the Offering Member Notice. The Company ROFR Exercise Notice shall be binding upon delivery and irrevocable by the Company.

(iv) If the Company shall have indicated an intent to purchase any less than all of the Offered Class A Units or all of Offered Class B Units, the Applicable ROFR Rightholders shall have the right to purchase the remaining Applicable Offered Units not selected by the Company. For a period of fifteen (15) Business Days following the receipt of a Company ROFR Exercise Notice in which the Company has elected to purchase less than all the Offered Units (such period, the "**ROFR Rightholder Option Period**"), each Applicable ROFR Rightholder shall have the right to elect irrevocably to purchase all or none of its Class A Pro Rata Portion of the remaining Applicable Offered Class A Units or all or none of its Class B Pro Rata Portion of the remaining Applicable Offered Class B Units by delivering a written notice to the Company and the Offering Member (a "**Member ROFR Exercise Notice**") specifying its desire to purchase its Class A Pro Rata Portion of the remaining Applicable Offered Class A Units or its Class B Pro Rata Portion of the remaining Applicable Offered Class B Units, on the terms and respective purchase prices set forth in the Offering Member Notice. In addition, each Applicable ROFR Rightholder shall include in its Member ROFR Exercise Notice the number of remaining Applicable Offered Units that it wishes to purchase if any other Applicable ROFR Rightholders do not exercise their rights to purchase their entire Applicable Pro Rata Portions of the remaining Applicable Offered Units. Any Member ROFR Exercise Notice shall be binding upon delivery and irrevocable by the Applicable ROFR Rightholder.

(v) The failure of the Company or any Applicable ROFR Rightholder to deliver a Company ROFR Exercise Notice or Member ROFR Exercise Notice, respectively, by the end of the Company Option Period or ROFR Rightholder Option Period, respectively, shall constitute a waiver of their respective rights of first refusal under this **Section 10.03** with respect to the Transfer of Offered Units, but shall not affect their respective rights with respect to any future Transfers.

(e) Upon the expiration of the ROFR Rightholder Option Period, the Applicable Offered Units not selected for purchase by the Company pursuant to **Section 10.03(d)(iii)** shall be allocated for purchase among the Applicable ROFR Rightholders as follows:

(i) First, to each Applicable ROFR Rightholder having elected to purchase its entire Applicable Pro Rata Portion of such Units, such Applicable ROFR Rightholder's Applicable Pro Rata Portion of such Units; and

(ii) Second, the balance, if any, not allocated under clause (i) above (and not purchased by the Company pursuant to **Section 10.03(d)(iii)**), shall be allocated to those Applicable ROFR Rightholders who set forth in their Member ROFR Exercise Notices a number of Applicable Offered Units that exceeded their respective Applicable Pro Rata Portions (the "**Purchasing Rightholders**"), in an amount, with respect to each such Purchasing Rightholder, that is equal to the lesser of:

Page **35** of **54**

(A)    the number of Applicable Offered Units that such Purchasing Rightholder elected to purchase in excess of its Applicable Pro Rata Portion; or

(B)    the product of (x) the number of Applicable Offered Units not allocated under clause (i) (and not purchased by the Company pursuant to **Section 10.03(d)(iii)**), multiplied by (y) a fraction, the numerator of which is the number of Applicable Offered Units that such Purchasing Rightholder was permitted to purchase pursuant to clause (i), and the denominator of which is the aggregate number of Applicable Offered Units that all Purchasing Rightholders were permitted to purchase pursuant to clause (i).

The process described in clause (ii) shall be repeated until no Offered Units remain or until such time as all Purchasing Rightholders have been permitted to purchase all Applicable Offered Units that they desire to purchase.

(f)    In the event that the Company or the Applicable ROFR Rightholders shall have, in the aggregate, exercised their respective rights to purchase all and not less than all of the Offered Units, then the Offering Member shall sell such Offered Units to the Company or the Applicable ROFR Rightholders, and the Company or the Applicable ROFR Rightholders, as the case may be, shall purchase such Offered Units, within sixty (60) days following the expiration of the ROFR Rightholder Option Period (which period may be extended for a reasonable time not to exceed ninety (90) days to the extent reasonably necessary to obtain required approvals or consents from any Governmental Authority). Each Member shall take all actions as may be reasonably necessary to consummate the sale contemplated by this **Section 10.03(f)**, including entering into agreements and delivering certificates and instruments and consents as may be deemed necessary or appropriate. At the closing of any sale and purchase pursuant to this **Section 10.03(f)**, the Offering Member shall deliver to the Company or the participating Applicable ROFR Rightholders certificates (if any) representing the Offered Units to be sold, free and clear of any liens or encumbrances (other than those contained in this Agreement), accompanied by evidence of transfer and all necessary transfer taxes paid and stamps affixed, if necessary, against receipt of the purchase price therefor from the Company or such Applicable ROFR Rightholders by certified or official bank check or by wire transfer of immediately available funds.

(g)    In the event that the Company or the Applicable ROFR Rightholders shall not have collectively elected to purchase all of the Offered Units, then the Offering Member may Transfer all of such Offered Units, at a price per Applicable Offered Unit not less than specified in the Offering Member Notice and on other terms and conditions which are not materially more favorable in the aggregate to the proposed purchaser than those specified in the Offering Member Notice, but only to the extent that such Transfer occurs within ninety (90) days after expiration of the ROFR Rightholder Option Period. Any Offered Units not Transferred within such ninety (90) day period will be subject to the provisions of this **Section 10.03** upon subsequent Transfer.

## Section 10.04 Drag-along Rights.

(a)    If one or more Members (together with their respective Permitted Transferees) holding no less than a majority of all the Class A Units (such Member or Members, the **"Dragging Member"**), proposes to consummate, in one transaction or a series of related transactions, a Change of Control (a **"Drag-along Sale"**), the Dragging Member shall have the right, after delivering the Drag-along Notice in accordance with **Section 10.04(c)** and subject to compliance with **Section 10.04(d)**, to require that each other Member (each, a **"Drag-along Member"**) participate in such sale in the manner set forth in **Section 10.04(b)**.

(b)    Subject to compliance with **Section 10.04(d)**:

(i)    If the Drag-along Sale is structured as a sale resulting in a majority of the Class

Page **36** of **54**

A Units of the Company on a Fully Diluted Basis being held by a Third Party Purchaser, then each Drag-along Member shall sell, with respect to the Units proposed by the Dragging Member to be included in the Drag-along Sale, the number of Units equal to the product obtained by multiplying (i) the number of applicable Units on a Fully Diluted Basis held by such Drag-along Member by (ii) a fraction (x) the numerator of which is equal to the number of applicable Units on a Fully Diluted Basis that the Dragging Member proposes to sell in the Drag-along Sale and (y) the denominator of which is equal to the number of applicable Units on a Fully Diluted Basis held by the Dragging Member at such time; and

(ii)     If the Drag-along Sale is structured as a sale of all or substantially all of the consolidated assets of the Company or as a merger, consolidation, recapitalization, or reorganization of the Company or other transaction requiring the consent or approval of the Members, then notwithstanding anything to the contrary in this Agreement (including **Section 4.06**), each Drag-along Member shall vote in favor of the transaction and otherwise consent to and raise no objection to such transaction, and shall take all actions to waive any dissenters', appraisal or other similar rights that it may have in connection with such transaction. The Distribution of the aggregate consideration of such transaction shall be made in accordance with **Section 13.03(c)**.

(c)     The Dragging Member shall exercise its rights pursuant to this **Section 10.04** by delivering a written notice (the **"Drag-along Notice"**) to the Company and each Drag-along Member no more than ten (10) Business Days after the execution and delivery by all of the parties thereto of the definitive agreement entered into with respect to the Drag-along Sale and, in any event, no later than twenty (20) Business Days prior to the closing date of such Drag-along Sale. The Drag-along Notice shall make reference to the Dragging Members' rights and obligations hereunder and shall describe in reasonable detail:

(i)     The name of the Person to which such Units are proposed to be sold;

(ii)     The proposed date, time and location of the closing of the sale;

(iii)     The number of each class or series of Units to be sold by the Dragging Member, the proposed amount of consideration for the Drag-along Sale and the other material terms and conditions of the Drag-along Sale, including a description of any non-cash consideration in sufficient detail to permit the valuation thereof and including, if available, the purchase price per Unit of each applicable class or series; and

(iv)     A copy of any form of agreement proposed to be executed in connection therewith.

(d)     The obligations of the Drag-along Members in respect of a Drag-along Sale under this **Section 10.04** are subject to the satisfaction of the following conditions:

(i)     The consideration to be received by each Drag-along Member shall be the same form and amount of consideration to be received by the Dragging Member per Unit of each applicable class or series (the Distribution of which shall be made in accordance with **Section 10.04(b)**) and the terms and conditions of such sale shall, except as otherwise provided in **Section 10.04(d)(iii)**, be the same as those upon which the Dragging Member sells its Units;

(ii)     If the Dragging Member or any Drag-along Member is given an option as to the form and amount of consideration to be received, the same option shall be given to all Drag-along Members; and

(iii)     Each Drag-along Member shall execute the applicable purchase agreement, if applicable, and make or provide the same representations, warranties, covenants, indemnities and agreements as the Dragging Member makes or provides in connection with the Drag-along Sale;

*provided*, that each Drag-along Member shall only be obligated to make individual representations and warranties with respect to its title to and ownership of the applicable Units, authorization, execution and delivery of relevant documents, enforceability of such documents against the Drag-along Member, and other matters relating to such Drag-along Member, but not with respect to any of the foregoing with respect to any other Members or their Units; *provided, further*, that all representations, warranties, covenants and indemnities shall be made by the Dragging Member and each Drag-along Member severally and not jointly and any indemnification obligation shall be pro rata based on the consideration received by the Dragging Member and each Drag-along Member, in each case in an amount not to exceed the aggregate proceeds received by the Dragging Member and each such Drag-along Member in connection with the Drag-along Sale.

(e)     Each Drag-along Member shall take all actions as may be reasonably necessary to consummate the Drag-along Sale, including entering into agreements and delivering certificates and instruments, in each case, consistent with the agreements being entered into and the certificates being delivered by the Dragging Member, but subject to **Section 10.04(d)(iii)**.

(f)     The fees and expenses of the Dragging Member incurred in connection with a Drag-along Sale and for the benefit of all Drag-along Members (it being understood that costs incurred by or on behalf of a Dragging Member for its sole benefit will not be considered to be for the benefit of all Drag-along Members), to the extent not paid or reimbursed by the Company or the Third Party Purchaser, shall be shared by the Dragging Member and all the Drag-along Members on a pro rata basis, based on the consideration received by each such Member; *provided*, that no Drag-along Member shall be obligated to make any out-of-pocket expenditure prior to the consummation of the Drag-along Sale.

(g)     The Dragging Member shall have ninety (90) days following the date of the Drag-along Notice in which to consummate the Drag-along Sale, on the terms set forth in the Drag-along Notice (which ninety (90) day period may be extended for a reasonable time not to exceed one-hundred and twenty (120) days to the extent reasonably necessary to obtain required approvals or consents from any Governmental Authority. If at the end of such period the Dragging Member has not completed the Drag-along Sale, the Dragging Member may not then exercise its rights under this **Section 10.04** without again fully complying with the provisions of this Section 10.04.

## 10.05  Tag-along Rights.

(a)     Subject to the terms and conditions specified in **Section 10.01**, **Section 10.02** and **Section 10.03**, if any Member (the "**Selling Member**") proposes to Transfer any of its Units to any Person (a "**Proposed Transferee**"), each other Member holding Units to be Transferred a (each, a "**Tag-along Member**") shall be permitted to participate in such sale (a "**Tag-along Sale**") on the terms and conditions set forth in this **Section 10.05**.

(b)     The provisions of this **Section 10.05** shall only apply to Transfers in which:

(i) The Company and Applicable ROFR Rightholders have not exercised their rights in full under **Section 10.03** to purchase all of the Offered Units; and

(ii) The Dragging Member has elected to not exercise its drag-along right under **Section 10.04**.

(c)     Prior to the consummation of any Transfer of Units qualifying under **Section 10.05(b)**, and after satisfying its obligations pursuant to **Section 10.03**, subject to **Section 5.09**, the Selling Member shall deliver to the Company and each other Member holding Units to be Transferred a written notice (a "**Sale Notice**") of the proposed Tag-along Sale as soon as practicable following the expiration of the ROFR Rightholder Option Period, and in no event later than five (5) Business Days thereafter. The Sale Notice shall make reference to the Tag-along Members' rights hereunder and shall

Page **38** of **54**

describe in reasonable detail:

(i)    The aggregate number of each series or class of the Units the Proposed Transferee has offered to purchase;

(ii)    The identity of the Proposed Transferee;

(iii)    The proposed date, time and location of the closing of the Tag-along Sale;

(iv)    The purchase price per applicable Unit (which shall be payable solely in cash) and the other material terms and conditions of the Transfer; and

(v)    A copy of any form of agreement proposed to be executed in connection therewith.

(d)    (i)    The Selling Member and each Tag-along Member timely electing to participate in the Tag-along Sale pursuant to **Section 10.05(d)(ii)** shall have the right to Transfer in the Tag-along Sale the number of Units equal to the product of (x) the aggregate number of Units that the Proposed Transferee proposes to buy as stated in the Sale Notice and (y) a fraction (A) the numerator of which is equal to the number of Units on a Fully Diluted Basis then held by the applicable Member, and (B) the denominator of which is equal to the number of Units on a Fully Diluted Basis then held by the Selling Member and all of the Tag-along Members timely electing to participate in the Tag-along Sale pursuant to **Section 10.05(d)(ii)** (the "**Tag-along Portion**").

(ii)    Each Tag-along Member shall exercise its right to participate in a Tag-along Sale by delivering to the Selling Member a written notice (a "**Tag-along Notice**") stating its election to do so and specifying the number of Units (up to its Common Tag-along Portion) to be Transferred by it no later than ten (10) Business Days after receipt of the Sale Notice (the "**Tag-along Period**").

(iii)    The offer of each Tag-along Member set forth in a Tag-along Notice shall be irrevocable, and, to the extent such offer is accepted, such Tag-along Member shall be bound and obligated to consummate the Transfer on the terms and conditions set forth in this **Section 10.05**.

(e)    (i)    If any Tag-along Member declines to exercise its right under **Section 10.05(d)(i)** or elects to exercise it with respect to less than its full Tag-Along Portion (the aggregate amount of Units resulting from all such unexercised Tag-Along Portions, the "**Remaining Portion**"), the Selling Member shall promptly deliver a written notice (a "**Remaining Portion Notice**") to those Tag-along Members who have elected to Transfer their Tag-along Portion in full (each, a "**Fully Participating Tag-along Member**"). The Selling Member, each Fully Participating Tag-along Member shall be entitled to Transfer, in addition to any applicable Units already being Transferred, a number of Units held by it equal to the product of (x) the Remaining Portion, and (y) a fraction (A) the numerator of which is equal to the number of Units then held by the applicable Member, and (B) the denominator of which is equal to the number of Units then held by the Selling Member and all Fully Participating Tag-along Members.

(ii)    Each Fully Participating Tag-along Member shall exercise its right to participate in the Transfer described in **Section 10.05(e)(i)** by delivering to the Selling Member a written notice (a "**Remaining Tag-along Notice**") stating its election to do so and specifying the number of Units (up to the amounts it may Transfer pursuant to Section 10.05(e)(i)), to be Transferred by it no later than five (5) Business Days after receipt of the Remaining Portion Notice.

(iii)    The offer of each Fully Participating Tag-along Member set forth in a Remaining Tag-along Notice shall be irrevocable, and, to the extent such offer is accepted, such Member shall be bound and obligated to consummate the Transfer on the terms and conditions set forth in this **Section 10.05**.

1611778.1 -- 32280.0001

(f)     Each Tag-along Member who does not deliver a Tag-along Notice in compliance with **Section 10.05(d)(ii)** shall be deemed to have waived all of such Tag-along Member's rights to participate in the Tag-along Sale with respect to the Units owned by such Tag-along Member, and the Selling Member shall (subject to the rights of any other participating Tag-along Member) thereafter be free to sell to the Proposed Transferee the Units identified in the Sale Notice at a per Unit price that is no greater than the applicable per Unit price set forth in the Sale Notice and on other terms and conditions which are not in the aggregate materially more favorable to the Selling Member than those set forth in the Sale Notice, without any further obligation to the non-accepting Tag-along Members.

(g)    (i)    Each Member participating in the Tag-along Sale shall receive the same consideration per Unit after deduction of such Member's proportionate share of the related expenses in accordance with **Section 10.05(i)** below.

(ii)    Each Tag-along Member shall make or provide the same representations, warranties, covenants, indemnities and agreements as the Selling Member makes or provides in connection with the Tag-along Sale; *provided*, that each Tag-along Member shall only be obligated to make individual representations and warranties with respect to its title to and ownership of the applicable Units, authorization, execution and delivery of relevant documents, enforceability of such documents against the Tag-along Member, and other matters relating to such Tag-along Member, but not with respect to any of the foregoing with respect to any other Members or their Units; *provided, further*, that all representations, warranties, covenants and indemnities shall be made by the Selling Member and each Tag-along Member severally and not jointly and any indemnification obligation shall be pro rata based on the consideration received by the Selling Member and each Tag-along Member, in each case in an amount not to exceed the aggregate proceeds received by the Selling Member and each such Tag-along Member in connection with the Tag-along Sale.

(h)     Each Tag-along Member shall take all actions as may be reasonably necessary to consummate the Tag-along Sale, including entering into agreements and delivering certificates and instruments, in each case, consistent with the agreements being entered into and the certificates being delivered by the Selling Member, but subject to **Section 10.05(g)(ii)**.

(i)    The fees and expenses of the Selling Member incurred in connection with a Tag-along Sale and for the benefit of all Tag-along Members (it being understood that costs incurred by or on behalf of a Selling Member for its sole benefit will not be considered to be for the benefit of all Tag-along Members), to the extent not paid or reimbursed by the Company or the Proposed Transferee, shall be shared by the Selling Member and all the participating Tag-along Members on a pro rata basis, based on the consideration received by each such Member; *provided*, that no Tag-along Member shall be obligated to make any out-of-pocket expenditure prior to the consummation of the Tag-along Sale.

(j)    If the Selling Member sells or otherwise Transfers to the Proposed Transferee any of its Units in breach of this **Section 10.05**, then each Tag-along Member shall have the right to sell to the Selling Member, and the Selling Member undertakes to purchase from each Tag-along Member, the number of Units of each applicable class or series that such Tag-along Member would have had the right to sell to the Proposed Transferee pursuant to this **Section 10.05**, for a per Unit amount and form of consideration and upon the terms and conditions on which the Proposed Transferee bought such Units from the Selling Member, but without indemnity being granted by any Tag-along Member to the Selling Member; *provided*, that nothing contained in this **Section 10.05(k)** shall preclude any Member from seeking alternative remedies against such Selling Member as a result of its breach of this **Section 10.05**. The Selling Member shall also reimburse each Tag-along Member for any and all reasonable and documented out-of-pocket fees and expenses, including reasonable legal fees and expenses, incurred pursuant to the exercise or the attempted exercise of the Tag-along Member's rights under this **Section 10.05(k)**.

Page **40** of **54**

## ARTICLE XI

### COVENANTS

**Section 11.01  Confidentiality.**

(a) Each Member acknowledges that during the term of this Agreement, he will have access to and become acquainted with trade secrets, proprietary information and confidential information belonging to the Company and its Affiliates that are not generally known to the public, including information concerning business plans, financial statements and other information provided pursuant to this Agreement, operating practices and methods, expansion plans, identity of acquisition targets, strategic plans, marketing plans, contracts, customer lists or other business documents which the Company treats as confidential, in any format whatsoever (including oral, written, electronic or any other form or medium) (collectively, "**Confidential Information**"). In addition, each Member acknowledges that: (i) the Company has invested, and continues to invest, substantial time, expense and specialized knowledge in developing its Confidential Information; (ii) the Confidential Information provides the Company with a competitive advantage over others in the marketplace; and (iii) the Company would be irreparably harmed if the Confidential Information were disclosed to competitors or made available to the public. Without limiting the applicability of any other agreement to which any Member is subject, no Member shall, directly or indirectly, disclose or use (other than solely for the purposes of such Member monitoring and analyzing his investment in the Company or performing his duties as a Manager, Officer, employee, consultant or other service provider of the Company) at any time, including use for personal, commercial or proprietary advantage or profit, either during his association or employment with the Company or thereafter, any Confidential Information of which such Member is or becomes aware. Each Member in possession of Confidential Information shall take all appropriate steps to safeguard such information and to protect it against disclosure, misuse, espionage, loss and theft.

(b) Nothing contained in **Section 11.01(a)** shall prevent any Member from disclosing Confidential Information: (i) upon the order of any court or administrative agency; (ii) upon the request or demand of any regulatory agency or authority having jurisdiction over such Member; (iii) to the extent compelled by legal process or required or requested pursuant to subpoena, interrogatories or other discovery requests; (iv) to the extent necessary in connection with the exercise of any remedy hereunder; (v) to other Members; (vi) to such Member's Representatives who, in the reasonable judgment of such Member, need to know such Confidential Information and agree to be bound by the provisions of this **Section 11.01** as if a Member; or (vii) to any potential Permitted Transferee in connection with a proposed Transfer of Units from such Member, as long as such Transferee agrees to be bound by the provisions of this **Section 11.01** as if a Member; *provided*, that in the case of clause (i), (ii) or (iii), such Member shall notify the Company and other Members of the proposed disclosure as far in advance of such disclosure as practicable (but in no event make any such disclosure before notifying the Company and other Members) and use reasonable efforts to ensure that any Confidential Information so disclosed is accorded confidential treatment satisfactory to the Company, when and if available.

(c) The restrictions of **Section 11.01(a)** shall not apply to Confidential Information that: (i) is or becomes generally available to the public other than as a result of a disclosure by a Member in violation of this Agreement; (ii) is or becomes available to a Member or any of its Representatives on a non-confidential basis prior to its disclosure to the receiving Member and any of its Representatives in compliance with this Agreement; (iii) is or has been independently developed or conceived by such Member without use of Confidential Information; or (iv) becomes available to the receiving Member or any of its Representatives on a non-confidential basis from a source other than the Company, any other Member or any of their respective Representatives; *provided*, that such source is not known by the recipient of the Confidential Information to be bound by a confidentiality agreement with the disclosing Member or any of its Representatives.

Page **41** of **54**

**Section 11.02 Other Business Activities.** Subject to Pacific Green's rights in connection with Participating Investments and the Company's rights in connection with Investment Opportunities, subject to **Section 5.09**, the parties hereto expressly acknowledge and agree that: (i) the Manager, the Members and their Affiliates are permitted to have, and may presently or in the future have, investments or other business relationships, ventures, agreements or arrangements with entities engaged in the business of the Company, other than through the Company and its Affiliates (an "**Other Business**"); (ii) the Manager, the Members and their Affiliates have or may develop a strategic relationship with businesses that are or may be competitive with the Company and its Affiliates; (iii) none of the Manager, the Members or their Affiliates will be prohibited by virtue of being the Manager or a Member from pursuing and engaging in any such activities; (iv) none of the Manager, the Members or their Affiliates will be obligated to inform the Company or any Member of any such opportunity, relationship or investment (a "**Company Opportunity**") or to present Company Opportunity, and the Company hereby renounces any interest in a Company Opportunity and any expectancy that a Company Opportunity will be offered to it; (v) nothing contained herein shall limit, prohibit or restrict the Manager, any Member or any of their Affiliates from serving on the board of directors or other governing body or committee of any Other Business; and (vi) the Members will not acquire, be provided with an option or opportunity to acquire, or be entitled to any interest or participation in any Other Business as a result of the participation therein of the Manager, any Member or any of their Affiliates. The parties hereto expressly authorize and consent to the involvement of the Manager, the Members or their Affiliates in any Other Business; *provided,* that any transactions between the Company and an Other Business will be on terms no less favorable to the Company than would be obtainable in a comparable arm's-length transaction. The parties hereto expressly waive, to the fullest extent permitted by Applicable Law, any rights to assert any claim that such involvement breaches any fiduciary or other duty or obligation owed to the Company or any Member or to assert that such involvement constitutes a conflict of interest by such Persons with respect to the Company, the Manager or any Member.

**Section 11.03 Disclosure of Manager's Business Practices.** The Manager, its owners, officers, directors and key personnel, as a recurring business practice, may (a) take paid or unpaid board of directors' positions with Portfolio Companies, or any of their Affiliates, and (b) acquire direct equity interests in Portfolio Companies or in the manager or general partner entities that run such Portfolio Companies, or any of their Affiliates, separate and apart from the ownership interest of the Company in such Portfolio Companies. The Members acknowledge such business practices of the Manager, its owners, officers, directors and key personnel, and waive any conflict of interest that such business practices may represent.

## ARTICLE XII

## ACCOUNTING; TAX MATTERS

**Section 12.01 Financial Statements.** The Company shall furnish to each Member the following reports:

(a)     As soon as available, and in any event within one hundred twenty (120) days after the end of each Fiscal Year, an unaudited balance sheet of the Company as at the end of each such Fiscal Year and an unaudited statement of income, cash flow and Members' equity for such Fiscal Year, in each case setting forth in comparative form the figures for the previous Fiscal Year, accompanied by the certification of independent certified public accountants of recognized regional standing selected by the Manager, certifying to the effect that, except as set forth therein, such financial statements have been prepared in accordance with GAAP, applied on a basis consistent with prior years, and fairly present in all material respects the financial condition of the Company as of the dates thereof and the results of its operations and changes in its cash flow and Members' equity for the periods covered thereby.

1611778.1 – 32280.0001

(b)     As soon as available, and in any event within forty-five (45) days after the end of each quarterly accounting period in each Fiscal Year (other than the last fiscal quarter of the Fiscal Year), an unaudited balance sheet of the Company as at the end of each such fiscal quarter and for the current Fiscal Year to date and an unaudited statement of income, cash flow and Members' equity for such fiscal quarter and for the current Fiscal Year to date, in each case setting forth in comparative form the figures for the corresponding periods of the previous fiscal quarter, all in reasonable detail and all prepared in accordance with GAAP, consistently applied (subject to normal year-end audit adjustments and the absence of notes thereto), and certified by the principal financial or accounting officer of the Company.

**Section 12.02 Inspection Rights.** Upon reasonable notice from a Member, the Company shall, and shall cause its Managers, Officers and employees to, afford such Member and its Representatives reasonable access during normal business hours to (i) the Company's properties, offices, plants and other facilities, and (ii) the corporate, financial and similar records, reports and documents of the Company, including all books and records, minutes of proceedings, internal management documents, reports of operations, reports of adverse developments, copies of any management letters and communications with Members or Managers, and to permit each Member and its Representatives to examine such documents and make copies thereof.

**Section 12.03 Tax Matters Member; Partnership Representative.**

(a)     The Members hereby appoint Alex Reyter as the "partnership representative" (the **"Partnership Representative"**) as provided in Code Section 6223(a) (as amended by the BBA).

(b)     The Partnership Representative is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by Taxing Authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith. The Partnership Representative shall have sole authority to act on behalf of the Company in any such examinations and any resulting judicial proceedings, and shall have sole discretion to determine whether the Company (either on its own behalf or on behalf of the Members) will contest or continue to contest any tax deficiencies assessed or proposed to be assessed by any Taxing Authority. The Company and its Members shall be bound by the actions taken by the Partnership Representative.

(c)     In the event of an audit of the Company that is subject to the partnership audit procedures enacted under Section 1101 of the BBA (the **"BBA Procedures"**), the Partnership Representative, in its sole discretion, shall have the right to make any and all elections and to take any actions that are available to be made or taken by the Partnership Representative or the Company under the BBA Procedures (including any election under Code Section 6226 as amended by the BBA). If an election under Code Section 6226(a) (as amended by the BBA) is made, the Company shall furnish to each Member for the year under audit a statement of the Member's share of any adjustment set forth in the notice of final partnership adjustment, and each Member shall take such adjustment into account as required under Code Section 6226(b) (as amended by the BBA). To the extent that the Partnership Representative does not make an election under Code Section 6221(b) or Code Section 6226 (each as amended by the BBA), the Company shall use commercially reasonable efforts to (i) make any modifications available under Code Section 6225(c)(3), (4), and (5), as amended by the BBA, and (ii) if requested by a Member, provide to such Member information allowing such Member to file an amended federal income tax return, as described in Code Section 6225(c)(2) as amended by the BBA, to the extent such amended return and payment of any related federal income taxes would reduce any taxes payable by the Company.

(d)     Each Member agrees that such Member shall not treat any Company item inconsistently on such Member's federal, state, foreign or other income tax return with the treatment of the item on the Company's return. Any deficiency for taxes imposed on any Member (including penalties, additions to tax or interest imposed with respect to such taxes and any tax deficiency

imposed pursuant to Code Section 6226 as amended by the BBA) will be paid by such Member and if required to be paid (and actually paid) by the Company, will be recoverable from such Member as provided in **Section 7.04(d)**.

(c)     The Partnership Representative may resign at the times and in the manner set forth in applicable Treasury Regulations or other administrative guidance. If Alex Reyter ceases to be the Partnership Representative for any reason, the holders of a majority of the Class A Units shall appoint a new Partnership Representative.

**Section 12.04  Tax Returns.**  At the expense of the Company, the Manager (or any Officer that it may designate) shall endeavor to cause the preparation and timely filing (including extensions) of all tax returns required to be filed by the Company pursuant to the Code as well as all other required tax returns in each jurisdiction in which the Company owns property or does business.  As soon as reasonably possible after the end of each Fiscal Year, the Manager or designated Officer will cause to be delivered to each Person who was a Member at any time during such Fiscal Year, IRS Schedule K-1 to Form 1065 and such other information with respect to the Company as may be necessary for the preparation of such Person's federal, state and local income tax returns for such Fiscal Year.

**Section 12.05  Company Funds.**  All funds of the Company shall be deposited in its name, or in such name as may be designated by the Manager, in such checking, savings or other accounts, or held in its name in the form of such other investments as shall be designated by the Manager.  The funds of the Company shall not be commingled with the funds of any other Person.  All withdrawals of such deposits or liquidations of such investments by the Company shall be made exclusively upon the signature or signatures of such Officer or Officers as the Manager may designate.

### ARTICLE XIII

### DISSOLUTION AND LIQUIDATION

**Section 13.01  Events of Dissolution.**  The Company shall be dissolved and its affairs wound up only upon the occurrence of any of the following events:

(a)     The determination of the Manager to dissolve the Company;

(b)     The sale, exchange, involuntary conversion, or other disposition or Transfer of all or substantially all the assets of the Company; or

(c)     The entry of a decree of judicial dissolution under § 18-802 of the Delaware Act.

**Section 13.02  Effective Date of Dissolution.**  Dissolution of the Company shall be effective on the day on which the event described in **Section 13.01** occurs, but the Company shall not terminate until the winding up of the Company has been completed, the assets of the Company have been distributed as provided in **Section 13.03** and the Certificate of Formation shall have been cancelled as provided in **Section 13.04**.

**Section 13.03  Liquidation.**  If the Company is dissolved pursuant to **Section 13.01**, the Company shall be liquidated and its business and affairs wound up in accordance with the Delaware Act and the following provisions:

(a)     The Manager shall act as liquidator to wind up the Company (the "**Liquidator**").  The Liquidator shall have full power and authority to sell, assign, and encumber any or all of the Company's assets and to wind up and liquidate the affairs of the Company in an orderly and business-like manner.

(b)     As promptly as possible after dissolution and again after final liquidation, the

Page **44** of **54**

Liquidator shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities and operations through the last day of the calendar month in which the dissolution occurs or the final liquidation is completed, as applicable.

(c)     The Liquidator shall liquidate the assets of the Company and Distribute the proceeds of such liquidation in the following order of priority, unless otherwise required by mandatory provisions of Applicable Law:

(i)     *First*, to the payment of all of the Company's debts and liabilities to its creditors (including Members, if applicable) and the expenses of liquidation (including sales commissions incident to any sales of assets of the Company);

(ii)     *Second*, to the establishment of and additions to reserves that are determined by the Manager in its sole discretion to be reasonably necessary for any contingent unforeseen liabilities or obligations of the Company; and

(iii)     *Third*, to the Members in the same manner as Distributions are made under **Section 7.02**.

(d)     Notwithstanding the provisions of **Section 13.03(c)** that require the liquidation of the assets of the Company, but subject to the order of priorities set forth in **Section 13.03(c)**, if upon dissolution of the Company the Liquidator determines that an immediate sale of part or all of the Company's assets would be impractical or could cause undue loss to the Members, the Liquidator may defer the liquidation of any assets except those necessary to satisfy Company liabilities and reserves, and may, in its absolute discretion, Distribute to the Members, in lieu of cash, as tenants in common and in accordance with the provisions of **Section 13.03(c)**, undivided interests in such Company assets as the Liquidator deems not suitable for liquidation. Any such Distribution in kind will be subject to such conditions relating to the disposition and management of such properties as the Liquidator deems reasonable and equitable and to any agreements governing the operating of such properties at such time. For purposes of any such Distribution, any property to be Distributed will be valued at its Fair Market Value.

**Section 13.04  Cancellation of Certificate.**  Upon completion of the Distribution of the assets of the Company as provided in **Section 13.03(c)** hereof, the Company shall be terminated and the Liquidator shall cause the cancellation of the Certificate of Formation in the State of Delaware and of all qualifications and registrations of the Company as a foreign limited liability company in jurisdictions other than the State of Delaware and shall take such other actions as may be necessary to terminate the Company.

**Section 13.05  Survival of Rights, Duties and Obligations.**  Dissolution, liquidation, winding up or termination of the Company for any reason shall not release any party from any Loss which at the time of such dissolution, liquidation, winding up or termination already had accrued to any other party or which thereafter may accrue in respect of any act or omission prior to such dissolution, liquidation, winding up or termination. For the avoidance of doubt, none of the foregoing shall replace, diminish or otherwise adversely affect any Member's right to indemnification pursuant to **Section 14.03**.

**Section 13.06  Recourse for Claims.**  Each Member shall look solely to the assets of the Company for all Distributions with respect to the Company, such Member's Capital Account, and such Member's share of Net Income, Net Loss and other items of income, gain, loss and deduction, and shall have no recourse therefor (upon dissolution or otherwise) against the Manager, the Liquidator or any other Member.

**ARTICLE XIV**

Page **45** of **54**

## EXCULPATION AND INDEMNIFICATION

### Section 14.01  Exculpation of Covered Persons.

(a)     As used herein, the term "**Covered Person**" shall mean (i) each Member, (ii) each officer, director, shareholder, partner, member, controlling Affiliate, employee, agent or representative of each Member, and each of their controlling Affiliates, and (iii) each Manager, Officer, employee, agent or representative of the Company.

(b)     No Covered Person shall be liable to the Company or any other Covered Person for any loss, damage or claim incurred by reason of any action taken or omitted to be taken by such Covered Person in good-faith reliance on the provisions of this Agreement, so long as such action or omission does not constitute fraud or willful misconduct by such Covered Person.

(c)     A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements (including financial statements and information, opinions, reports or statements as to the value or amount of the assets, liabilities, Net Income or Net Losses of the Company or any facts pertinent to the existence and amount of assets from which Distributions might properly be paid) of the following Persons or groups: (i) another Manager; (ii) one or more Officers or employees of the Company; (iii) any attorney, independent accountant, appraiser or other expert or professional employed or engaged by or on behalf of the Company; or (iv) any other Person selected in good faith by or on behalf of the Company, in each case as to matters that such relying Person reasonably believes to be within such other Person's professional or expert competence. The preceding sentence shall in no way limit any Person's right to rely on information to the extent provided in § 18-406 of the Delaware Act.

### Section 14.02  Liabilities and Duties of Covered Persons.

(a)     This Agreement is not intended to, and does not, create or impose any fiduciary duty on any Covered Person. Furthermore, each of the Members and the Company hereby waives any and all fiduciary duties that, absent such waiver, may be implied by Applicable Law, and in doing so, acknowledges and agrees that the duties and obligation of each Covered Person to each other and to the Company are only as expressly set forth in this Agreement. The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Covered Person.

(b)     Whenever in this Agreement a Covered Person is permitted or required to make a decision (including a decision that is in such Covered Person's "discretion" or under a grant of similar authority or latitude), the Covered Person shall be entitled to consider only such interests and factors as such Covered Person desires, including its own interests, and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person. Whenever in this Agreement a Covered Person is permitted or required to make a decision in such Covered Person's "good faith," the Covered Person shall act under such express standard and shall not be subject to any other or different standard imposed by this Agreement or any other Applicable Law.

### Section 14.03  Indemnification.

(a)     To the fullest extent permitted by the Delaware Act, as the same now exists or may hereafter be amended, substituted or replaced (but, in the case of any such amendment, substitution or replacement only to the extent that such amendment, substitution or replacement permits the Company to provide broader indemnification rights than the Delaware Act permitted the Company to provide prior to such amendment, substitution or replacement), the Company shall indemnify, hold harmless, defend, pay and reimburse any Covered Person against any and all losses, claims, damages, judgments, fines or liabilities, including reasonable legal fees or other expenses incurred in

investigating or defending against such losses, claims, damages, judgments, fines or liabilities, and any amounts expended in settlement of any claims (collectively, "**Losses**") to which such Covered Person may become subject by reason of:

(i)     Any act or omission or alleged act or omission performed or omitted to be performed on behalf of the Company or any Member in connection with the business of the Company; or

(ii)     The fact that such Covered Person is or was acting in connection with the business of the Company as a partner, member, stockholder, controlling Affiliate, manager, director, officer, employee or agent of the Company, any Member, or any of their respective controlling Affiliates, or that such Covered Person is or was serving at the request of the Company as a partner, member, manager, director, officer, employee or agent of any Person including the Company;

*provided*, that (x) such Covered Person acted in good faith and in a manner believed by such Covered Person to be in, or not opposed to, the best interests of the Company and, with respect to any criminal proceeding, had no reasonable cause to believe his conduct was unlawful, and (y) such Covered Person's conduct did not constitute fraud or willful misconduct, in either case as determined by a final, nonappealable order of a court of competent jurisdiction. In connection with the foregoing, the termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of *nolo contendere* or its equivalent, shall not, of itself, create a presumption that the Covered Person did not act in good faith or, with respect to any criminal proceeding, had reasonable cause to believe that such Covered Person's conduct was unlawful, or that the Covered Person's conduct constituted fraud or willful misconduct.

(b)     The Company shall promptly reimburse (or advance to the extent reasonably required) each Covered Person for reasonable legal or other expenses (as incurred) of such Covered Person in connection with investigating, preparing to defend or defending any claim, lawsuit or other proceeding relating to any Losses for which such Covered Person may be indemnified pursuant to this **Section 14.03**; *provided*, that if it is finally judicially determined that such Covered Person is not entitled to the indemnification provided by this **Section 14.03**, then such Covered Person shall promptly reimburse the Company for any reimbursed or advanced expenses.

(c)     The indemnification provided by this **Section 14.03** shall not be deemed exclusive of any other rights to indemnification to which those seeking indemnification may be entitled under any agreement or otherwise. The provisions of this **Section 14.03** shall continue to afford protection to each Covered Person regardless of whether such Covered Person remains in the position or capacity pursuant to which such Covered Person became entitled to indemnification under this **Section 14.03** and shall inure to the benefit of the executors, administrators, legatees and distributees of such Covered Person.

(d)     To the extent available on commercially reasonable terms, the Company may purchase, at its expense, insurance to cover Losses covered by the foregoing indemnification provisions and to otherwise cover Losses for any breach or alleged breach by any Covered Person of such Covered Person's duties in such amount and with such deductibles as the Manager may determine; *provided*, that the failure to obtain such insurance shall not affect the right to indemnification of any Covered Person under the indemnification provisions contained herein, including the right to be reimbursed or advanced expenses or otherwise indemnified for Losses hereunder. If any Covered Person recovers any amounts in respect of any Losses from any insurance coverage, then such Covered Person shall, to the extent that such recovery is duplicative, reimburse the Company for any amounts previously paid to such Covered Person by the Company in respect of such Losses.

(e)     Notwithstanding anything contained herein to the contrary, any indemnity by the Company relating to the matters covered in this **Section 14.03** shall be provided out of and to the extent of Company assets only, and no Member (unless such Member otherwise agrees in writing)

Page **47** of **54**

shall have personal liability on account thereof or shall be required to make additional Capital Contributions to help satisfy such indemnity by the Company.

(f)      If this **Section 14.03** or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Covered Person pursuant to this **Section 14.03** to the fullest extent permitted by any applicable portion of this **Section 14.03** that shall not have been invalidated and to the fullest extent permitted by Applicable Law.

(g)      The provisions of this **Section 14.03** shall be a contract between the Company, on the one hand, and each Covered Person who served in such capacity at any time while this **Section 14.03** is in effect, on the other hand, pursuant to which the Company and each such Covered Person intend to be legally bound.  No amendment, modification or repeal of this **Section 14.03** that adversely affects the rights of a Covered Person to indemnification for Losses incurred or relating to a state of facts existing prior to such amendment, modification or repeal shall apply in such a way as to eliminate or reduce such Covered Person's entitlement to indemnification for such Losses without the Covered Person's prior written consent.

**Section 14.04  Survival.**  The provisions of this **Article XIV** shall survive the dissolution, liquidation, winding up and termination of the Company.

## ARTICLE XV

### MISCELLANEOUS

**Section 15.01  Expenses.**  Except as otherwise expressly provided herein, all costs and expenses, including fees and disbursements of counsel, financial advisors and accountants, incurred in connection with the preparation and execution of this Agreement, or any amendment or waiver hereof, and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses.

**Section 15.02  Further Assurances.**  In connection with this Agreement and the transactions contemplated hereby, the Company and each Member hereby agrees, at the request of the Company or any other Member, to execute and deliver such additional documents, instruments, conveyances and assurances and to take such further actions as may be required to carry out the provisions hereof and give effect to the transactions contemplated hereby.

**Section 15.03  Notices.**  All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); or (c) on the date sent by e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient.   Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this **Section 15.03**):

If to the Company:                     Hills One, LLC
                                       16350 Ventura Blvd., Suite D275_
                                       Encino, CA 91436
                                       E-mail: areyter@gmail.com_
                                       Attention: Alex Reyter

If to a Member, to such Member's mailing address as set forth on the Member Schedule.

**Section 15.04 Headings.** The headings in this Agreement are inserted for convenience or reference only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Agreement or any provision of this Agreement.

**Section 15.05 Severability.** If any term or provision of this Agreement is held to be invalid, illegal or unenforceable under Applicable Law in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Subject to **Section 11.02(d)**, upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

**Section 15.06 Entire Agreement.** This Agreement, together with the Certificate of Formation, and all related Exhibits and Schedules, constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter.

**Section 15.07 Successors and Assigns.** Subject to the restrictions on Transfers set forth herein, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

**Section 15.08 No Third-Party Beneficiaries.** Except as provided in **Article XIV**, which shall be for the benefit of and enforceable by Covered Persons as described therein, this Agreement is for the sole benefit of the parties hereto (and their respective heirs, executors, administrators, successors and assigns) and nothing herein, express or implied, is intended to or shall confer upon any other Person, including any creditor of the Company, any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 15.09 Amendment.** No provision of this Agreement may be amended or modified except by an instrument in writing executed by the Manager. Any such written amendment or modification will be binding upon the Company and each Member; provided, that an amendment or modification that materially adversely affects the interests of any Member, shall require the consent of such Member.

**Section 15.10 Waiver.** No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. For the avoidance of doubt, nothing contained in this **Section 15.10** shall diminish any of the explicit and implicit waivers described in this Agreement, including in **Section 4.07(f)**, **Section 9.01(c)**, **Section 10.03(d)(v)**, **Section 10.04(b)(ii)**, and **Section 15.13** hereof.

**Section 15.11 Governing Law.** All issues and questions concerning the application, construction, validity, interpretation and enforcement of this Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Delaware.

**Section 15.12 Negotiated Agreement; Dispute Resolution.**

Page **49** of **54**

(a)     This Agreement has been negotiated at arm's length and between persons sophisticated and knowledgeable in the matters dealt with in this Agreement.  Each party has been represented by experienced and knowledgeable legal counsel.  Accordingly, any rule of law (including, without limitation, California Civil Code Section 1654) or legal decision that would require interpretation of any ambiguities in this Agreement against the party that has drafted it is not applicable and is waived.  The provisions of this Agreement shall be interpreted in a reasonable manner to affect the purpose of the parties and this Agreement.

(b)     In the event of a dispute, claim or controversy, arising out of or relating to this Agreement and/or a Member's investment in the Company or in an investment opportunity or to the rights, duties and obligations of the parties arising out of or relating to this Agreement (a "**Dispute**"), the complaining party shall deliver to the other a "**Dispute Notice**", which shall describe the Dispute with particularity.  Within thirty (30) days of receipt of any such Dispute Notice, the parties thereto acting through principals with authority to resolve the matter shall meet and confer in person without counsel unless the parties agree otherwise regarding the matters set forth in the Dispute Notice (a "**Preliminary Conference**"), and shall attempt to resolve all issues described therein.

(c)     To the extent the parties either are not able to meet or otherwise are not able to resolve the Dispute at a Preliminary Conference within the time stated (unless extended by mutual agreement), such Dispute shall be submitted to mediation to JAMS, or its successor, with such mediation to be held in the City of Los Angeles. The parties will cooperate with JAMS and with one another in selecting a mediator from the JAMS panel of neutrals sitting in Los Angeles and in scheduling the mediation proceedings. The parties agree that they will participate in the mediation in good faith and that they will share equally in its costs.  If the matter is not resolved through mediation, then it shall be submitted to JAMS for Judicial Reference as set forth below.

(d)     The parties agree to waive his, her or its right to jury trial and agree, pursuant to California Code of Civil Procedure ("**CCP**") Section 638(a), to the appointment of a JAMS referee to hear, determine and resolve the Dispute. The parties will cooperate with JAMS and with one another in selecting a referee from the JAMS panel of neutrals sitting in Los Angeles. If the parties are unable to agree upon a referee within 30 days after the ending of Mediation referenced above, each party shall submit to the Los Angeles Superior Court up to three nominees for appointment as referee and the court shall make the appointment from the nominees in accordance with CCP § 640. Likewise, if no nominations are received from any of the parties, the court shall make the appointment pursuant to CCP § 640. The parties shall pay in advance the estimated reasonable fees and costs of the reference, as may be specified in advance by the referee. The parties shall initially share equally, by paying their proportionate amount of the estimated fees and costs of the reference. The hearing shall be held in the City of Los Angeles, at a place to be agreed by the parties, or if they do not agree, as determined by the referee.  The hearing shall be conducted and the Dispute shall be determined in accordance with the substantive laws of the State of California and the procedural laws of the State of California, as determined by the referee.

(e)     **BY AGREEING TO THIS PROVISION, EACH PARTY IS WAIVING ALL RIGHT(S) TO A TRIAL BY A JUDGE OR BY A JURY.**

**Section 15.13  Equitable Remedies.**  Each party hereto acknowledges that a breach or threatened breach by such party of any of its obligations under this Agreement would give rise to irreparable harm to the other parties, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by such party of any such obligations, each of the other parties hereto shall, in addition to any and all other rights and remedies that may be available to them in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

1611778.1 -- 32280.0001

**Section 15.14 Attorneys' Fees.** In the event that any party hereto institutes any legal suit, action or proceeding, including arbitration, against another party in respect of a matter arising out of or relating to this Agreement, the prevailing party in the suit, action or proceeding shall be entitled to receive, in addition to all other damages to which it may be entitled, the costs incurred by such party in conducting the suit, action or proceeding, including reasonable attorneys' fees and expenses and court costs.

**Section 15.15 Remedies Cumulative.** The rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise, except to the extent expressly provided in **Section 14.02** to the contrary.

**Section 15.16 Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of Electronic Transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

**Section 15.17 Attorney-In-Fact.** To the extent not inconsistent with the terms of this Agreement, each Member by this Agreement irrevocably constitutes and appoints the Manager his true and lawful attorney-in-fact, with full power and authority, in his name, place and stead, to make, execute, consent to, swear to, seal, acknowledge, record and file: (a) any certificate or other instruments which may be required to be filed by the Company or the Member under the Delaware Act or Applicable Law; (b) any and all amendments or modifications of the instruments described in subsection (a) immediately above; (c) all certificates and other instruments which may be required to effect the dissolution and termination of the Company pursuant to the provisions of this Agreement; (d) any deed, promissory note, deed to secure debt, bill of sale and other instruments necessary or appropriate in connection with the sale, leasing, development, operation or financing of the Company's property or any part thereof; and (e) all such other instruments and agreements as such attorney-in-fact may deem necessary or desirable in order to carry out the provisions of this Agreement in accordance with its terms. Each Member by this Agreement acknowledges and agrees that the power of attorney by this Agreement given is a power coupled with an interest and is irrevocable.

**Section 15.18 Counsel.** This Agreement was prepared by Greenberg & Bass, LLP (**"Counsel"**) as legal counsel for the Company. Counsel may also be counsel to a Member or to one or more of its Affiliates. The Manager shall be authorized to execute on behalf of the Company any consent to the representation of the Company that Counsel may request pursuant to the California Rules of Professional Conduct or similar rules in any other jurisdiction (the **"Rules"**). Since this Agreement sets forth the parties' rights and obligations, there is an inherent potential for conflicts of interest among the parties. If any dispute or controversy arises between or among any Member (or any of its Affiliates), the Manager (or any of its Affiliates) or the Company, the Members hereby agree that Counsel may represent any or all of such Member (or any of its Affiliates), the Manager (or any of its Affiliates) or the Company therein to the extent permitted by the Rules and each Member hereby consents to such representation and waives any conflict of interest arising from or related to such representation.

**[ACKNOWLEDGEMENTS AND SIGNATURES APPEAR ON THE FOLLOWING PAGES]**

## ARTICLE XVI

## ACKNOWLEDGMENT

**Section 16.1  Acknowledgements.**  BY ITS INITIALS BELOW, EACH MEMBER ACKNOWLEDGES AND AGREES THAT: (A) IT HAS CAREFULLY READ AND FULLY UNDERSTANDS THE PROVISIONS OF THIS AGREEMENT AND IS FREELY AND VOLUNTARILY ENTERING INTO THIS AGREEMENT; (B) IT HAS BEEN ADVISED THAT ITS INTEREST IN THE AGREEMENT MAY CONFLICT WITH THOSE OF THE COMPANY OR THE OTHER MEMBERS; (C) IT HAS BEEN ADVISED THAT THIS AGREEMENT IS LIKELY TO HAVE LEGAL, FINANCIAL AND TAX CONSEQUENCES; (D) IT HAS BEEN ADVISED TO SEEK INDEPENDENT LEGAL, ACCOUNTING, TAX AND OTHER PROFESSIONAL ADVICE REGARDING THIS AGREEMENT AND ALL MATTERS RELATED THERETO, INCLUDING ITS LEGAL, FINANCIAL AND TAX CONSEQUENCES; (E) IT HAS EITHER SOUGHT SUCH PROFESSIONAL ADVICE OR CHOSEN FREELY AND VOLUNTARILY NOT TO DO SO; (F) IT SHALL NOT DENY OR ATTEMPT TO DENY THE VALIDITY OF THIS AGREEMENT ON THE GROUNDS THAT IT ENTERED INTO THIS AGREEMENT UNDER DURESS, COMPULSION OR THREAT OF ANY KIND OR WITHOUT KNOWLEDGE OF ITS TERMS OR ON ANY OTHER GROUNDS; AND (G) THIS AGREEMENT IS THE PRODUCT OF ARM'S LENGTH NEGOTIATIONS BETWEEN THE PARTIES, IS BEING ENTERED INTO IN GOOD FAITH AND IS FAIR JUST AND REASONABLE.

Members'
Initials:

*[SIGNATURES APPEAR ON THE FOLLOWING PAGE]*

1611778.1 -- 32280.0001

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**The Company**

HILLS ONE, LLC,
a Delaware limited liability company

By: Hills Group, LLC
  a Delaware limited liability company

Its: Manager

  By:
  Name: Alex Reyter
  Its: Manager

**The Members**

HILLS GROUP, LLC,
a California limited liability company

By:
Name: Alex Reyter
Its: Manager

PACIFIC GREEN, LLC,
a Delaware limited liability company

By: Pacific Green Management, LLC,
  a Delaware limited liability company

Its: Manager

  By:
  Name: Jacob Stein
  Its: Manager

BIG TREE HOLDINGS, LLC,
a Delaware limited liability company

By:
Name: Jacob Stein
Its: Manager

1611778.1 - 32280.0001

## SCHEDULE A

### MEMBERS SCHEDULE

| Member Name and Address | Class A Units | Class B Units | Capital Contribution | Percentage Interest |
|---|---|---|---|---|
| Hills Group LLC | 11,000 | none | $1,000,000 in cash<br><br>and<br><br>100% of its ownership interests in Skyline Brands, LLC and NatureRx | 90.91% |
| Pacific Green, LLC | none | 550 | $500,000 in cash | 4.545% |
| Big Tree Holdings, LLC | None | 550 | $500,000 in cash | 4.545% |
| **Total:** | 11,000 | 1,100 | | 100% |

1611778.1 — 32280.0001